


$ __150.00__ DEPOSITED

AUG 14 2020

SECURE COSTS
Cuyahoga County Clerk of Courts
Per _____ Deputy

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **CHANTELLE GLASS** | |
| *Plaintiff,* | Case No. CV 19-917942 |
| v. | |
| **IDRIS-FARID CLARK** (individually), | Judge Timothy McCormick |
| **ROBERT MARSH** (individually), | |
| **CUYAHOGA COUNTY**, | |
| **ARMOND BUDISH** (individually), | |
| **EARL LEIKEN** (individually), | |
| **GEORGE TAYLOR** (individually), | |
| **CLIFFORD PINKNEY** (individually), | |
| **KENNETH MILLS** (individually), | |
| **ERIC IVEY**, (individually), | |
| **JAZMYNE JACKSON** (individually), | |
| **BARBARA BAILEY**, (individually), | |
| **FEBEN YESHAK** (individually), | |
| **ANTONIO SETTLES** (individually), | |
| **RUSSELL BELLE** (individually), | |
| and | |
| **DIANE LESSMANN, R.N.** (individually). | |
| *Defendants.* | |

FILED
2020 AUG 14 P 3: 02
CLERK OF COURTS
CUYAHOGA COUNTY

## PLAINTIFF'S AMENDED AND SUPPLEMENTAL COMPLAINT
### WITH JURY DEMAND[1]

---

[1] Plaintiff incorporates by reference her July 9, 2019 manual filing of the discs containing video footage from a stationary surveillance camera (Ex. 1) and a body-worn camera (Ex. 2) depicting the attack that Ms. Glass endured and some of her suffering afterward. Cuyahoga County withheld these videos from Ms. Glass until she filed an action for writ of mandamus with the Supreme Court of Ohio to obtain these public records.

## NATURE OF ACTION

1.      This is a civil-rights action brought to redress an act of torture perpetrated by two

corrections officers who—as numerous colleagues looked on—restrained, punched, and pepper

sprayed Chantelle Glass for asking to make a phone call, and to hold Cuyahoga County and its

leadership responsible for adopting customs, policies, patterns, or practices leading to the

brutalization of incarcerated citizens, including Ms. Glass.

2.      Cuyahoga County leadership failed to properly train employees, coddled corrections

officers who perpetrated sadistic violent acts against the people in their custody, and mismanaged

the jail system through chronic understaffing and overcrowding while pushing to add more

detainees. The unprecedented humanitarian crisis at the Cuyahoga County Corrections

Center—which has caused so much harm through the unconstitutional mistreatment of those in

custody—was an entirely foreseeable and avoidable disaster. But from the top down, those with

power deliberately abused it—mistreating inmates and employees alike—and for that they must

account.

3.      In the fall of 2018, the United States Marshals Service conducted a review of the facility.

Released in November 2018, the Marshals Report was a scathing rebuke of the generally

inhumane conditions at the jail from food to hygiene to medical care and especially to the use of

excessive force as a punitive measure.

4.      The Inspector General for Defendant Cuyahoga County, participated in the facility

review with the federal team, continued investigating after the Marshals Report, and—in early

2019—issued its own report saying it "strongly concurs with the U.S. Marshals findings." The

County's Inspector General reported that its "investigation revealed a fundamental failure of

leadership, management[,] and oversight" and that "[t]o the extent that CCCC has written

policies, the CCCC management and leadership has failed to adequately disseminate those policies or train staff."

5. The Defendant County's Inspector General identified numerous "systemic failings" and concluded that "County leadership failed to adequately supervise, manage, and operate the CCCC." The Defendant County's Inspector General was particularly critical of county executive Defendant Armond Budish's decision to hire Defendant Kenneth Mills as director of regional corrections when he "had no previous jail management experience" and critical of the fact that Mills "was allowed at times to circumvent the formal chain of command and the oversight" of the then-sheriff, Defendant Clifford Pinkney. The Defendant County's Inspector General also found that there was "a culture of perceived retaliation that impeded the open and honest discussion" of the jail's failings.

6. Ms. Glass was injured because of the judgment or discretion that Cuyahoga County officials exercised to punish a pre-trial detainee for asking for a phone call. Her injuries were then compounded by the failure of Cuyahoga County officials to employ rudimentary decontamination protocols or provide adequate medical care to a hypertensive, asthmatic woman.

7. Those at every level of County government share responsibility for the torture that Ms. Glass endured. From the county executive (who refused to heed warnings about mismanagement of the jail) to the line corrections staff (who stood by and did nothing as they watched the torture unfold), there is plenty of blame to go around.

PARTIES

8. Plaintiff Chantelle Glass is an African-American woman who resides in Cleveland, Ohio.

9. Defendant Idris-Farid Clark worked as a corrections officer with the Cuyahoga County Corrections Center. At all times relevant, he was in uniform and acting under color of state law.

10.     Defendant Robert Marsh worked as a corrections officer with the Cuyahoga County Corrections Center. At all times relevant, he was in uniform and acting under color of state law.

11.     Defendant Cuyahoga County is an Ohio political subdivision responsible for the Cuyahoga County Corrections Center ("the county jail" or "the jail").

12.     Defendant Armond Budish is the Cuyahoga County Executive. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

13.     Defendant Earl Leiken was the County Executive's chief of staff. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

14.     Defendant George Taylor is interim director of Cuyahoga County's jails. He previously served as Director of Public Safety and Justice Services for Cuyahoga County and as Chief Deputy in the Cuyahoga County Sheriff's Department. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

15.     Defendant Clifford Pinkney was the Cuyahoga County Sheriff, until he retired in August 2019. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

16.     Defendant Kenneth Mills was Cuyahoga County's director of regional corrections, until he resigned in November 2018 as he was about to be fired. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

17.     Defendant Eric Ivey was the jail's warden from 2017 until February 2019, when he was demoted to associate warden over an alleged nepotism violation. He resigned in the fall of 2019 after pleading guilty to falsification and obstruction of justice related to the death of an inmate at the jail. At all times relevant, he was responsible for the jail's operation and acting under color of state law.

18.     Defendant Barbara Bailey is a corrections officer with the Cuyahoga County Corrections Center and is the sister of Defendant Marsh. At all times relevant, she was in uniform and acting under color of state law.

19.     Defendant Feben Yeshak is a corrections officer with the Cuyahoga County Corrections Center. At all times relevant, she was in uniform and acting under color of state law.

20.     Defendant Jazmyne Jackson is a corrections officer with the Cuyahoga County Corrections Center. At all times relevant, she was in uniform and acting under color of state law.

21.     Defendant Russell Belle is a corrections officer with the Cuyahoga County Corrections Center. At all times relevant, he was in uniform and acting under color of state law.

22.     Defendant Antonio Settles is a corrections officer with the Cuyahoga County Corrections Center. At all times relevant, he was in uniform and acting under color of state law.

23.     Defendant Diane Lessmann, R.N. worked for Cuyahoga County as a nurse at the jail. At all times relevant, she was acting under color of state law.

### JURISDICTION AND VENUE

24.     This Court has jurisdiction because the suit concerns state-law violations by Defendants and the amount in controversy exceeds $15,000.

25.     The suit concerns civil liability for acts that occurred in this county.

26.     Venue is proper here because the events at issue took place in this county.

### FACTUAL BACKGROUND

**For years, Cuyahoga County has been operating a violent and abusive jail, failing to ensure the facility is adequate and safe and that corrections personnel are trained to respect the constitutional rights of those in custody.**

27.     For years, Defendants Budish, Leiken, Taylor, Mills, and Ivey (the "policymaking Defendants") worked to regionalize the County's jail system—urging local communities

throughout the County to incarcerate prisoners at a County facility and pay the County for this privilege.

28.     In his February 9, 2015 press release announcing Defendant Mills's appointment as the director of regional corrections, Defendant Budish represented that Mills would "oversee both our County Jail and collaborations among regional jails." The press release continued:

> As Regional Director of Corrections, Mills will oversee emerging collaborations and potential consolidations with jails county-wide. He will also direct the operations of the Sheriff's Department County Jail after a long-term transition with the current, part-time County Jail Wardens. The Regional Director of Corrections position will become a self-sustaining position, with its salary offset over time by the revenue generated from jail regionalization. As Regional Director of Corrections, Mills will also ensure compliance with departmental policy and standards and assist with developing and managing the budget, among other responsibilities.

29.     Defendant Pinkney publicly endorsed Defendant Budish's selection of Defendant Mills for this important and complex position, saying "Ken Mills has been a capable leader and effective public servant during his time here in Cuyahoga County." Defendant Pinkney described Defendant Mills as having "the right background and experience to successfully manage the County Jail and usher in a new age of collaboration in county-wide corrections." Per the press release referred to above, Defendant Pinkney was to "supervise Mills in the Sheriff's Department."

30.     These policymaking Defendants crammed more people into the jail facilities despite terrible overcrowding and a lack of adequate facilities, staff, training, medical care, and other resources. Due to this effort, many people's civil rights were violated through punitive violence, inadequate medical care, and generally unhygienic and depraved conditions. Plaintiff Chantelle Glass was among the many victims of this terrible, but avoidable, nightmare.

31.     The county jail has a maximum capacity of 1,765 detainees. For years, the jail violated

state standards as to its total population. From 2012–18, the jail was overcrowded by hundreds of

inmates every day. And that overcrowding reached peak frenzy under Defendant Mills's tenure.

In 2012, the jail population was 2,005 people on average. By 2018, it was 2,357.

32.     Simultaneously as Defendant Mills (with the support and approval of County

administration) was driving up the inmate population, he was driving down the staff numbers. In

2015, 33 officers separated from their positions. In 2016, that number rose to 42. It rose again in

2017 to 57. And in 2018, 72 corrections officers left their positions. By the time Mills resigned in

late 2018, the total corrections officers employed at the downtown jail was the lowest number for

staffing at that location in the preceding three years. Yet, Mills had no comprehensive staffing

plan to address the slew of vacancies.

33.     The understaffing that Mills and his team created led to call-offs by corrections staff

reaching massive levels: as many as 40% of corrections officers would be absent from work in a

week. The OPBA, which represents the corrections officers, attributes the high level of call-offs to

the staff's dislike of mandatory hold-overs and the belief that management unfairly denies their

grievances and complaints. Before Defendant Mills's tenure, overtime was voluntary and red-

zoning was a rarity. But, after Defendant Budish appointed Defendant Mills, that changed. He

removed the off-day volunteer list to reduce overtime. Faced with understaffing and high call-

offs, the policymaking Defendants allowed Defendant Mills to refuse to fully staff or pay the costs

of overtime and instead opt to entrench these dangerous practices by frequent "red-zoning"

(where inmates are locked in their cells for 23 or more hours a day—essentially solitary-

confinement for all those in custody).

34.     The deliberate overcrowding and understaffing resulted in chronic red-zoning, with one

corrections officer responsible for up to four housing pods. Extended confinement in cramped

quarters can increase tensions and lead to aggressive behaviors, psychological breakdowns, and physical illness. Red-zoning leads to higher levels of stress and disruptions for inmates and leads to high turnover, low morale, and increased absenteeism for staff.

35.     After Defendant Budish appointed Defendant Mills, medical care suffered in the facility. Inmates with health conditions were frequently not seen and inmates' grievances about lack of medical treatment were regularly ignored or dismissed. Mills moved the medical screenings out of the intake area, making it harder for medical staff to determine who needs what care.

36.     The jail staff, under Defendant Mills's leadership, used food as punishment, providing "sweat meat," bologna sandwiches, rotten carrots, and spoiled milk—even ordering food past its expiration date to save money. During Mills's tenure, the average cost per meal declined from $.83 to $.64. During that same time frame, the State of Ohio spent $1.58 per meal per prisoner.

37.     Failing to provide minimally adequate nutrition was another indignity Cuyahoga County's detainees faced in custody. Other indignities included being denied access to toilet paper and living in filthy, squalid conditions surrounded by mold, bugs, stains, and water leaks.

38.     Under Defendants Mills and Ivey, there was significant and widespread belief among corrections officers that jail management retaliated against employees who report malfeasance, misconduct, or mistakes, labeling those employees as disgruntled. And the corrections officers retaliated against inmates who complained. The policymaking Defendants did not remedy this criminal mismanagement of the jail system.

39.     The policymaking Defendants failed to institute adequate policies to prevent or redress inhumane jail conditions.

40.     With the knowledge, support, and acquiescence of the other policymaking Defendants, one of the specific ways that Defendant Mills implemented policies designed to violate the civil rights of those in custody was by intentionally reducing the supervision of corporals by sergeants.

Defendant Mills gave corporals—like Defendant Clark—more authority to run their areas of the facilities and advised the sergeants they did not have to respond to any emergency unless they were at the scene. This resulted in diminished oversight and accountability for the violence and brutality perpetrated at the jail, including the brutality that Ms. Glass suffered on July 16, 2018. Other conduct—such as the systematic failure to preserve public-record surveillance and body-worn-camera footage—also contributed to the ongoing humanitarian crisis at the jail, making it more difficult for those brutalized to seek or obtain justice.

41.      As senior administrators, the policymaking Defendants intentionally or recklessly failed to ensure that there were sufficient safeguards in place to protect those in custody from foreseeable violence, and intentionally or recklessly failed to ensure that corrections employees who used excessive force were disciplined accordingly (up to and including removal). They also recklessly or intentionally permitted the creation of a culture that viewed inmates as sub-human. And they recklessly or intentionally allowed for the deletion of countless hours of public-record videos in the jail documenting what transpired there. In doing these things, these administrators created, tolerated, and encouraged a custom, policy, pattern, and practice of unjustified brutality against those in custody in violation of their constitutional rights. The policymaking Defendants were the moving force in creating conditions in which use of excessive force prevails.

42.      At all relevant times, Defendants Pinkney, Mills, and Ivey were responsible for reviewing use-of-force incident reports to ensure compliance with written jail policies and to ensure that the behavior of corrections staff was not devolving into lawless depravity.

43.      In running a facility where punitive, unjustified violence was accepted and reinforced, the policymaking Defendants bear significant responsibility for the torture that Ms. Glass endured at the jail as described below.

### Police arrest Ms. Glass on an outstanding traffic warrant and book her into the county jail.

44.     On July 16, 2018, Cleveland police responded to an incident at Ms. Glass's mother's home, where Ms. Glass's sister had engaged in self-harm. While there, police apparently ran a warrant check and discovered a traffic warrant for Ms. Glass. Police arrested her and booked her into the county jail.

45.     After being booked, Ms. Glass requested a phone call to alert her immediate family to her situation or to find a lawyer.

46.     Various corrections officers refused to allow Ms. Glass to make a call.

47.     A corrections officer, Defendant Feben Yeshak, threatened to lock Ms. Glass in a chair for "getting smart" with her.

48.     Another corrections officer, Defendant Jazmyne Jackson, told Ms. Glass: "you don't get a phone call because she [Yeshak] told me that you got a smart-ass mouth and you don't need a phone call."

49.     Ms. Glass continued to demand a phone call.

50.     When Ms. Glass persisted in her request after being placed in a holding cell, corrections officers threatened that if she did not stop, they would tie her down and "mace" her.

51.     When Ms. Glass did not stop asking for her phone call, corrections officer Defendant Jazmyne Jackson became angry and either she or Defendant Yeshak summoned their supervisor (the corporal on duty), Defendant Idris-Farid Clark.

52.     On information and belief, Defendant Jackson and/or Defendant Yeshak instigated the attack on Ms. Glass described below by summoning Defendant Clark.

53.     Defendant Clark and corrections officer Defendant Robert Marsh responded at approximately 8:20 p.m. While Defendant Marsh retrieved a restraint chair, Defendant Clark

shook up his can of pepper spray and put it into a front pocket on this tactical vest. He was

already wearing gloves to protect his own skin from the pepper foam he was preparing to spray

on Ms. Glass's face.

54.     The following photo is a still image from the surveillance camera showing Defendant

Clark shaking his can of pepper spray before Ms. Glass was brought to the chair to be restrained:



**Ms. Glass cooperates as Defendants Marsh and Clark confine her to a
restraint chair—for requesting a phone call.**

55.     Defendants Marsh and Clark walked Ms. Glass, who was handcuffed behind her back,

out of her holding cell and toward the restraint chair, which was positioned in the corner of an

open area in the center of the pod.

56.     The following photo is a still image from the surveillance camera showing Ms. Glass being led to the restraint chair by Defendant Marsh with Defendant Clark following behind as two other corrections officers (believed to be Defendants Belle and Settles) looked on:



57.     Ms. Glass, wearing a white tea-length dress, walked to and sat down in the restraint chair as instructed.

58.     There is no legitimate reason to strap a compliant inmate into a restraint chair.

59.     The following photo is a still image from the surveillance camera showing Ms. Glass sitting down in the restraint chair as instructed:



60.     Defendant Marsh secured the restraint chair's waist strap across Ms. Glass's midsection.

61.     The following photo is a still image from the surveillance camera showing Defendant

Marsh securing the waist strap across Ms. Glass's midsection as she calmly sat in the restraint

chair:



62.     Ms. Glass complied with the officers and did not resist being strapped into the restraint chair.

63.     After securing the waist strap, Defendant Marsh grabbed Ms. Glass's handcuffs behind her back and yanked them upwards, stretching her arms unnaturally and causing her pain. He then aggressively pushed his elbow into the back of her neck, and then grabbed her neck hard with his left hand, forcing her head down into her lap as he unlocked the handcuffs. There was

no reason to be rough or aggressive with Ms. Glass, who was sitting still in the chair to which she was strapped. Ms. Glass remained compliant despite this manhandling.

64.    These photos are still images from the surveillance camera showing Defendant Marsh yanking Ms. Glass's arms, holding her head down, and removing the handcuffs from her wrists—as Clark, Belle, and Settles do nothing to stop him from hurting her:



65.    Once Defendant Marsh removed her handcuffs, Ms. Glass remained compliant and allowed Defendant Marsh to strap her left wrist to the restraint chair. She remained compliant while he strapped her left shoulder to the restraint chair.

66.    Ms. Glass remained compliant while Defendant Marsh strapped her right shoulder to the restraint chair. She remained complaint while he strapped her right wrist to the restraint chair.

**Once Ms. Glass's waist, wrists, and shoulders are strapped securely in the restraint chair, Defendant Clark pulls out and shakes his pepper spray.**

67.     After Defendant Marsh strapped Ms. Glass's waist, wrists, and shoulders to the restraint chair, Defendant Clark took out of his tactical vest the pepper spray he had shaken before Ms. Glass was led to the chair.

68.     The following is a still image from the surveillance camera showing Defendant Clark removing his can of pepper spray from his tactical vest after Defendant Marsh had strapped Ms. Glass's waist, wrists, and shoulders to the restraint chair and while Defendant Marsh was further tightening the straps as Ms. Glass sat calmly:



69.     While Defendant Marsh cinched the restraint chair's straps behind her, Defendant Clark

stood in front of Ms. Glass again shaking his pepper spray.

70.     The following is a still image from the surveillance camera showing Defendant Clark

again shaking his pepper spray as Defendant Marsh cinches the restraint chair's straps:



71.     With his strap-fiddling complete, Defendant Marsh circled to Ms. Glass's left, and

Defendant Clark moved from in front of Ms. Glass to her right (still shaking his pepper-spray

can).

**Ms. Glass flinches as Defendant Marsh reaches between her legs; he punches her in the face and Defendant Clark empties the can of pepper spray into her face.**

72.     Another corrections officer—Defendant Belle—stepped up behind the restraint chair and tilted it backward. None of the corrections officers explained to Ms. Glass why they were tilting the chair backwards.

73.     As Defendant Belle tilted back the restraint chair to which Ms. Glass was strapped, Defendant Marsh reached between Ms. Glass's knees and she recoiled, reflexively drawing her legs together in fear.

74.     The following photo is a still image from the surveillance video showing Defendant Marsh reaching his hand between Ms. Glass's knees:



75.     Defendant Marsh briefly stepped back. Aside from her instinctive response to a strange man reaching between her legs, Ms. Glass didn't further move her legs or resist or harm Defendant Marsh or the other corrections officers in the room (all of whom were larger than her).

And Ms. Glass—strapped into the restraint chair—could not reach Defendant Marsh even if she wanted to.

76.     Despite being safe and out of harm's way, Defendant Marsh stepped towards Ms. Glass and struck her in the head.

77.     These are still images from the surveillance cameras showing Defendant Marsh hitting Ms. Glass in the head while she is strapped in the restraint chair:





78.     Before Defendant Marsh hit Ms. Glass, she did not try to resist and was complying with Defendants' commands (other than still requesting a phone call). Her reflexive response of quickly drawing her legs together was not an effort to attack any corrections officer. Pulling her knees together as Defendant Marsh reached between her legs was a reasonable, understandable, and instinctual response for Ms. Glass. She was tied down in a restraint chair and being tilted backward with a strange man reaching between her legs. No reasonable corrections officer would have perceived her movement as aggressive or resisting. Reasonable corrections officers would have stepped back from the tied-down woman if they felt threatened, and would have tried to deescalate the situation before trying to harm her.

79.     Once Defendant Marsh punched Ms. Glass in the head, she flailed to protect herself, kicking at him with her legs to stop his attack. Rather than step back and place themselves entirely outside of Ms. Glass's limited range, Defendant Clark leapt in to deploy the pepper spray

that he had been readying since before they strapped her into the chair (just as Defendant Jackson had threatened).

80.  Defendant Clark pepper sprayed Ms. Glass's face from less than six inches away for six seconds.

81.  The following are still images from the surveillance video showing Defendant Clark pepper spraying Ms. Glass while she was strapped in the restraint chair:







82.    Ms. Glass attempted to turn her head away from the pepper spray, but Defendant Clark

continued to torture Ms. Glass with pepper spray, grabbing her by the hair to prevent her from

turning her head to avoid the direct line of spray to her eyes.

83.     These are still images from the surveillance camera showing Defendant Clark grabbing Ms. Glass's hair and yanking her head to prevent her from turning her head to avoid the direct line of spray to her eyes:







84.     Defendant Belle held Ms. Glass still while Defendant Clark tortured her with the pepper

spray. Defendant Belle could have easily moved her out of harm's way, but chose instead to hold

her in the line of fire.

85.     Defendants Jackson, Yeshak, and Bailey stood in the pod doorway, watching these events

unfold, as shown in these still images:

 

 

86.     Defendants Jackson, Yeshak, and Bailey—like Defendants Settles and Belle—failed to intervene physically or verbally to stop the violence against Ms. Glass.

87.     When Defendant Clark deployed his pepper spray, Ms. Glass posed no danger to anyone.

88.     After deploying the pepper spray, Defendants Marsh and Clark secured the restraint chair's lower straps around Ms. Glass's ankles while Defendant Bailey tilted Ms. Glass back in the restraint chair.

89.     Here is a still image from the surveillance camera of Defendants Marsh and Clark securing Ms. Glass's ankles to the restraint chair held by Defendant Bailey (Defendant Marsh's sister):



90.     As her ankles were strapped to the chair, Ms. Glass struggled to breathe and her chest visibly heaved. Her face was saturated with burning pepper foam.

91.     Defendant Clark then wheeled Ms. Glass out of 4F pod in the restraint chair.

92.     Here is a still image from the surveillance camera showing Defendant Clark wheeling Ms. Glass from the pod with pepper spray all over her face as other corrections officers looked on, unconcerned:



93.     Only after Defendant Clark pepper sprayed Ms. Glass did he turn on his body-worn camera.

**After the attack concludes, Defendants leave Ms. Glass covered in pepper spray and deny her prompt and adequate medical care.**

94.     After the attack concluded, Ms. Glass was in excruciating pain and gasping for breath. She cried out in anguish, alerting the corrections officers she was having trouble breathing because she had asthma. She also suffers from hypertension.

95.     Each time Ms. Glass said that she couldn't breathe, one or more corrections officers, indifferent to her suffering, responded by saying, "If you talkin' you can breathe" or words to that effect. Ms. Glass was ignored and ridiculed by corrections staff.

96.     The corrections officers were in no hurry to employ decontamination protocols or to ensure that Ms. Glass had a medical assessment (which was urgent because of her asthma).

97.     Despite her reported breathing condition, Defendant Clark's body-worn camera shows him slowly wheeling Ms. Glass into the elevator and transporting her from the fourth floor to the sixth floor.

98.     The following photo is a still image from Defendant Clark's body-worn camera showing corrections officer Christopher Perdue[2] and Corporal Jason Jozwiak[3] in the elevator with Defendant Clark and Ms. Glass:

---

[2] Christopher Perdue is a member of the Special Response Team ("SRT"; referred to by inmates as the "Men in Black." SRT's reputation for violence and abuse is notorious within the jail and was noted in the United States Marshals Report referenced below. Perdue is currently as defendant in a civil case filed by Tyrone Hipps, Jr. Perdue was caught on camera choking Mr. Hipps and dragging him through a pod while Mr. Hipps was trying to pray.

[3] Jason Jozwiak is a corporal with the jail. He is currently a defendant in a civil case filed by Joshua Castleberry. As detailed below, Jozwiak was criminally charged for denying Castleberry access to medical care after an SRT member, John Wilson, knocked out two of Castleberry's teeth, jammed a third up into his nasal cavity, and pepper-sprayed him.



99.    Once they arrived on the sixth floor, Defendant Clark slowly wheeled Ms. Glass into a

utility closet with a hose that corrections staff call the "slop room." SRT officer Frederick

Barthany stood in the doorway watching.

100.   Here is a still image from Defendant Clark's body-worn camera showing him wheeling

Ms. Glass into the slop room:



101.   Corrections officers unduly delayed beginning decontamination procedures to remove the

pepper-spray residue from Ms. Glass. This delay was intended to prolong her agony. And it had

its intended effect.

102.     Once in the slop room, Defendant Clark stood around for 30 seconds doing nothing as Ms. Glass continued to suffer, screaming in agony and begging for help.

103.     From the moment that Defendant Clark wheeled Ms. Glass into the utility closet, the "O.C. Administrative Warning" sheet ("the sheet") was on the slop room door and plainly visible.

104.     The following are still images from Defendant Clark's body-worn camera showing SRT Officer Frederick Barthany standing in and leaning on the closet doorway before eventually reaching for "the sheet" on the closet door while Defendant Clark putzes around and Ms. Glass writhes in agony:



105.    Over 30 seconds after Defendant Clark wheeled Ms. Glass into the closet, Barthany (as

pictured above) took a copy of "the sheet" off the door—which had been hanging there the

whole time—and asked Defendant Clark if he wanted Barthany to read it. Clark agreed. As

Barthany read "the sheet" (as described below), other corrections officers stood watching in

amusement from the hallway.

106.    These photos are still images from Defendant Clark's body-worn camera showing

Barthany preparing to read "the sheet" to Ms. Glass:



107.    For approximately one minute and 15 seconds, Barthany and Ms. Glass had the following

exchange as Barthany read "the sheet" to Ms. Glass and she did her best to respond:

| | |
|---|---|
| Barthany: | Listen up. |
| Glass: | Okay! |
| Barthany: | You have been contaminated with OC a natural product derived from cayenne peppers. |
| Glass: | Ahhh! |
| Barthany: | I am going to treat you to reduce the discomfort you are feeling as long as you cooperate. |
| Glass: | Okay, I will! |
| Barthany: | Listen. OC is non-toxic and the effects will dissipate in a short time. |
| Glass: | Okay! |

| | |
|---|---|
| Barthany: | The effects of OC may however mask or cover other medical conditions… |
| Glass: | I got asthma! |
| Barthany: | Hold on. |
| Glass: | I cannot breathe! |
| Barthany: | You gotta stop interrupting me. Or it's gonna take longer. Including overdose… |
| Glass: | Okay. |
| Barthany: | Listen. Or toxic levels of drugs like cocaine, amphetamines… |
| Glass: | Okay. |
| Barthany: | …barbiturates… |
| Glass: | [sobbing] |
| Barthany: | …PCP, opiates, heroin… |
| Glass: | Aaaaah! |
| Barthany: | …or alcohol. |
| Glass: | Aaaaah! |
| Barthany: | I am going to ask you five questions for your own safety. Not answering my questions withholding… |
| Glass: | Yes! Yes! Yes! |
| Barthany: | …information or giving false or misleading answers… |
| Glass: | Please, sir! |
| Barthany: | …could delay medical treatment and may severely jeopardize your health and safety. |
| Glass: | Okay! |
| Barthany: | Okay. Are you currently under the influence of cocaine, |
| Glass: | No! |
| Barthany: | …amphetamines… |
| Glass: | No! No! No! |

Page 31 of 130

| | |
|---|---|
| Barthany: | …barbiturates—listen— barbiturates, PCP, opiates, |
| Glass: | No! No! |
| Barthany: | …heroin, or alcohol? Have you taken cocaine… |
| Glass: | No! |
| Barthany: | …amphetamines, barbiturates, PCP, opiates, heroin, or alcohol… |
| Glass: | No! [sobbing] |
| Barthany: | …in the last eight hours? |
| Glass: | No! |
| Barthany: | Do you normally take any illegal drugs… |
| Glass: | No! No! |
| Barthany: | …or prescription drugs? |
| Glass: | No! [screaming] |
| Barthany: | Do you have heart problems… |
| Glass: | No! [screaming] |
| Barthany: | …lung problems, diabetes… |
| Glass: | No! [sobbing] |
| Barthany: | …high blood pressure, or any other… |
| Glass: | No! [screaming] |
| Barthany: | …serious medical condition? Do you have allergies? |
| Glass: | No! Please! [begging] |
| Barthany: | Alright. |

108.    The following are still images from Defendant Clark's body-worn camera showing various employees of the Defendant County (some appearing to enjoy themselves) observing Ms. Glass's agony from the closet doorway, as Barthany belabored the recitation of "the sheet" and both supervisory and line corrections officers loitered in the hallway (taking no steps to prompt timely or effective decontamination of Ms. Glass):





109.    The image above shows Corporal Jason Jozwiak watching Barthany as Ms. Glass screams in pain.

110.    There was no reason that Defendant Clark or the other corrections officers could not have read Ms. Glass "the sheet" during transport from the pod, up the elevator, and down the hall to the closet. Any officer authorized to deploy pepper spray should have "the sheet" readily accessible on his or her person or memorized to be able to avoid any undue delay in beginning decontamination procedures.

111.    After Barthany finished reading "the sheet," and approximately two minutes after wheeling her into the closet, Defendant Clark finally began the "decontamination" (although what he did was not effective in decontaminating Ms. Glass of the pepper-spray residue left behind after he attacked her)

112.    Defendant Clark spent more time spraying Ms. Glass in the face with his pepper spray than he spent rinsing off the pepper-spray residue.

113.    Defendant Clark sloshed hose water on top and to the left of Ms. Glass's head three times for less than two seconds each time. This did not remove the pepper-spray residue.

114.    Defendant Clark's failure to effectively decontaminate Ms. Glass was intended as a punitive measure to prolong her suffering. And it had its intended effect.

115.    Here are still images from Defendant Clark's body-worn camera showing each of the three brief hose splashes that constituted the entirety of Defendant Clark's effort to decontaminate Ms. Glass of the pepper-spray residue:



116.    Between splashes, Perdue stood in the doorway, observed Ms. Glass in agony, and smiled at Barthany.

117.    Here is a still image from Defendant Clark's body-worn camera showing Perdue smiling at his fellow SRT officer Barthany as Defendant Clark sprays Ms. Glass:



118.    During none of the three splashes did Defendant Clark even try to ensure the water was actually removing the pepper-foam residue. Defendant Clark predominantly directed the hose spray at the top and left of Ms. Glass's head and didn't remove the residue from where he had sprayed her directly in the face.

119.    The haphazard, half-hearted manner in which Defendant Clark splashed hose water on Ms. Glass is inconsistent with standard or appropriate protocols for decontaminating the victim of a pepper-spray attack.

120.    Failing to properly decontaminate Ms. Glass by effectively removing the pepper-spray residue was designed to extend the torture and perpetuate her suffering.

121.    After the "decontamination," the orange-red pepper-spray residue was clearly visible on Ms. Glass's skin and clothing.

122.    Water alone will not remove pepper-spray residue.

123.    Defendant Clark used no cleaning agent to remove the pepper-spray residue. This failure was intentional and designed to prolong Ms. Glass's agony, which it did.

124.    The following photo is a still image from Defendant Clark's body-worn camera showing Ms. Glass in evident agony—still with visible pepper-spray residue —after Defendant Clark discontinued all of his supposed efforts to "decontaminate" her:



125.    Throughout her stay in the jail, Defendants denied Ms. Glass soap or any other cleaning agent that would have removed the pepper-spray residue.

126.    The water that Defendant Clark sloshed on Ms. Glass did not remove the pepper-spray residue, but it did have the expected effect on her white dress (which was now not only hiked up around her hips but also damp and clinging to her body). Her legs shook and splayed as she writhed in agony.

127.    After thrice spritzing Ms. Glass with water, Defendant Clark wheeled her down the hall to the infirmary.

128.    The following is a still image from Defendant Clark's body-worn camera showing Ms. Glass with visible pepper-spray residue on her skin and clothing as Defendant Clark wheeled her from the closet to the infirmary:



129.    Neither Defendant Clark nor any other corrections officer attempted to cover Ms. Glass's body while wheeling her down the hall and into the co-ed infirmary where numerous male corrections officers and males in custody stared at her as Defendant Clark pushed her into the room tilted back in the restraint chair in a soaked and clinging white garment hiked up to her hips.

130.    The following is a still image from Defendant Clark's body-worn camera showing numerous men ogling Ms. Glass as Defendant Clark wheeled her into the infirmary:



**Nurse Diane Lessmann treats Ms. Glass with contempt and winks at and laughs with corrections officers as Ms. Glass begs for help.**

131.    Defendant Clark wheeled Ms. Glass into the medical area at approximately 8:35 p.m.

132.    Having access to medical personnel did not improve matters given the medical staff's participation in the corrections officers' deliberate indifference to and apparent enjoyment of Ms. Glass's agony.

133.    Once in the medical area, Ms. Glass continued to beg for water and for her face to be wiped.

134.    Even the jail medical staff, specifically Defendant Diane M. Lessmann, R.N., responded with deliberate indifference to Ms. Glass's evident agony.

135.   Like the corrections officers, Defendant Lessmann mocked Ms. Glass's cries about her struggles to breathe, repeatedly echoing their refrain about her being able to breathe: "You're breathin' or you wouldn't be screamin'."

136.   Defendant Lessmann behaved in a cruel and indifferent manner toward Ms. Glass, failing to provide any appreciable medical care.

137.   Defendant Lessmann did not ask Ms. Glass for her name.

138.   Defendant Lessmann did not attempt to comfort or reassure Ms. Glass.

139.   Defendant Lessmann did not explain what Ms. Glass was experiencing or describe what steps would be taken to abate her pain.

140.   Defendant Lessmann did not even identify herself as a nurse.

141.   As Ms. Glass shook and writhed in pain, Defendant Lessmann told her to sit still.

142.    The following are still images from Defendant Clark's body-worn camera showing SRT

officer Perdue and Defendant Lessmann seemingly unmoved by Ms. Glass's evident distress:







143.    Defendant Lessmann ignored Ms. Glass's pleas for water.

144.    While Lessmann went through the motions of performing supposed medical "care," numerous corrections officers sat staring at the scene, doing nothing to ensure Ms. Glass was being properly attended to.

145.    Defendant Lessmann did nothing to extinguish Ms. Glass's agony beyond half-heartedly dabbing both of her eyes with one side of a single gauze pad (thus assuring that the residue removed from one eye was transferred to the other via the pad). Lessmann waited approximately four minutes after Ms. Glass arrived in the infirmary to do so.

146.    Defendant Lessmann did not flush Ms. Glass's eyes with water to ensure that they were properly decontaminated.

147.    Ms. Glass remained unable to open her eyes, so besides the pain of being pepper sprayed, she was also enduring the disorientation and fear of being unable to see where she was or what was happening to her.

148.    Ms. Glass remained in agony and feared for her life, begging not to be killed: "I swear to God I'm about to die here. Please don't kill me."

149.    Defendant Lessmann squinched her eyes in mockery when Ms. Glass begged them not to kill her.

150.    The following is a still image from Defendant Clark's body-worn camera showing Defendant Lessmann's reaction to Ms. Glass's pleas that they not kill her:



151.    Defendant Lessmann did not confirm that Ms. Glass had been properly decontaminated from the pepper foam. The pepper foam was still visible on Ms. Glass while she was under Defendant Lessmann's "care," and any reasonable healthcare provider would have observed the residue and addressed it. But Defendant Lessmann did not confirm that corrections staff had properly decontaminated Ms. Glass. And Defendant Lessmann made no effort to properly decontaminate Ms. Glass or abate her agony, such as by ensuring her contaminated clothing was removed.

152.     Ms. Glass's blood pressure was dangerously high in the medical dispensary. But Defendant Lessmann allowed corrections staff to remove Ms. Glass from the infirmary despite her need for continuous medical monitoring for both her asthma and hypertension.

153.     Ms. Glass remained in evident agony and was still visibly covered in pepper-spray residue, but Defendant Lessmann nevertheless failed to provide appropriate care and instead appeared to celebrate Ms. Glass's pain with the corrections officers. As Ms. Glass continued to scream in pain, Defendant Lessmann winked at Defendant Clark saying, "She's done."

154.     The following photo is a still image from Defendant Clark's body-worn camera showing Lessmann winking at Ms. Glass's torturer, Defendant Clark:



155.     Only after pronouncing that Ms. Glass was "done" did Defendant Lessmann ask Defendant Clark for Ms. Glass's SO# or name, presumably to complete the required paperwork to document the "care" that Lessmann administered.

156.    In total, Ms. Glass spent approximately six minutes in the medical area.

157.    The "care" that Defendant Lessmann provided was so woefully inadequate as to amount
to no treatment at all.

158.    As Perdue wheeled Ms. Glass out of the medical area, Lessmann joined in with the
assembled corrections officers laughing at Ms. Glass and joking about taking her out the same
way she came in so she would only "leave a trail that way" (referring to the water and pepper-
spray residue dripping from her body that had not been removed from Ms. Glass despite
"decontamination" and "medical care").

159.    The following is a still image from Defendant Clark's body-worn camera showing Perdue
wheeling Ms. Glass out of the infirmary while Lessmann laughs with the corrections officers
about Ms. Glass:



160.    The following is a still image from Defendant Clark's body-worn camera showing other employees of the Defendant County laughing at Ms. Glass as Perdue wheels her from the infirmary with pepper-spray residue still visible on her clothing and body, and with her damp white dress still clinging to her body and hiked up around her hips:





161.    Failing to appropriately decontaminate Ms. Glass caused her additional pain and suffering

and resulted in the pepper spray migrating from her face and décolletage to other parts of her body

including her vagina. The burning agony she endured was brutal and constant.

### After the useless stop in the medical unit, Ms. Glass is put in an isolation cell still covered in pepper-spray residue. Lessmann falsifies Ms. Glass's medical records.

162.    From the medical unit, Perdue wheeled Ms. Glass back to the elevator. She continued to

express that she could not breathe. Corrections officers responded uncaringly. "Yes, you can."

163.    She asked for more water to be poured on her face. Corrections officers ignored her.

164.    The following are still images from Defendant Clark's body-worn camera showing Perdue and other corrections officers waiting for the elevator as Ms. Glass cries out in pain (with visible pepper-spray residue on her clothing and skin):

 

165.    Corrections officers transported Ms. Glass back to the fourth floor, still taking no steps to cover her exposed body or to protect her modesty.

166.    Here is a still image from Defendant Clark's body-worn camera showing Ms. Glass being wheeled into the elevator by Perdue:



167.    Ms. Glass remained unable to open her eyes. As she was wheeled down the hallway, an officer announced that she was "about to go sit in the wait room." The officers, including Defendant Clark, Perdue, and others, then placed her alone in an isolation cell.

168.    Here is a still image from Defendant Clark's body-worn camera showing Ms. Glass alone in an isolation cell:



169.    The officers left Ms. Glass alone in the restraint chair in an isolation cell, still covered in pepper-spray residue. They did not remove her from the restraint chair until approximately 10:50 p.m.

170.    Ms. Glass spent over two hours alone in the isolation room, strapped into a restraint chair and covered in pepper-spray residue—all for having requested a phone call.

171.    When Ms. Glass called out saying she had to use the bathroom, a corrections officer responded that she had to wait. But she was unable to wait, which forced her to urinate on herself, further compounding her degradation and humiliation.

172.    Defendant Lessmann did not examine Ms. Glass while she was in the wait room.

173.    Ms. Glass was in the wait room at 9:35 p.m.

174.    Despite not having examined Ms. Glass while she was in the wait room, Defendant Lessmann recorded false information in Ms. Glass's medical chart, indicating that she took Ms.

Glass's blood pressure and that it was normal at 9:35 p.m. Ms. Glass's abnormally high blood pressure readings at 9:02 p.m. (172/123) and 11:06 p.m. (166/111) make it wildly implausible, if not impossible, that Ms. Glass's blood pressure was 119/74 at 9:35 p.m. And even if it weren't medically unlikely, Lessmann could not have checked Ms. Glass's blood pressure remotely.

### Defendant Clark leaves Ms. Glass alone in the restraint chair for hours, admits that he tortured her "because [she] talk[s] too much" and "should not have gotten smart," and returns her to her cell still covered in pepper-spray residue.

175.    Defendant Clark decided how long Ms. Glass would sit in the wait room tied to the chair. He left her there for nearly three hours.

176.    When Defendant Clark returned to finally release Ms. Glass from the restraint chair at 10:50 p.m., he admitted that he had no legitimate reason to deploy his pepper spray.

177.    Ms. Glass asked Defendant Clark: "Why did you mace me?" Defendant Clark responded: "Because you talk too much."

178.    Ms. Glass said that she hadn't done anything wrong. Defendant Clark responded: "You should not have gotten smart."

179.    Getting "smart" is not a reason to strap a human being into a restraint chair.

180.    Getting "smart" is not a reason to pepper spray a human being who is strapped to a restraint chair.

181.    Getting "smart," that is, speaking one's mind to government officials, is constitutionally protected conduct.

182.    When Defendant Clark removed Ms. Glass from the restraint chair, he directed her to walk back to her original cell, but she could not see because her eyes were still impaired due to the failure to effectively remove the pepper-spray residue.  He did not permit her to shower or change her clothing despite visible pepper foam on her skin and clothes.

### Other jail staff did not allow Ms. Glass to shower or change her clothing until releasing her two days later.

183.    While locked in the cell for the next two days, Ms. Glass repeatedly begged corrections staff for a shower because she was still burning from the pepper spray and had been forced to urinate on herself while in the isolation cell.

184.    For her entire 48-hour stay in the jail, corrections staff denied Ms. Glass's request to shower.

185.    For that entire stay, Ms. Glass remained in the same clothing contaminated with pepper spray.

186.    Ms. Glass was released on July 18, 2018 after New Jersey officials confirmed that they did not want her extradited on the old warrant.

187.    Ms. Glass continued to experience burning sensations all over her body for the next two weeks.

188.    Defendant Pinkney charged Ms. Glass with jail rule violations including "major disruptive conduct" and "assault" for the incident in which Defendants Marsh and Clark tied her down and maced her. She was punished with disciplinary isolation and denied mail, commissary, visits, phone calls, and exercise privileges in addition to being refused the right to shower or change clothes.

### What Ms. Glass endured is consistent with how the County and its leaders choose to operate the jail.

189.    The manner in which Defendants Marsh and Clark perpetrated the vicious attack on Ms. Glass suggests such violence is a standard occurrence in this facility.

190.    The manner in which the other corrections staff witnessed the attack and failed to promptly and effectively decontaminate Ms. Glass—and the ho-hum way in which the staff captured in the video reacted to such sadistic violence and brutal agony—demonstrates the toxic

culture in the jail. Cuyahoga County wantonly, willfully, recklessly, maliciously, and in bad faith cultivates, perpetuates, and encourages a culture of punitive abuse including customs, policies, patterns, and practices of using excessive force, failing to provide medical care to victims of corrections-officer attacks, and generally failing to train staff on how to act consistent with constitutional requirements or common decency.

191.    The failure of Defendants Settles, Bailey, Jackson, Belle, and Yeshak to intervene to stop the violence against Ms. Glass is consistent with the corrections staff's group culture to remain silent and permit other staff to hurt inmates.

192.    These photos are still images from Defendant Clark's body-worn camera showing the faces of various jail employees as they witnessed Ms. Glass's agony; these are the faces of deliberate indifference:

    

193.    The employees whose photos appear above are participating in the culture of deliberate indifference that permeates the jail. This is what the citizens incarcerated at the jail see. This is what the other corrections officers see. This is what the supervisors and administrators see (if they bother to look) and have failed to remedy. And this is what Ms. Glass would have seen if she weren't unable to open her eyes because she had been peppered sprayed at close range on camera by a government employee freely engaged in a ritual of torture with no apparent concern that there would be consequences for restraining and pepper spraying someone for having a "smart mouth."

194.    The policymaking Defendants ignored or soft-pedaled ferocious acts of violence by corrections personnel, thus creating a thriving culture in which unprovoked and excessive violence was commonplace.

### The County's culture of punitive violence against inmates resulted in staff failing to intervene to protect those in custody.

195.    Any reasonable human being who witnessed any aspect of the brutal attack on Ms. Glass or failing to decontaminate her would have responded with horror and alarm. But every member of the jail staff who observed what happened to Ms. Glass responded casually as if this were something they see regularly.

196.    Defendants Jackson, Bailey, Yeshak, Settles, and Belle each could have intervened to stop the use of excessive force against Ms. Glass, but each failed to do so.

197.    Defendant Clark could have intervened to stop Defendant Marsh's use of excessive force against Ms. Glass, but Defendant Clark failed to do so.

198.    Defendant Marsh could have intervened to stop Defendant Clark's use of excessive force against Ms. Glass, but Defendant Marsh failed to do so.

199.    The corrections staff behaved in this manner because it was consistent with the violent and abusive culture that the policymaking Defendants tolerated, nurtured, and/or failed to remedy.

200.    The culture of deliberate indifference so permeates the jail that even some medical personnel, including Defendant Lessmann, participate in the indifferent and dehumanizing treatment of the people in custody.

201.    These are still images from Defendant Clark's body-worn camera showing Defendant Lessmann as she "cared" for Ms. Glass. This was less than two months after Defendants Budish and Leiken had secured the retaliatory firing of nursing supervisor Gary Brack, R.N. for publicly

advocating at a County Council meeting about the need for better patient care and staffing (which happened more than a month after budget director Maggie Keenan[1] alerted Budish to serious problems at the jail). The first of nine deaths started the month after Defendants Budish and Leiken secured Nurse Brack's firing.

202.    In the wake of Nurse Brack's firing, this is the face of medical care at the Cuyahoga County jail:



203.    Defendant Lessmann resigned from her position as a Cuyahoga County jail nurse as of September 2, 2018. In her exit questionnaire, she rated the overall work environment as a 1 of 5 (with one being least favorable), denied being "provided with adequate support/training," and suggested having "a better management structure in the jail."

204.    Throughout Ms. Glass's two-day stay in the county jail, no one ever properly or effectively decontaminated her. On information and belief, this failure was intentional and intended to prolong the agony that Defendant Clark inflicted on Ms. Glass. It was also consistent with Cuyahoga County's practice of using less effective decontamination procedures on inmates of color than on white inmates.

---

[1] Ms. Keenan herself was later terminated and a substantial motivating factor in that termination was her whistleblowing on corruption in the Budish administration, including the jail.

**Bailey and Settles filed materially false reports to try to justify their colleagues' attack on Ms. Glass**

205.    On or about July 23, 2018, Defendant Bailey filed a report regarding the incident in which Defendants Marsh and Clark unlawfully restrained Ms. Glass, Defendant Marsh assaulted her by punching her in the head, and Defendant Clark sprayed a can of pepper spray in her face at close range while holding her head still.

206.    In her report, Defendant Bailey claimed that Marsh "USED HIS RIGHT HAND TO PUSH INMATE GLASSES [sic] HEAD TO THE RIGHT WHERE THERE WAS NOBODY STANDING IN CASE SHE BEGAN SPITTING AND NO SPIT MASKS WERE AVAILABLE TO BE UTILIZED."

207.    As video of the incident shows, this was materially false. And Defendant Bailey, who had a clear view of the scene, knew it to be false when she filed the report.

208.    On or about July 23, 2018, Defendant Settles filed a report regarding the incident in which Defendants Marsh and Clark unlawfully restrained Ms. Glass, Defendant Marsh assaulted her by punching her in the head, and Defendant Clark sprayed a can of pepper spray in her face at close range while holding her head still.

209.    In his report, Defendant Settles falsely claimed that Marsh "OPEN PALM MOVED HER HEAD TO THE RIGHT."

210.    As video of the incident shows, this was materially false. And Defendant Settles, who had a clear view of the scene, knew it to be false when he filed the report.

211.    Defendants Bailey and Settles filed their materially false reports with the intention of influencing one or more public officials in the exercise of their duties, including influencing (successfully) Defendant Pinkney to discipline Ms. Glass for the attack she endured.

**The County destroyed evidence of its employees' criminal conduct
and interfered with Ms. Glass's efforts to collect evidence proving her
claims.**

212.    As Ms. Glass was discharged from the jail, County employees confiscated her clothing

and destroyed that evidence of her mistreatment.

213.    Defendant Cuyahoga County interfered with Ms. Glass's ability to collect evidence of the

torture she experienced. On April 24, 2019, Ms. Glass made a public-records request to

Defendant County for the video of the attack. But Defendant County did not provide the videos

until June 21, 2019—after Ms. Glass filed a petition for writ of mandamus with the Supreme

Court of Ohio. Only then did Defendant County provide Ms. Glass with the videos that she

attached to her initial complaint.

214.    After assuring Ms. Glass and the Court that all video of her time in custody had been

provided, the County provided three additional videos on March 6, 2020.

215.    But on information and belief, the County destroyed videos of Ms. Glass's intake,

transport within the jail, and discharge.

216.    Defendant Cuyahoga County and its leadership also sought to further cover up the

continuing torture of Ms. Glass by failing to produce the Defendant Clark bodycam video to

media who had submitted public-records requests that encompassed the video.

**The United States Marshals Service investigates the jail and finds
inhumane and brutal conditions including use of excessive force and
failure to train.**

217.    In October–November 2018, a team led by the United States Marshals Service

investigated jail conditions and issued a comprehensive report.

218.    The team that conducted the investigation leading to that report included six U.S.

Marshals personnel, seven subject-matter experts, three FBI representatives, and staff from the

Cuyahoga County Agency of the Inspector General (AIG).

219.   In a statement released November 8, 2018, Defendant Leiken described the team
reviewing the jail as "a team of highly experienced assessors."

220.   The resulting report—Quality Assurance Review of the Cuyahoga County Corrections
Center ("Marshals Report") (attached as Ex. 1)—identified these (and other) deficiencies:

   a.   "Review of Use of Force (UOF) incidents determined staff are not utilizing all tools
       and techniques generally accepted as best practices for UOF teams to ensure staff and
       detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and
       debriefings, removing staff involved at the on-set of the incident from the immediate
       area, and a review of all UOF incidents by the agency administrator or designee, and
       medical assessment of all involved). Additionally, video tapes involving UOF are not
       tagged and labeled as evidence. Written reports are not required from all persons
       involved in the use of force or any staff who played a role in the incident (i.e., medical,
       correctional personnel, SRT, etc.)." *Id.* at 35.

   b.   "Over 100 detainee/inmate interviews reveal strong and consistent allegation of
       brutality, UOF punishment, and cruel treatment at the hands of Security Response
       Team (SRT), whom the detainee/inmates refer to as "The Men in Black," based on
       their black para-military uniforms." *Id.*

   c.   "During the review, review team members observed SRT members verbally abusing
       and demonstrating aggressive behavior towards detainees/inmates; review of multiple
       UOF and SRT body-cam video reveal and contain aggressive conduct and behavior
       as well as abusive, explicit language used by SRT members directed at
       detainees/inmates." *Id.*

   d.   "SRT members who were escorting detainee/inmates to be interviewed by Facility
       Review Team members were referring to requested detainee/inmates as "Snitches,"
       as they escorted them to and from the interview location. The threatening,
       intimidating and aggressive behavior demonstrated and witnessed by the Facility
       Review Team resulted in the request to remove up to 10 detainee/inmates from the
       CCCC, for fear of SRT members retaliation, and the legitimate fear of
       detainee/inmate safety." *Id.*

   e.   "Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed
       access to showers, telephones and recreation due to CCCC's implementation of a
       lockdown system known as "Red Zone." The "Red Zone" RHU detainees/inmates
       management system is used as a means to address insufficient staff and staffing
       shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for
       periods of 27 or more hours in their cells, additionally interviews with
       detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of
       their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied
       access to razors or barbering." *Id.* at 4.

f. "There is no internal quality control plan in place to provide an annual review of CCCC's operations to ensure compliance to ensure compliance with CCCC's policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was on November 14, 2017; review of the November 14, 2017 previous inspection documentation reveal CCCC's staff did not comply, address or provide corrective actions for identified deficiencies which included: exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not being provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review." *Id.* at 26.

g. "Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter." *Id.* at 28-29.

h. "There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications." *Id.* at 29.

i. "Interview with staff reveal numerous staff at all levels express concerns for their safety and security due to staffing shortages; concerns were also expressed regarding morale and sense of inability to make changes or voice concerns to leadership or management." *Id.* at 29.

221. The Marshals Report's conclusions were accurate.

222. The toxic culture and abuse of power that led jail staff to intimidate witnesses in front of the U.S. Marshals is the same culture that emboldened Defendants Jackson and Yeshak to threaten Ms. Glass with being tied down and maced, and permitted Defendants Marsh and Clark to do it.

**Cuyahoga County's Inspector General issues a report "strongly concur[ring]" with the Marshals Report, makes additional findings regarding the failures that led to the jail crisis, and refers the matter to the Ohio Attorney General's Office for prosecution.**

223.    The Cuyahoga County Inspector General is "the County's chief ethics officer." Charter, Art. XV, § 15.01(1).

224.    The Cuyahoga County Inspector General has the authority to investigate "possible ethical violations in the conduct of County business" and any "fraud, corruption, waste, abuse, misfeasance, malfeasance and nonfeasance." Such investigations must be conducted "without interference or pressure" from other public officials or employees.[5]

225.    The Cuyahoga County Executive appoints the Inspector General.[6] Defendant Budish appointed Inspector General Mark Griffin in 2015. He may be removed only for cause by resolution of County Council with eight members voting to remove.[7]

226.    After the U.S. Marshals concluded their review, Defendant County's Inspector General reviewed issues that the Marshals had not already investigated and issued a report—Cuyahoga County Corrections Center Report of Investigation (attached as Ex. 2).[8]

227.    In its 80-page report dated February 12, 2019, the Cuyahoga County Inspector General detailed how his office had "initiated an investigation into the conditions of the County Jail" in September 2018 following four deaths at the facility. The report describes how the Cuyahoga County Inspector General "participated in the inspection conducted by the federal team" that

---

[5] *Id.* at § 15.01(2); Cuyahoga County Code § 204.01(B)(3).
[6] Cuyahoga County Charter § 15.01(4).
[7] *Id.* at § 15.01(5).
[8] Ms. Glass obtained the attached report by the Cuyahoga County Inspector General from the Ohio Attorney General's Office via public-records request. The redactions in the exhibit were present when Ms. Glass received it.

produced the Marshals Report. The Inspector General stated that "[t]he professionalism of the U.S. Marshals Service cannot be overstated. They are outstanding."

228.    The Cuyahoga County Inspector General described the U.S. Marshals Service's investigation: "Eleven jail management experts undertook a detailed and specific examination as to whether the CCCC complied with federal standards for federal detainees."

229.    The Cuyahoga County Inspector General continued: "The U.S. Marshals Service, in a 52-page report issued November 21, [2018,] concluded that the CCCC failed numerous standards and identified 24 of 55 criteria in which the CCCC was rated either 'unsatisfactory' or 'marginal.'"

230.    The Cuyahoga County Inspector General then admitted that it "strongly concurs with the U.S. Marshals findings" and was in "agreement with the findings of the federal subject matter experts."

231.    Defendant County's Inspector General expressly admitted that **"[t]o the extent that CCCC has written policies, the CCCC management and leadership has failed to adequately disseminate those policies or train staff."** (Emphasis added.) The Cuyahoga County Inspector General attributed the problems at the jail to a "a fundamental failure of leadership, management[,] and oversight."

232.    Defendant County's Inspector General summarized Defendant Mills's hiring and performance:

> In 2015, the County appointed a Regional Director of Corrections who had no previous jail management experience. The Regional Director was allowed at times to circumvent the formal chain of command and the oversight of the County Sheriff. Within the CCCC leadership, despite objective evidence of unexplained deaths, increased staff turnover[,] and high rates of staff absenteeism, there was sentiment that any problems were overstated or were caused by external factors and that the jail itself was well-run. This disconnected reasoning was reinforced by a

culture of perceived retaliation that impeded the open and honest
discussion of failings in the CCCC.

233.    Defendant County's Inspector General continued: "The simultaneous overcrowding,

understaffing[,] and 'red-zoning' of the CCCC are equal parts symptoms and causes of the

systemic failings. Every year since 2012, the CCCC's average daily prisoner population exceeded

the level permitted by its certification. Rather than correct this problem, the CCCC increased its

overcrowded population by 18%. It is both commendable and evidence of past management

failures, that after the federal report, the Court was able to reduce its average daily population by

nearly 20% within two months."

234.    Defendant County's Inspector General further found that as of February 12, 2019, the

jail was still "below the authorized staffing levels for corrections officers. ('COs'). CO turnover

increased 118% between 2015 and 2018. It is not unusual for 40% of COs to 'call off' for their

shifts. As a result of these staff shortages, and a change in the overtime policy, many COs are

required to work 16[-]hour shifts and detainees are 'red-zoned'- - a process that requires a single

CO to lock down and monitor multiple prisoner pods. Red-zoning increases the stress on COs as

well as on detainees."

235.    Defendant County's Inspector General also reported that "[d]eficiencies were found in

the provision of medical services. Medical staff reported that inmates were unable to receive

necessary medical care in a timely fashion. At times, requests for medical care were allegedly

delayed, ignored[,] or deleted from the case tracking system without receiving care. Because of a

change in CO staffing, medical personnel can be stymied from providing care due to a lack of

sufficient COs assigned to the medical center."

236.    The Cuyahoga County Inspector General's report continued: "The AIG also found a

failure of oversight. At its core, the primary responsibility for correcting management problems

lies with management itself. The wardens, Regional Jail Director[,] and those who supervise them – or are supposed to supervise them – are responsible for managing the jails."

237.    Defendant County's Inspector General admitted that the County violated federal standards as laid out in the Marshals Report, and admitted that those same failings transgressed parallel Ohio requirements: "The AIG concurs with the findings of the U.S. Marshal, including findings regarding violations of federal standards. These violations mirror violations of the equivalent Ohio Jail State Minimums in most cases. Rather than repeat those findings, the AIG globally recommends that each violation be rectified."

238.    The Defendant County's Inspector General made these recommendations regarding management and leadership at the jail: "1. Establish and maintain a clear chain of command from COs to the Warden to the Regional Jail Director, to the County Sheriff and the County Executive; 2. Empower the County Sheriff with effective primary responsibility, institutional support[,] and authority regarding the operations of the Regional Jail System. 3. Hire qualified leadership with extensive experience in managing of system of correctional facilities."

239.    As for staffing, the Inspector General recommended that the jail "[s]ignificantly increase the number of CCCC staff in order to minimize red-zoning, improve safety and security, improve morale, and reduce inmate incidents…[and] [w]ork to create a culture of respect between all levels of CCCC employees."

240.    Defendant County's Inspector General found that "County leadership failed to adequately supervise, manage, and operate the CCCC. Despite years of overcrowding, the CCCC increased the average daily inmate population while reducing staff. At the same time, CO turnover increased 118% and weekly call-offs averaged approximately 40%. This led to increase double-, triple[-] or even quadruple[-]podding. The County's ability to identify and correct problems was worsened by a culture of contempt towards COs, fear of retaliation by

whistleblowers, and a system that fails to address complaints in an effective manner. Oversight was inadequate at nearly every level — from the line managers, to the County, to the State. As set forth in the recommendations above, the County should increase the quantity and quality of staff by, among other things, hiring professional leaders with experience in jail management, filling staff to authorized levels and working to change the culture that has damaged morale, affected call-offs, and discouraged staff from correcting problems within the CCCC."

241. Defendant County's Inspector General questioned Defendant Budish's decision to appoint the unqualified Defendant Mills to lead the jails: "Leading a regional system of correctional facilities requires skills and experience that are both profoundly deep and extremely specialized. These are extremely complicated and important jobs that require tremendous skills and a legacy of practical experience. 'To become a prison warden, you must first start as a correctional officer to gain experience and familiarize yourself with the workings of a correctional facility… With vast experience and an advanced degree, you can become the head of prisons in your county or state.' To become a successful leader of correctional facilities, you should have:

- A detailed knowledge of administration of correctional facilities
- A good understanding of human behavior and psychology
- Strong administrative and leadership skills
- Strong problem-solving skills
- The ability to work with people from diverse backgrounds
- An intricate understanding of prisoners' rights
- An awareness of safety and health issues in correctional facilities"

242. But Defendant Mills had none of those things and acted accordingly, as Defendant Budish should have expected as he was aware of Mills's lack of qualifications for the position.

243. Defendants Budish and Leiken should have heeded the warnings of other County employees and leaders who raised concerns about Defendant Mills's behavior, including declaring that Mills should be fired.

244.    Defendant County's Inspector General found that "management ignored objective data" and that "Mills reorganized the CCCC and appointed direct reports who served in their positions at his will. By the end of September 2018, six detainees had died in the CCCC, staff turnover had increased 118%[,] and absenteeism by COs was frequently at 40% or higher."

245.    One way that jail management was deliberately indifferent to the constitutional rights of those in custody was by chronically understaffing the overcrowded facility and then mistreating those officers who didn't quit or call off. According to Defendant County's Inspector General, "[a]s a profession, corrections work is one of the most stressful in law enforcement. Officers must remain continually alert during eight-to[-]16-hour shifts to avoid being attacked or killed by the offenders that they supervise. The intensity of these environments often prompts officers to shut down emotionally, reducing their ability to function effectively within the institution."

246.    Defendant County's Inspector General also concluded that there was "a break down in the management process with regards to cleanliness of the jail."

247.    The Cuyahoga County Code § 204.01(B)(3)(d) provides that "If an [AIG] investigation reveals reasonable grounds to believe that a violation of any state, federal, or local law, rule, regulation, or policy has taken place, the Inspector General shall notify the appropriate civil, criminal, or administrative agencies in charge with enforcement of said violation."

248.    On April 25, 2019—two weeks after Defendants Clark and Marsh were indicted on April 8, 2019 for attacking Ms. Glass—Defendant County's Inspector General sent a referral memorandum (attached as Ex. 3) and his February 12, 2019 report and other materials to the Ohio Attorney General's Office to refer the matter for prosecution.

**Clark obtained body-worn camera videos from the jail and tried to blackmail a fellow corporal into testifying about jail mismanagement and lack of training.**

249.    On July 9, 2019, Ms. Glass filed this action.

250.    After Cuyahoga County notified Defendant Clark in August 2019 that is was seeking to be relieved of its obligation to defend and indemnify him in this lawsuit, he was captured on audio recording trying to get a jail colleague to testify about the lack of training they received at the jail and how the jail is managed. Defendant Clark threatened to release videos that he had in his possession of other corrections personnel, if they did not testify about the lack of training and did not provide him with more videos from the jail's server. Clark said, "I'm not gonna burn for no one. If I go down, others are going down too."

251.    Defendant Clark's ability to obtain video records from a jail colleague demonstrates Defendant County's deliberate indifference to ensuring it put in place appropriate controls to prevent tampering with its video records that document brutality against inmates.

### Clark and Marsh plead guilty and are sentenced, but no one else is held accountable for what she endured.

252.    Defendant Marsh pleaded guilty to assault for his attack on Ms. Glass. He was sentenced to 180 days in jail, of which 150 were suspended.

253.    Defendant Clark pleaded guilty to attempted felonious assault and unlawful restraint for his attack on Ms. Glass. He also pleaded guilty to extortion for trying to blackmail other corrections officers to testify about the lack of training in the facility and about the mismanagement of jail by threatening to release videos of them engaged in use-of-force incidents. He was sentenced to 18 months in prison.

254.    None of the corrections officers who instigated or watched the attack have been held accountable.

255.    No one in jail administration has been held accountable.

256.    No one in County administration has been held accountable.

257.     As the videos attached to Ms. Glass's complaint show, officials of the Defendant County exercised discretion with malicious purpose, in bad faith, or in a wanton and reckless manner sufficient to overcome standard political-subdivision immunity. And their co-workers stood around watching and doing nothing to protect Ms. Glass.

### Even after the Marshals Report, the jail's culture celebrates gratuitous and punitive violence against inmates, in particular the use of restraint chairs and pepper spray.

258.     The casual resort to violence—in particular the use of pepper spray or OC foam—is something the corrections officers at the jail find so unremarkable and amusing that they joke about it on social media.

259.     On January 7, 2019, Darriell Hayes was a corrections officer at the jail.[9] Hayes shared a Facebook post with a video of a "Scared Straight" style program. The thumbnail image shows a young boy approximately five-years old in prison garb and looking terrified. The post included the question, "An intervention program exposing kids to jail is raising questions for some. Do you think it goes too far?"

260.     Katie Spragg, also a corrections officer at the jail, posted a public comment sharing her view (misspellings in original): "maybe im crazy but i dont think its enough they need a chair and pepper spray."

---

[9] Hayes is a defendant in a civil-rights lawsuit filed by former inmate Glenn Mayer, Jr. regarding Hayes's use of excessive force. The facts of that matter are described later in this complaint.

261.   Hayes's Facebook post, with Spragg's comment, is below:



262.    On March 4, 2019, Hayes posted the following image saying, "I WILL NOW REFER TO PEPPER SPRAY AS PEOPLE SEASONING IN MY REPORTS."



263.    Photographs of Hayes—including a selfie in his corrections-officer uniform—are visible in the screenshots from his public Facebook postings alongside the images he shared with the world.

264.    Hayes remained a corrections officer at the jail until he resigned in August 2019. Spragg is still on the job.

265.    These examples of corrections-officer social-media presence shed light on the toxic culture in which they work. It takes a special depth of depravity to joke about tying down and pepper spraying a kindergartener. And that established and ingrained depravity was on display

when Defendants Clark and Marsh attacked Ms. Glass just as Defendants Jackson and Yeshak

had threatened.

266.    Sheriff David Shilling has made repeated admissions—to Ms. Glass and to the media—as

recently as January 2020 about the problems at the jail and the need to change the violent and

abusive culture characterized by employees like Defendants Clark and Marsh and those who

stand by while those in custody are abused.

**Defendant Cuyahoga County ignores the manufacturer's warnings
and recommendations regarding deploying OC foam including the
duration of each spray, the distance from the target, and the protocol
for decontaminating someone exposed to OC foam.**

267.    Cuyahoga County uses OC foam manufactured by Defense Technology (First Defense

1.3% MK-4 Foam OC Aerosol). The manufacturer's website describes the product as a

"powerful" and "fast-acting foam that coats the face upon contact."[10]

268.    Defense Technology describes the effective range of this OC product as 10–12 feet, with

a minimum recommended distance of 3 feet.

269.    The manufacturer recommends a half-second spray followed by reassessment of any

continuing threat.

270.    Given that there was no threat from Ms. Glass in the first place, there was no reason to

spray her at all. There was certainly no reason to use 12-times the amount that the manufacturer

recommends and to spray it directly into her face at close range.

271.    The manufacturer advises that these measures be taken following deployment of its

product: "Flush the skin with large amounts of water and expose the subject to fresh air. Further

relief may be gained by showering with cool water using mild soap and shampooing hair. Wash

---

[10] https://www.defense-technology.com/products/oc-aerosols/first-defense-1.3-pct-mk-4-foam-oc-aerosol-1030672.html.

thoroughly, rinsing often to manage any contaminated water on your body." And it specifically advises to "wash eyes out with large amounts of cool water."

272.   Defendant Clark did not follow the manufacturer's recommendations in decontaminating Ms. Glass.

273.   Defendant Clark spoke at his sentencing hearing on March 9, 2020. He denied that his actions were intentional or done with malice, though he did acknowledge that the "optics are bad." He blamed his training: "I can only do what I'm trained to do and how I'm trained to do it."

274.   At his sentencing hearing, Defendant Clark defended his "decontamination" of Ms. Glass, citing his training:

> Per the training that I received, we are to give three rinses, and after that we take them into the main dispensary area where the nurses will then wipe their face, take their blood pressure and take their temperature. After that they are then taken up in another floor where the containment room is where she will sit for at least a minimum of an hour. These are all part of the policies and procedures that Cuyahoga County has in place. I can only do what I'm asked to do in the way that I'm taught to do, nothing more. So once I take her up there, that's why you hear me say, "You'll have to wait an hour." That will be the minimum that she can wait.

275.   As Defendant Clark admitted, he treated Ms. Glass exactly how Defendant Cuyahoga County trained him to treat her.

### Defendant Cuyahoga County engages in racially disparate decontamination practices.

276.   Defendant Cuyahoga County has a custom, policy, pattern, and practice of racial discrimination in decontamination following deployment of chemical agents such as OC foam: white inmates generally receive more effective decontamination than black inmates.

277.   On April 8, 2019, corrections staff pepper sprayed a white inmate for approximately two seconds, or one third as long as Ms. Glass was sprayed. Earlier in the day, the white inmate had

attacked a deputy in the courtroom after he was sentenced to prison. When he reached the jail's

sallyport, he was physically harming himself and ignoring instructions. After being sprayed, the

white inmate remained combative and resisted efforts to handcuff him. SRT secured the inmate

in a restraint chair. While he was seated, a supervisor walked up to him and asked, "What's going

on, brother?" and inquired as to the inmate's well-being. The supervisor concluded the colloquy

by assuring the inmate that "everyone's gonna to look out for you." The supervisor then said,

"Stay hard, man" and gave the inmate a fist bump. During transport from the elevator to the

slop room, the inmate was calm and in no apparent distress, and the corporal pushing the chair

recited "the sheet" en route to the slop room. Once in the slop room, the inmate asked that water

*not* be administered because it would intensify the burning. The corporal explained that they had

to clean him off and flushed him with water for approximately nine seconds. The corporal asked

the inmate to turn his head to ensure he removed the residue from the back of his head. Corporal

Jason Jozwiak was present for this decontamination as well as for Ms. Glass's.

278.     On December 19, 2018, corrections staff pepper sprayed a white inmate. He was rinsed

with the hose for approximately three times as long as Ms. Glass was rinsed despite having less

OC foam sprayed on his skin than she did. This was still insufficient to decontaminate him, but

was much better than the treatment that Ms. Glass received.

279.     On December 31, 2018, corrections staff pepper sprayed a white inmate. Upon arriving

on the sixth floor (where the slop room and medical dispensary are located), a corrections officer

literally *ran* out of the elevator to get "the sheet," which the staff began reading to the inmate

while she was being wheeled to the slop room. Hose water was applied to this inmate's face for

over nine seconds. This was still insufficient to actually decontaminate her, but it was nearly twice

as long what Ms. Glass received.

280.    By contrast to the white inmates described in the preceding paragraphs, on April 4, 2018, corrections staff pepper sprayed a black inmate. Like with Ms. Glass, staff did not read "the sheet" until the black inmate arrived in the slop room, thus delaying application of water. Like Ms. Glass, he was sprayed with water for less than six seconds. Staff refused his request for another spray of water. He was not decontaminated.

### OTHER INCIDENTS RESULTING FROM THE MALICIOUS, BAD-FAITH, WANTON, AND RECKLESS EXERCISE OF DISCRETION AT THE COUNTY JAIL

281.    Besides the above-described attack on Ms. Glass, corrections staff, as part of a custom, policy, pattern, and practice, have perpetrated many additional unprovoked and unwarranted acts of violence on the people incarcerated in the jail. Some of those acts are described below.

### A corrections officer attacked Lucille Dumas while she was confined to a restraint chair, breaking a Tupperware container over her head.

282.    On January 14, 2015, Lucille Dumas was booked into the Euclid Jail—then operated by Defendant Cuyahoga County—after a traffic stop. During the booking process, Corporal Madeline Chappell punched Ms. Dumas in the face.

283.    When Ms. Dumas stood up to take a defensive posture, several officers threw her to the ground. One officer kicked her while she was on the ground, and Chappell sprayed her with pepper spray. An officer then lifted Ms. Dumas off the floor by her hair and threw her into a restraint chair.

284.    After the officers strapped Ms. Dumas into the chair, Corporal Chappell fixed her own hair and then punched Ms. Dumas in the face. Another officer rolled Ms. Dumas into an area out of sight of surveillance cameras, where Chappell beat her with a Tupperware container, using enough force to shatter the container.

285.    Corporal Chappell ordered officers to throw away evidence of her attack, delete information from their reports of the incident, and sign false statements about what happened.

286.    Before the attack on Ms. Dumas, Corporal Chappell had been disciplined dozens of times. She was only able to carry out her attack on Ms. Dumas because the County failed to properly discipline her for unprofessional conduct.

287.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### Corrections staff pepper sprayed and restrained Chariell Glaze for asking about his release timing.

288.    On November 27, 2017, Chariell Glaze was scheduled to be released from the jail. During the breakfast delivery, he asked the guard on duty to check on the status of his release paperwork, and the guard did not. The facility had been on red-zone, where inmates are confined to their cells for up to 23+ hours a day due to the jail's chronic understaffing. When the inmates were permitted to leave their cells later that morning, Mr. Glaze asked officer Deleonte Brown to check on the release paperwork. The pod was then again placed on red-zone, which Mr. Glaze feared would delay his release. So he asked to speak to a corporal, which is consistent with the jail's standard practice that an incarcerated person has the right to request that a corporal respond to try to resolve an issue or concern with a corrections officer.

289.    Corporal Damien Bodeker responded. Mr. Glaze showed him the journal entry confirming that he was due to be released and asked Bodeker to check on the status. Mr. Glaze did not threaten himself or others, yet the corporal's response was, "I should dump you and spray you right now." Bodeker then grabbed Mr. Glaze by his shirt collar and emptied a can of pepper foam directly into his face from an unsafe distance. This use of force with pepper foam was consistent with the Defendant County's custom, policy, pattern, and practice of using force to retaliate against and abuse inmates indiscriminately.

290.    The following is a screen shot from the body-worn camera footage of the attack on Mr. Glaze. It shows Bodeker's gloved left hand gripping Mr. Glaze's shirt as the corporal's right hand sprays the pepper foam into Mr. Glaze's face from inches away:



291.    Bodeker and Brown then walked Mr. Glaze into a metal door, resulting in a broken tooth and cuts to his face and lips, which were aggravated by the pepper spray.

292.    Special Response Team ("SRT") officers arrived and roughly strapped Mr. Glaze into a restraint chair. SRT officers wear black paramilitary garb and are known in the jail for their proclivity for violence. After strapping him into the chair, SRT officers mocked Mr. Glaze as he gasped for air and endured the burning agony of the pepper foam. As he tried to get pepper spray out of his mouth by spitting onto his own lap (and not at any staff member), SRT officers yelled with laughter that they "got a spitter!" and pulled a spit mask over Mr. Glaze's face (further exascerbating his discomfort).

293.    After ineffectively decontaminating Mr. Glaze from the pepper foam, they refused to let him use the restroom, leaving him confined alone in a frigid isolation room crying, drenched in pepper foam and urine. He spent the next three days in a segregation cell without access to a

shower, soap, clean clothing, or clean bedding. He spent another five days in disciplinary isolation before finally leaving the jail on December 7, 2017.

294.    Mr. Glaze requested public-records video footage of his incarceration, but the County's response was woefully incomplete. It provided just a single snippet of a portion of the attack captured on Bodeker's body-worn camera. It did not provide complete footage of the events preceding the attack, the attack itself, or its aftermath. It provided no video of his transport to decontamination or medical, or of his ineffective decontamination, or of the spit mask being yanked on to his head for no reason. It provided no surveillance video at all.

295.    On information and belief, the video showing a portion of the attack on Mr. Glaze was tampered with or altered by someone with access to the videos.

296.    No one was punished for hurting Mr. Glaze, ensuring that no one involved would be dissuaded from hurting other incarcerated citizens. On March 1, 2019, the Defendant County issued Corporal Bodeker, who is white, a written reprimand for making a racist remark about a supervisor; he called a black male sergeant a "monkey ass" in front of subordinates. A few months later, the County promoted him to sergeant, again confirming that those who indiscriminately abuse inmates need not fear discipline at the jail and instead can look forward to advancing through the ranks to leadership positions.

297.    No one was held accountable for the missing video footage.

298.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

299.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

**A corrections officer smashed Joshua Castleberry's teeth into his
nose over a dispute about a bologna sandwich.**

300.    On February 5, 2018, Joshua Castleberry was in the county jail. Following a dispute over

a bologna sandwich, officer John Wilson pepper sprayed and then savagely smashed a

handcuffed Mr. Castleberry's face into the floor so violently that his teeth were broken (with one

tooth pushed all the way up into his nasal cavity). At least one other officer—Corporal Brandon

Honaker—witnessed this attack but did not report it to law enforcement. Instead, Honaker also

pepper sprayed Mr. Castleberry. Wilson, Jozwiak, Honaker, Barthany, and Pritchett placed Mr.

Castleberry in a restraint chair and jammed a mask over his broken face to conceal the assault

from medical staff. The spit mask quickly became soaked in blood.

301.    Ken Mills was the then-administrator of the jail. (As detailed above, Mills has since

resigned and been indicted based on his jail-related conduct.) His officers refused to let nursing

staff remove the mask to assess Mr. Castleberry's injuries, but a night nurse saw Mr. Castleberry

and requested medical evaluation. The security supervisor refused, saying: "He wants to try and

hit one of my officers — he can sit the fuck there for hours."

302.    The night nurse called the nursing supervisor — Gary Brack, R.N. — at home to report

a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a

medical evaluation, but the Defendant County waited another half-hour before transporting Mr.

Castleberry to medical. The mask was lifted, EMS was called, and Mr. Castleberry was

transported to the hospital for surgery to remove the tooth from his nasal cavity and reconstruct

his face.

303.    The next day at the monthly sheriff's meeting, Mills covered up the abuse. When asked

about the incident, Mills stated: "I reviewed the situation and the officers used appropriate force

to the threat of what the inmate was using." Medical Director Dr. Thomas Tallman asked to

view the security footage, but Mills refused, saying: "I already reviewed it — nothing was done wrong." (Dr. Tallman has since been removed as the jail's medical director.)

304.     Former Sheriff Clifford Pinkney stated that he would follow up with the incident, but when he went to review the footage, the security and body-camera footage had somehow "disappeared."

305.     Wilson was indicted for felonious assault in the second degree and misdemeanor charges of interfering with civil rights and unlawful restraint. Corporal Jason Jozwiak was charged with unlawful restraint and interfering with civil rights related to denying Mr. Castleberry medical care. Jozwiak was acquitted but the result was a hung jury on the charges against Wilson for felonious assault and interfering with civil rights. On February 19, 2020, Wilson pleaded guilty to a reduced charge of assault and was sentenced to probation. He remains a jail employee.

306.     During the trial, FBI agent Dennis Timony testified that his investigation revealed evidence that jail videos had been tampered with through deletion and other means. That explains why there was no video of Wilson attacking Mr. Castleberry for the sheriff to review or for the jury in the criminal case to see. And it reveals serious flaws in the County's security and records-management protocols.

307.     The jail held no one accountable for what happened to Mr. Castleberry.

308.     No one was held accountable for the missing video footage.

309.     The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

310.     Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records that document the abuse corrections staff are perpetrating at the jail.

**Corrections officers pepper sprayed and physically abused Michael Roarty-Nugent when he asked for an extra milk during breakfast.**

311.    On April 4, 2018, Michael Roarty-Nugent asked the officer on breakfast rounds if he could have an extra milk. The officer at first agreed, but then changed her mind. She began to close the cell door on Mr. Roarty-Nugent's foot, and he instinctively protected himself by blocking the door with his arm. The officer then radioed SRT, claiming that he had somehow attempted to assault her.

312.    SRT officers responded to escort him to segregation and roughed him up as they walked him to the elevator. He remained compliant and cooperated in the transport process.

313.    Instead of going directly to segregation, the officers took Mr. Roarty-Nugent to another floor. When the elevator doors opened, several officers were waiting for him. He was compliant, and there was no excuse to use any force against him. But the officers handcuffed, pepper sprayed, and physically abused Mr. Roarty-Nugent, and then strapped him into a restraint chair.

314.    After deploying pepper foam, jail staff did not effectively decontaminate Mr. Roarty-Nugent. His breathing remained labored and foam residue was visible on his face.

315.    He was kept in an isolation cell for several hours without water, a shower, new clothes, or access to a restroom. He was then taken to the hole, but was denied a shower, clean clothes, or sheets for several days. Mr. Roarty-Nugent spent 11 days in the hole.

316.    The jail held no one accountable.

317.    Mr. Roarty-Nugent requested video of these events, but Cuyahoga County claims that no surveillance video exists and has provided only limited, incomplete body-worn camera video.

318.    No one was held accountable for the missing video.

319.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

320.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

### Blanche Hill endured a 12-hour confinement to a restraint chair with no restroom access.

321.    In July 2018, Blanche Hill was booked into the county jail.

322.    With no legitimate reason to do so, jail staff confined Ms. Hill to a restraint chair for many hours and denied her food, water, and the opportunity to use the restroom facilities.

323.    The jail held no one accountable.

324.    Ms. Hill requested video footage of her ordeal. Other than a single 32-second snippet from a body-worn camera (showing her already confined to the restraint chair), the jail has produced no video—from wall-mounted surveillance or body-worn cameras—documenting what she endured or why she was restrained.

325.    No one was held accountable for the missing video footage.

326.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

**Corrections officer Darriell Hayes chokes Glenn Mayer, Jr. for twitching while receiving his medication for a neurological condition that causes muscle spasms and twitching.**

327.     In August 2018, Mr. Mayer was booked into the jail. He was assigned to the medical housing unit, which was designed for people who, like him, have serious medical conditions. His podmates in the eight-man pod called him "Twitch," referring to his pronounced tremors.

328.     Each day, Mr. Mayer received certain medication from a nurse to treat his condition (though the County did not provide him with all his prescribed medications). Mr. Mayer had established a rapport with most of the medical staff and with corrections officer Shaw, who was typically assigned to the unit.

329.     On October 16, 2018, during the second pill call, corrections officer Darriell Hayes was assigned to substitute for Shaw. Hayes displayed a callous disregard for the well-being of those housed in the medical unit. Before the attack on Mr. Mayer, Hayes prevented a disabled inmate from stepping out of the cell, hollering: "I don't care about medical issues. I'm treating this like a regular pod. I'll still put you on the ground."

330.     Hayes accompanied Nurse Heather Johnson in her routine distribution of medicine. Her first stop was Mr. Mayer's cell. He stepped out of his cell to get his medicine.

331.     Because of Mr. Mayer's medical condition, nurses must hold his hand still to dispense his medication.

332.     As Nurse Johnson placed the medicine in Mr. Mayer's hand, it twitched slightly. Hayes grabbed Mr. Mayer from behind by the neck and squeezed hard. This aggression triggered an intense muscle spasm. His pills went flying. Hayes, with one hand still gripping Mr. Mayer's neck, slammed his opposite elbow into Mr. Mayer's back while yanking back on his neck. The spasms continued as Hayes continued to manhandle Mr. Mayer, squeezing his neck hard.

333.    Nurse Johnson eventually told Hayes to let Mr. Mayer go and explained his condition. Hayes did not immediately release Mr. Mayer despite what the nurse explained. Hayes replied, "I'm not used to this, I'm used to choking people out when things like this happen." Hayes eventually released Mr. Mayer.

334.    Even after releasing Mr. Mayer's neck, Hayes continued to torment him, insisting on performing multiple mouth-checks (where an officer observes the inside of a patient's mouth to confirm that he swallowed his pills) while Mr. Mayer, shaken from the attack, twitched erratically. Hayes did not relent until Nurse Johnson told him that was enough and to leave Mr. Mayer alone. He returned to the safety of his cell and another man went out to get his medicine from the nurse. Outside the cell, Mr. Mayer could hear Hayes continuing to run his mouth about how he was used to "laying people out" and otherwise carrying on for the nurse as she attended to other patients.

335.    After Hayes's attack on him, Mr. Mayer experienced pain and discomfort. Though he initially retained his ability to walk, his physical condition deteriorated progressively. Over the coming days, he experienced tingling and intermittent loss of mobility of his body, which sometimes manifested as near-total paralysis requiring the use of a wheelchair (such as when he collapsed in his cell two days after the attack and for an extended period thereafter). He continues to experience the effects of Hayes's brutalization and still requires the use of a walker for mobility for persistent left-sided weakness and loss of muscle control. Mr. Mayer's twitching has increased since the attack.

336.    Upon the dispatch of medical emergency personnel following Mr. Mayer's collapse, a Special Response Team officer's body-worn camera footage showed another officer—James Toney—directing the SRT officer to turn off his body-worn camera. The officer complied and cut short the recording of Mr. Mayer's agony on that day.

337.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

338.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records that document the abuse that corrections staff are perpetrating at the jail.

### Corrections personnel brutally attacked Corrionne Lawrence without provocation, used racial slurs, and threatened to kill him and "make it look like a suicide."

339.    On September 16, 2018, Corrionne Lawrence was booked into the jail. He spent approximately four hours confined in a restraint chair as a punishment for speaking Spanish during the booking process. The responsible corrections officer failed to prepare and submit the required report documenting this use of the restraint chair. And the County destroyed the video footage of this use of the restraint chair.

340.    Before being assigned to a pod, Mr. Lawrence alerted corrections staff that he had to be kept separate from Stacey Norris, who was in the jail on charges that he murdered Mr. Lawrence's cousin.

341.    Though initially housing them separately, the jail relocated Mr. Lawrence to Mr. Norris's pod approximately one month later. As Mr. Lawrence was brought into his new pod, Mr. Norris threatened Mr. Lawrence in the presence of corrections officers. Corrections staff then allowed Mr. Norris to attack Mr. Lawrence in his cell.

342.    Mr. Lawrence sustained no visible injuries in the Norris attack, but was taken to medical per protocol and was then released from medical.

343.    While Corporal Christopher Little escorted a handcuffed Mr. Lawrence from the infirmary to his new cell in disciplinary isolation, Little told Mr. Lawrence to step to the back of

the elevator and face the wall. Mr. Lawrence complied and Little stated: "Let's play a game." Little then repeatedly punched Mr. Lawrence in the side of his face, punched and kicked him while he was on the floor, called him a "n*****," and threatened him if he did not keep his mouth shut. Corporal Honaker witnessed this attack, but did not stop it or report it.

344.    Mr. Lawrence asked another employee, Brandon Smith, if he could go to the nurse and Smith laughed in Mr. Lawrence's face.

345.    While still in isolation, a corrections officer threatened to mace Mr. Lawrence and told him "N**** I will kill you, hang you, and make it look like a suicide" when Mr. Lawrence asked for a shower. In the four months before the officer threatened Mr. Lawrence, four incarcerated people had died in apparent suicides.

346.    Mr. Lawrence spent 12 days in isolation. Mr. Lawrence was interviewed repeatedly by the United States Marshals Service. During his interview, Mr. Lawrence revealed to the Marshals that Little had assaulted and threatened him.

347.    Smith escorted Mr. Lawrence from the interview and said: "Why you snitching? You a snitch now. Trying to get my boy indicted."

348.    The Marshals Service eventually demanded that the County transfer Mr. Lawrence and others out of the jail given the threats by SRT staff. Mr. Lawrence was taken to Geauga County jail for his own protection.

349.    No one has been held accountable for attacking or threatening Mr. Lawrence.

350.    Despite his request for surveillance or body-worn camera footage of Corporal Little assaulting him in the elevator, Cuyahoga County has produced none (despite Corporal Little's insistence that Corporal Honaker's body-worn camera was activated).

351.    No one was held accountable for the missing video footage.

352.    Mr. Lawrence sued the County and corrections personnel Christopher Little, Brandon Smith, Barry Hickerson, and Beverly Witt. The matter settled for $140,000.

353.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

354.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

### Jail staff beat and pepper sprayed Joseph Sawyer in his wheelchair for no reason.

355.    In October 2018, Joseph Sawyer was booked into the jail. Mr. Sawyer was confined to a wheelchair due to a degenerative bone condition. With no legitimate reason to do so, jail staff punched Mr. Sawyer in the face, pepper sprayed him, and strapped him into a restraint chair.

356.    Jail staff failed to effectively decontaminate Mr. Sawyer from the pepper spray and refused to permit him to shower or change clothes for more than a week. Jail staff also denied him the use of a wheelchair.

357.    The jail held no one accountable.

358.    Mr. Sawyer asked the County to provide the video of the attack, but the County has provided nothing, claiming that no video records exist of Mr. Sawyer on the day of the attack.

359.    No one was held accountable for the missing video footage.

360.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

361.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

### Corrections officer Brandon Smith violently shoved Timothy Bennett while he was receiving an injection from medical staff.

362.    On approximately November 1, 2018—during the Marshals investigation at the jail—corrections officer Brandon Smith attacked Timothy Bennett as he was receiving an injection from medical staff at the diabetic cart, pushing Mr. Bennett while the needle was inserted in his back.

363.    On information and belief, Smith was written up for this violent outburst. Compared with the many times corrections staff imposed punitive violence with no consequence, the isolated write up of Smith was an anomaly.

364.    On information and belief, this stray instance of showing mild displeasure at an SRT officer hurting someone in custody was motivated by either the presence of medical staff during the incident or the ongoing federal investigation—about which Smith was furious.

365.    The jail's own investigation into Smith's use of force against Mr. Bennett confirmed that just before Smith put his hands on Mr. Bennett at the diabetic cart that morning, Smith had called Mr. Bennett a "snitch" for speaking to federal investigators about jail conditions. Jail nurse Gwendolyn Bremer confirmed that Smith called Mr. Bennett a "snitch."

366.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**A corrections officer choked and dragged Tyrone Hipps, Jr. because
he complained about being denied the opportunity to pray.**

367.     Tyrone Hipps, Jr. was booked into the county jail on June 22, 2018. He informed the

officers that he is a Muslim and requested a no-pork diet.

368.     Practicing Muslims must pray five times per day, facing east toward the holy city of

Mecca.

369.     On November 3, 2018, Mr. Hipps was preparing to pray at the eastern end of his

dormitory when corrections officer Christopher Perdue approached Mr. Hipps and told him to

go to his bed area. Mr. Hipps explained that he was about to pray. Perdue said: "Pray by your

bed." Mr. Hipps explained that praying by his bed was improper because his faith requires him

to pray facing the east with no one walking in front of him. Perdue then told Mr. Hipps to go

pray in the day area. Mr. Hipps explained that praying in the day area would also be improper

because people would still be in front of him while he was praying. Mr. Hipps tried to explain the

importance of observing proper prayer protocols.

370.     In response to Mr. Hipps's explication of his religious custom, Perdue threatened to send

Mr. Hipps to the hole. Consistent with the jail's practice of inmates having the right to request

that a corporal respond to resolve any issue or concern with a corrections officer, Mr. Hipps

asked Perdue to get the corporal to resolve the issue. Perdue left, returned a few seconds later

(without the corporal), and threatened: "I'm going to give you three chances to move, if you

don't move by the third, I'm going to move you myself."

371.     Mr. Hipps complied with Perdue's command, picked up his prayer rug, and walked

towards his bunk. He said: "This is my religion. I could sue you for this." Perdue responded: "I'll

give you something to sue for." Perdue then grabbed Mr. Hipps and put him in a chokehold.

Perdue dragged Mr. Hipps to the front of the pod, threw him on his face, and told him to stop resisting.

372. Another officer had to physically remove Perdue from Mr. Hipps.

373. Despite having done nothing wrong, Mr. Hipps spent the next five days in the hole.

374. He remained in the hole for two days after an investigator visited Mr. Hipps in the hole and confirmed that the video showed that Mr. Hipps had done nothing wrong.

375. Despite Perdue's vicious attack on Mr. Hipps, jail administration did not place Perdue on leave or even separate Perdue from Mr. Hipps. Perdue constantly taunted Mr. Hipps when he returned from the hole.

376. No one has been held accountable for attacking Mr. Hipps.

377. The video evidence of this attack that the County has provided in response to public-records requests by media and others excludes footage of part of the attack. The County can provide no explanation for this apparent tampering, and has provided little of the surveillance video of Mr. Hipps's time in custody that should exist.

378. No one was held accountable for the missing video footage.

379. The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

380. Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

**Corrections officer Charles Enoch attacked Jasper Muldrow for singing, putting him in a dangerous rear naked chokehold.**

381.    On November 12, 2018, corrections officer Charles Enoch, who touts being "trained in ground fighting," used excessive and entirely unnecessary force against Jasper Muldrow, pushing and punching him before putting him in a rear naked chokehold. In Brazilian Jiu Jitsu, the move is called Mata-Leão, which means "lion killer."

382.    Other officers then pepper sprayed and strapped Mr. Muldrow into a restraint chair.

383.    Enoch attacked Mr. Muldrow because he was singing during the 20 minutes he was allotted out of his cell each day.

384.    Mr. Muldrow suffered a broken wrist. The County did not transport him to the hospital to receive medical care for the broken bone until five days later.

385.    In explaining his use of the rear naked chokehold, Enoch asserted in a written statement that while "it would appear that inmate was being choked," "in actuality" he wasn't. Enoch explained that "according to doctors + MMA [mixed martial arts], and Ju [sic] Jitsu coaches when a 'choke hold' is applied correctly, the person being choked will lose consciousness with in [sic] 4 to 7 seconds." He essentially tried to excuse the attack because he failed to nail the move.

386.    The jail found that Enoch failed to attempt to disengage before using force, failed to document what had actually transpired, and used excessive force.

387.    Enoch is a 12-year veteran of the corrections staff. His behavior in attacking Mr. Muldrow is consistent with what Enoch understood to be something with which he could get away based on how the jail had responded (or failed to respond) to past use-of-force incidents.

388.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**A corrections officer emptied a can of pepper foam into Daniel Ford,
Jr.'s face as he suffered a PTSD attack.**

389.    In December 2018, Daniel Ford, Jr. was booked into the jail. Mr. Ford suffers from post-traumatic stress disorder. Corrections staff refused to provide his mental-health medication.

390.    Mr. Ford was attacked by another inmate and put into administrative segregation.

391.    Corrections officers left him in a cell with blood, feces, and urine in it without clothing or sheets.

392.    When Mr. Ford begged corrections officers to let him clean the cell or give him a blanket, they refused.

393.    Staff eventually brought Mr. Ford clothing when they came to confine him to a restraint chair. While restrained, the staff emptied a can of pepper spray in his face as he experienced a PTSD episode because of the jail's failure to provide his medication.

394.    Corrections staff did not properly decontaminate Mr. Ford, leaving him covered in pepper-spray residue.

395.    The jail held no one accountable.

396.    Mr. Ford requested video of these events, but Cuyahoga County has provided only a fraction of the video that should exist of his mistreatment.

397.    No one was held accountable for the missing video footage.

398.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

399.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

**Jail staff restrained, beat, and pepper sprayed Antoine Blackshear
without legitimate reason to do so.**

400.    During a single week in December 2018–January 2019, with no legitimate reason to do

so, jail staff confined Antoine Blackshear to a restraint chair, beat him, and pepper sprayed him

six times.

401.    Jail staff failed to adequately decontaminate Mr. Blackshear before releasing him.

402.    The jail held no one accountable.

403.    The jail has provided no video evidence of two of the attacks on Mr. Blackshear despite

repeated public-records requests on his behalf.

404.    No one was held accountable for the missing video footage.

405.    The treatment that this individual endured is consistent with the jail's custom, policy,

pattern, and practice of using excessive force as a punitive measure and otherwise victimizing

and abusing the individuals detained there.

406.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom,

policy, pattern, and practice of destroying public records documenting the abuse that corrections

staff are perpetrating at the jail.

**Corrections staff pepper sprayed and restrained Margaret Jackintell,
an elderly veteran with mental-health issues, for no reason.**

407.    Margaret Jackintell is a 57-year old Navy veteran. She was booked into the county jail in

December 2018.

408.    While incarcerated, she observed a corrections officer verbally abusing other incarcerated

women. She voiced her disagreement with the way that he was addressing the women.

409.    Ms. Jackintell suffers from mental illness. As she sat calmly at a table in her pod,

corrections staff took her to the ground and triggered an anxiety attack. Two guards saturated

her with pepper spray before strapping her into a restraint chair.

410.    Jail staff left Ms. Jackintell in the restraint chair, covered in pepper spray, for approximately 10 hours and 15 minutes. She was denied food, water, or the opportunity to use the restroom facilities.

411.    For days after she was released from the chair, corrections staff refused to allow her to shower or clean herself.

412.    After she endured this abuse, Corporal Brad Bitterman repeatedly came to her cell to taunt her saying, e.g., "You're no fucking kind of veteran, you fucking bitch! I don't believe you're a veteran."

413.    The jail held no one accountable.

414.    Ms. Jackintell, through counsel, requested video of her time in custody. But the Defendant County did not provide surveillance video that should have existed of the attack and its aftermath, and produced body-worn camera video from only Corporal Brad Bitterman.

415.    No one was held accountable for the missing video footage.

416.    The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

417.    Failing to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse that corrections staff are perpetrating at the jail.

### Corrections officers beat Terrence Debose while he was strapped into a restraint chair.

418.    On March 22, 2019, a corrections officer strapped Terrence Debose in a restraint chair in a small cell. Mr. Debose suffers from mental illness.

419.    While Mr. Debose was restrained, Corporal Nicholas Evans turned off his body-worn camera and repeatedly punched Mr. Debose in the face.

420.    A screen shot from the jail-surveillance video of the beating follows:



421.    Another corrections officer, Timothy Dugan, entered the room and joined in the abuse, punching Mr. Debose twice in the face.

422.    Because of the attack, Mr. Debose suffered a concussion.

423.    Evans was indicted for felonious assault and Dugan was indicted for misdemeanor assault. Both pleaded guilty. Evans was sentenced to 9 months incarceration and Dugan was sentenced to 10 days.

424.    The jail held no one accountable.

425.   The treatment that this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

426.   On information and belief, there are incidents of excessive force and abuse by corrections officers—including retaliatory and punitive use of force, restraints, and pepper spray—besides those listed above.

427.   The failure of County administration to respond appropriately to acts of gratuitous and excessive violence in the years leading up to July 16, 2018 left corrections personnel with the unmistakable impression that unprovoked brutality was acceptable. And corrections personnel acted accordingly by engaging in ever-more-egregious acts of violence. The County administration encouraged this violence by responding with callousness to inmates' physical and medical needs.

428.   The County has a custom, policy, pattern, and practice of failing to use body-worn cameras to document incidents at the jail. Defendant Ivey, the former warden, was indicted and pleaded guilty on charges stemming from his direction to corrections staff not to film certain incidents or encounters (because the video could help people pursue civil lawsuits against the County). He resigned as part of a plea deal in the fall.

429.   The County has a custom, policy, pattern, and practice of failing to preserve and maintain public records as required by law and consistent with the applicable records-retention schedule and preservation obligations triggered by pending or anticipated litigation. The County destroyed public records depicting the incidents described above in violation of Ohio public-records law. The systematic and unauthorized deletion of jail surveillance video permits corrections staff to misrepresent facts regarding the systemic abuses perpetrated in the facility.

430.    In October 2019, Ohio Attorney General Dave Yost launched a criminal investigation

into missing county records in the County's Sharepoint system, which is a document-sharing and

storage platform. Certain documents known to be in that system have since been deleted,

precluding review and examination of metadata that would reveal which employees accessed or

otherwise interacted with records. The County defied a court order from Judge Patricia

Cosgrove in failing to preserve the records. The County also failed to preserve the records as

required by the applicable records-retention schedule.

### CLAIM 1
### FOURTEENTH AMENDMENT EXCESSIVE-FORCE VIOLATION
### UNDER 42 U.S.C. § 1983
### (AGAINST DEFENDANTS CLARK AND MARSH)

431.    Plaintiff incorporates all previous allegations.

432.    Both Defendants Marsh and Clark purposefully or knowingly used objectively

unreasonable force against Ms. Glass, a pretrial detainee, consistent with the jail's custom, policy,

pattern, and practice of using force, restraints, and chemical agents as punishment.

433.    Defendant Marsh followed Defendant Clark's unlawful order to strap Ms. Glass into a

restraint chair.

434.    Defendant Marsh then purposefully and knowingly yanked on her handcuffs and pushed

her head down into her lap, holding it down with his elbow and then his hand as he removed the

handcuffs. Ms. Glass remained complaint. His use of force was unnecessary, gratuitous, and

objectively unreasonable.

435.    Ms. Glass was strapped in a restraint chair when Defendant Marsh purposefully and

knowingly punched her in the head. Nothing could justify punching a restrained person in the

head. That use of force was unnecessary, gratuitous, and objectively unreasonable.

436.    This was not the first time that Defendant Marsh punched a restrained inmate in the head. He did the same thing to Sean Panoroski. The one-day suspension he received was a slap on the wrist and was woefully inadequate to remedy his violent tendencies.

437.    On information and belief, Defendant Marsh punched another inmate in the face for no reason in June 2018 and was not disciplined.

438.    Ms. Glass was strapped in a restraint chair when Defendant Clark purposefully and knowingly pepper sprayed Ms. Glass in the face, grabbing her by the hair to prevent her from turning her face to avoid the spray. He pepper-sprayed Ms. Glass in the eyes approximately six-inches away from her face.

439.    Defendant Clark's use of pepper spray on Ms. Glass was unnecessary, gratuitous, and objectively unreasonable.

440.    How Defendant Clark administered the pepper spray was also purposeful, knowing, and objectively unreasonable. On information and belief, manufacturer recommendations and the Defendant County's own written policy mandates that the discharge of pepper spray be at least three feet away from the person's face.

441.    Defendant Clark knew that officials using pepper spray must hold the can at least three feet from the person's face.

442.    Defendant Clark's blatant disregard of written policy and/or manufacturer recommendations caused Ms. Glass unreasonable physical, mental, and emotional pain.

443.    Defendant Clark's use of excessive force was premeditated: he continuously shook up his pepper-spray can even before Ms. Glass was brought into the room to be restrained. He continued shaking the can even after Ms. Glass's waist, wrists, and shoulders were strapped into the chair, rendering her immobile.

444.    The time that Defendant Clark sprayed Ms. Glass was greater than reasonably necessary under the circumstances.

445.    Defendant Clark used the pepper spray the way he did and as long as he did with malicious intent to cause pain, consistent with Cuyahoga County's established custom, policy, pattern, and practice of condoning gratuitous violence against inmates. His failure to decontaminate her effectively was intended to prolong her suffering, and was likewise consistent with Cuyahoga County's established custom, policy, pattern, and practice of inadequately decontaminating OC-exposed inmates, especially inmates of color.

446.    No one could have thought that the force employed against Ms. Glass was reasonably necessary. Defendant Clark's use of excessive force, however, was entirely consistent with the County's culture of abusive violence toward inmates. Corrections staff were left in the position of going along with brutality or objecting and risking violence themselves for insisting on constitutional treatment for those incarcerated.

447.    As a direct and proximate result of these Defendants' unlawful and sadistic conduct, Ms. Glass suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

448.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this unlawful conduct.

### CLAIM 2
### FIRST AMENDMENT RETALIATION AND FOURTEENTH AMENDMENT VIOLATION
### UNDER 42 U.S.C. § 1983
### (AGAINST DEFENDANTS MARSH AND CLARK)

449.    Plaintiff incorporates all previous allegations.

450.    Defendants Marsh and Clark restrained Ms. Glass in a restraint chair—and then attacked her—for requesting a phone call.

451.    In requesting a phone call, Ms. Glass was engaging in protected conduct under the First Amendment to the U.S. Constitution.

452.    It is commonly understood in the community that people arrested may make a phone call. Much like the right to remain silent or the right to an attorney, the right to make a phone call is commonly referenced in television programs depicting law-enforcement activities.

453.    Ms. Glass had a constitutional right to request a phone call. And as the mother of three children who needed to know where she was, it was reasonable for her to make that request. It was unreasonable for jail staff to deny her request.

454.    Defendants Marsh and Clark retaliated against Ms. Glass by strapping her to the restraint chair and attacking her for exercising her First Amendment rights.

455.    These Defendants' conduct caused Ms. Glass unreasonable physical, mental, and emotional pain.

456.    As a direct and proximate result of these Defendants' unlawful conduct, Ms. Glass suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

457.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this unlawful conduct.

### CLAIM 3
#### FOURTEENTH AMENDMENT EXCESSIVE-FORCE VIOLATION
#### UNDER 42 U.S.C. § 1983 FOR FAILURE TO PROMPTLY AND EFFECTIVELY DECONTAMINATE PLAINTIFF FOLLOWING USE OF CHEMICAL AGENT
#### (AGAINST DEFENDANT CLARK)

458.    Plaintiff incorporates all previous allegations.

459. Following his unwarranted and wildly excessive use of force against her, Defendant Clark was responsible for ensuring that he removed the chemical agent from Ms. Glass's skin.

460. Defendant Clark unreasonably delayed initiating decontamination of Ms. Glass following his administration of OC foam to her face.

461. Defendant Clark intentionally failed to effectively decontaminate Ms. Glass following his administration of OC foam to her face.

462. Defendant Clark left Ms. Glass alone in a wait room for over two hours covered in burning pepper foam.

463. Defendant Clark was primarily responsible for leaving Ms. Glass to suffer the effects of OC foam for a prolonged period after he sprayed her. He maliciously and sadistically failed to promptly or effectively decontaminate her to cause her additional harm.

464. As a direct and proximate result of this Defendant's unlawful conduct, Ms. Glass suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

465. Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant Clark and others from engaging in this unlawful conduct.

### CLAIM 4
### INTENTIONAL TORT—ASSAULT
### (AGAINST DEFENDANTS MARSH AND CLARK)

466. Plaintiff incorporates all previous allegations.

467. Defendants Marsh and Clark's intentional actions described above caused Plaintiff reasonable apprehension of an immediate harmful or offensive contact.

468. As a direct and proximate result of these Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which these

Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

469.     These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this unlawful conduct.

## CLAIM 5
### INTENTIONAL TORT—BATTERY
### (AGAINST DEFENDANTS MARSH AND CLARK)

470.     Plaintiff incorporates all previous allegations.

471.     Defendants Marsh and Clark engaged in the above-described actions intending to cause the harmful contact and the harmful contact resulted. The offensive contacts were unlawful and unwanted.

472.     As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

473.     These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this unlawful conduct.

## CLAIM 6
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DEFENDANTS CLARK AND MARSH)

474.     Plaintiff incorporates all previous allegations.

475.     In conducting himself as he did, Defendant Clark either intended to cause emotional distress or knew or should have known that the actions taken would cause serious emotional distress to Ms. Glass.

476.     Defendant Clark's conduct in pepper spraying Ms. Glass approximately six inches away from her face, while holding her head to prevent her from averting her eyes from the direct spray, was extreme and outrageous. Defendant Clark's conduct in failing to decontaminate Ms.

Glass from the pepper spray residue, continuing to restrain her, and failing to permit her to shower or change her clothing for two days was also extreme and outrageous. His conduct went beyond all possible bounds of human decency and is intolerable in civilized society.

477.    In conducting himself as he did, Defendant Marsh either intended to cause emotional distress or knew or should have known that the actions taken would cause Ms. Glass serious emotional distress.

478.    Defendant Marsh's conduct in tying down Ms. Glass and hitting her in her face was extreme and outrageous. It went beyond all possible bounds of human decency and is intolerable in civilized society.

479.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer mental anguish so serious and of such a nature that no reasonable person could be expected to endure it, and for which these Defendants are liable.

480.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this unlawful conduct.

## CLAIM 7
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DEFENDANTS CLARK AND MARSH)

481.    Plaintiff incorporates all previous allegations.

482.    Plaintiff was subjected to physical peril at the hands of Defendants Clark and Marsh and suffered severe emotional distress.

483.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer serious mental anguish for which these Defendants are liable.

**CLAIM 8**
**CIVIL LIABILITY FOR CRIMINAL ACTS UNDER R.C. 2307.60(A)(1)**
**(AGAINST DEFENDANT CLARK)**

484.   Plaintiff incorporates all previous allegations.

485.   The conduct complained of above constitutes criminal acts by Defendant Clark. The crimes include, but are not limited to,

   a.  felonious assault (R.C. 2903.11(A)(1));

   b.  attempted felonious assault (R.C. 2923.02/2903.11(A)(1));

   c.  interfering with civil rights (R.C. 2921.45(A));

   d.  unlawful restraint (R.C. 2905.03(A));

   e.  dereliction of duty (R.C. 2921.44).

486.   As a direct and proximate result of Defendant Clark's criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff has suffered and will continue to suffer economic and non-economic damages for which Defendant Clark is liable, including, but not limited to mental, emotional, and physical pain and suffering, and punitive damages.

487.   This Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant Clark and others from engaging in this unlawful conduct.

**CLAIM 9**
**CIVIL LIABILITY FOR CRIMINAL ACTS UNDER R.C. 2307.60(A)(1)**
**(AGAINST DEFENDANT MARSH)**

488.   Plaintiff incorporates all previous allegations.

489.   The conduct complained of above constitutes criminal acts by Defendant Marsh. The crimes include, but are not limited to,

   a.  assault (R.C. 2903.13(A));

   b.  interfering with civil rights (R.C. 2921.45(A));

    c.   unlawful restraint (R.C. 2905.03(A));

    d.   dereliction of duty (R.C. 2921.44).

490.    As a direct and proximate result of Defendant Marsh's criminal conduct, which showed a

spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff suffered and will

continue to suffer economic and non-economic damages for which Defendant Marsh is liable,

including, but not limited to mental, emotional, and physical pain and suffering, and punitive

damages.

491.    This Defendant's acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter Defendant Marsh and others from engaging in this unlawful

conduct.

### CLAIM 10
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR A CUSTOM, POLICY, PATTERN AND PRACTICE TOLERATING THE USE OF
### EXCESSIVE FORCE
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

492.    Plaintiff incorporates all previous allegations.

493.    Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to the use

of excessive force by its corrections officers at the jail. This widespread tolerance of excessive

force by corrections officers constitutes a County custom, policy, pattern, and practice, and led to

Plaintiff being attacked on July 16, 2018 for no good reason.

494.    The behavior of Defendants Marsh and Clark, and the various corrections officers

depicted throughout the videos attached to Ms. Glass's initial complaint, that harmed Ms. Glass

is part of a recurring pattern of excessive force used on the people in custody at the county jail.

495.    The corrections employees who witnessed the attack on Plaintiff and its aftermath failed

to demonstrate basic human empathy, barely reacting at all to the attack Defendants Marsh and

Clark inflicted on Plaintiff and, with Defendants Jackson, Bailey, Yeshak, Settles, and Belle,

failing to intervene to protect her from the savage and unjustified violence that Defendants Marsh and Clark inflicted. This callous indifference bespeaks a routine character to brutal, sadistic violence as something wholly unremarkable or unusual to county corrections officers. To them, this was just another day at the office.

496.    Cuyahoga County has failed to provide its corrections staff with acceptable working conditions by grossly understaffing its jail. This understaffing makes jail staff more fearful and likely to overreact to any situation that arises. Regularly working under such conditions means there will be more violence. When that violence is not punished, staff learn that violence is allowed or even encouraged as a mechanism for control. Supervisors should have anticipated that corrections personnel would be angry and frustrated about terrible employment conditions, and were likely to take out that anger on those in custody.

497.    Per the jail's *written* policies, use of force is ostensibly supposed to be limited to instances of justifiable self-defense, prevention of self-inflicted harm, protection of others, prevention of riot, prevention of escape or other crimes, controlling or subduing an inmate who refuses to obey a staff command, and discharge of a firearm or other weapon.[11] But the jail regularly allows corrections officers to use force against inmates in other instances not listed in its written policies. Even when the jail does investigate or impose any sanction, it is typically nothing more than a slap on the wrist. Based on the totality of the circumstances—including the sheer number of use-of-force incidents and deployments of OC foam/pepper spray where no use of force should have been permitted at all—the jail's actual policy, custom, pattern, and practice is contrary to its written policy.

---

[11] *See* Cuyahoga County Corrections Center Policy and Procedures, Use of Force (Response to Resistance), Policy No. 0002 (effective Jan. 1, 2016).

498.    The use of force is regularly used as a punishment or a form of discipline by corrections officers at the jail, including when corrections personnel don't like what an incarcerated citizen has to say. And the County has time and again failed to appropriately discipline officers who engage in such tactics, resulting in a clear understanding among those incarcerated that they are subject to indiscriminate violence for any perceived slight or irritation that they might inspire in an officer. Inmates justifiably fear being attacked by jail staff for no good reason.

499.    Because the County has for so long tolerated acts of indiscriminate and excessive violence against people in custody, Defendants Marsh and Clark understood that they were welcome to abuse Ms. Glass (or anyone else) without fear of reprisal.

500.    Cuyahoga County's customs, policies, patterns, and practices have created a toxic culture that has desensitized its corrections personnel to brutal, sadistic violence at the jail because that violence is something wholly unremarkable. Corrections officers' savage and casual resort to violence is an ordinary aspect of jail culture that those incarcerated have learned to expect and that those responsible for overseeing the jail staff have fostered and tolerated.

501.    Based on previous unjustified use of restraints and pepper spray, Defendant Cuyahoga County had notice of a pattern of constitutionally offensive acts by its corrections officers, but took no remedial steps in response to the notice.

502.    Cuyahoga County lacked proper administrative controls to ensure that staff conducted their work in a constitutional manner.

503.    The culture of the punitive violence cultivated at the county jail was apparent to federal investigators who assessed the facility in October–November 2018.

504.    By permitting, tolerating, and sanctioning a persistent and widespread custom, policy, pattern, and practice of corrections officers using excessive force against people in custody, under which Plaintiff was restrained, assaulted, and pepper sprayed, Defendant Cuyahoga County

deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

505.    The County's response to the attack on Ms. Glass further confirms its abdication of its responsibility to protect those in its custody: the County's failure to swiftly investigate and impose significant discipline against Defendant Marsh and Clark for their criminal conduct ratified their conduct and confirmed for all of their colleagues who witnessed the attack (or viewed the video) that employees who inflict brutal, gratuitous, and unprovoked violence are welcome to continue their employment at the jail.

506.    Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to Ms. Glass, Lucille Dumas, Joshua Castleberry, Blanche Hill, Chariell Glaze, Corrionne Lawrence, Glenn Mayer, Jr., Joseph Sawyer, Timothy Bennett, Tyrone Hipps, Jr., Jasper Muldrow, Daniel Ford, Jr., Antoine Blackshear, Margaret Jackintell, Terrence Debose, Michael Roarty-Nugent, and others.

507.    Despite the current sheriff making repeated admissions about the problems in the jail and the need to change the violent and abusive culture among the corrections staff, the Defendant County has not disciplined each of the corrections staff who have used excessive force against inmates, or held anyone in jail administration or County administration accountable for perpetrating the greatest human-rights crisis in this community's history. Nor has anyone been held accountable for the mass deletion of jail surveillance videos that captured these horrific events as they unfolded.

508.    As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM 11
## FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR DELIBERATE INDIFFERENCE/FAILURE TO TRAIN AND SUPERVISE CORRECTIONS OFFICERS AND PERSONNEL WITHIN THE JAIL
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

509.    Plaintiff incorporates all previous allegations.

510.    Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to its failure to train and supervise corrections officers and other jail personnel, including nurses, on how to interact with people in custody, including how to use force appropriately in a correctional setting, how to not sadistically abuse inmates, how to provide medical care to people in urgent and evident distress (including how to properly decontaminate people subjected to pepper spray), how to effectively decontaminate those sprayed with chemical agents, and the constitutional obligation of how to intervene to prevent coworkers from using excessive force against those in custody.

511.    Defendant Cuyahoga County failed to train and supervise its corrections officers on how to use the best use-of-force tactics to ensure the safety of both staff and incarcerated citizens. The behavior of Defendants Marsh and Clark, and the other employees who did nothing while those Defendants abused Plaintiff, is consistent with a recurring pattern of how corrections officers interact with people in custody at the Cuyahoga County Corrections Center, due to a lack of training and accountability, and due to a general tolerance for ignoring the humanity of those in the jail. Cuyahoga County failed to adequately train corrections staff on conflict resolution, de-escalation techniques, and anger management.

512.    Defendant Cuyahoga County had notice of its failure to train and supervise its corrections personnel, which resulted in a pattern of constitutionally offensive acts by its corrections officers. But, Defendant County took no remedial steps in response to the notice.

513.     Defendants Marsh and Clark and the other Defendants present for the attack on Ms. Glass behaved as they did because it was consistent with Defendant Cuyahoga County's culture of violence and abuse against the people detained in its jail.

514.     Defendant Cuyahoga County has, despite notice, tolerated and nurtured its corrections officers' violent and abusive conduct by failing to intervene and prevent abuse.

515.     For example, Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to, Glenn Mayer Jr., Corrionne Lawrence, Tyrone Hipps, Jr., Joshua Castleberry, Terrence Debose, Joseph Sawyer, Daniel Ford, Jr., Antoine Blackshear, Margaret Jackintell, Blanche Hill, Michael Roarty-Nugent, Jasper Muldrow, Timothy Bennett, Lucille Dumas, Chariell Glaze, and others.

516.     Defendant Cuyahoga County has, despite notice, tolerated and nurtured its corrections officers' violent and abusive conduct by failing to train its corrections personnel on their constitutional obligation to intervene and prevent abuse.

517.     Defendant County knew that it was not enforcing its written policies and that its corrections staff, including the individual Defendants, lacked relevant training. The County also knew that its chronic failure to adequately staff the jail while continuously marketing itself to take in more and more incarcerated population from Cleveland and the surrounding communities would lead to predictable disaster. Yet, Defendant County failed to take basic steps to mitigate the disaster it created.

518.     Defendant County also was deliberately indifferent to its obligation to preserve public records depicting the activities in the jail—including use-of-force incidents—that would prove that inmate allegations of misconduct are true. Instead, the County carried out mass deletion of jail surveillance footage and otherwise operated an insecure computer system that allowed individual corrections personnel to avoid uploading to upload use-of-force videos captured on

body-worn cameras, delete videos, rename videos, or transfer video files out of the system where they are customarily stored.

519. As detailed above, Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens, and failed to train its staff to preserve evidence of use-of-force incidents.

520. The County consistently tolerated a practice by jail staff of falsely reporting use of force and the circumstances (or lack thereof) leading to that use of force. The corrections staff's ability to get away with false reporting encouraged more violence by lessening accountability.

521. Besides the constant threat of punitive violence, Cuyahoga County's incarcerated population also lives with deplorable conditions including acute overcrowding, lack of medical care, inadequate nutrition and hygiene, vermin infestations, and a cascade of other horrific conditions. The jail is a crucible of misery of which the County has been on notice and aware for years. In a move calculated to inflict unnecessary suffering on the incarcerated population, jail administration deliberately moved medical screenings from the intake area to avoid having medical personnel observe and evaluate new arrivals in need of medical care, including mental-health and substance-abuse treatment. Despite its obligation to maintain minimum standards under Ohio Administrative Code Chapter 5120:1-8 and the Federal Performance-Based Detention Standards of the United States Department of Justice, the County allowed the jail to devolve into abject squalor.

522. In November 2018, several county judges wrote to jail administration about poor conditions in the jail. One judge said, "The County's indifference to the dangers created by failing to meet the needs of a very fragile and volatile prison population must end." Others blasted the woefully inadequate medical care.

523. The County's deliberate indifference to the needs of its inmate population and the conditions under which they are forced to survive led directly to the deaths of nine inmates: on June 10, 2018, Theodore Carter died at the jail from complications from cancer; on June 26, 2018, Esteban Parra died at the jail from an overdose; on July 3, 2018, Larry Johnson died at the jail from suicide; on August 28, 2018, Jose Arquillo died at the jail from an overdose (Defendant Ivey would later be charged and plead guilty to charges stemming from his direction to a corrections officer to turn off his body camera during this incident); on August 30, 2018, Gregory Fox died at the jail from suicide; on August 31, 2018, Randall Rain died at the jail from suicide; on October 2, 2018, Allen Gomez Roman died at the jail from suicide; on December 30, 2018, Brandon Kiekisz died at the jail from suicide; and on May 10, 2019, Nicholas Colbert died at the jail from suicide.

524. Despite its awareness of the overcrowding, understaffing, lack of adequate medical care, use of excessive force, destruction of video and other evidence, and other misconduct at the jail, Defendant Cuyahoga County has refused to mitigate this disaster.

525. Conditions at the jail remain so atrocious that in September 2019 the corrections officers filed to begin the process of changing the union that will represent them in collective-bargaining negotiations with the County from the Ohio Patrolmen's Benevolent Association to the Fraternal Order of Police. The officers cited involuntary overtime and unsafe working conditions (such as double- and quadruple-podding, leaving a single officer in charge of 100–200 inmates at a time) as some of the concerns prompting the change in their bargaining representative.

526. The State of Ohio Department of Rehabilitation and Correction has also found serious deficiencies with the jail's conditions. Two separate inspections in 2019 revealed a combined 150 violations of state standards.

527.    Last year, specially appointed assistant Ohio attorneys general indicted numerous current or former jail employees including the former director of regional corrections, the former warden, as well as supervisors and line corrections officers. The charges include violent crimes, drug crimes, dereliction of duty, and tampering with evidence, among others.

528.    Defendant Budish appointed an utterly unqualified individual to run the jail system and took no steps to exercise his authority as county executive to ensure the jail was properly managed and that those in custody were safe.

529.    Defendants Budish and Leiken ignored repeated complaints from senior administrators and others about Defendant Mills's performance and leadership of the jails.

530.    Defendant Leiken did not exercise his authority as the chief of staff—to whom the sheriff was reporting—to ensure the jail was properly managed and that those in custody were safe.

531.    Defendant Taylor did not exercise his authority in his various roles to ensure that the jail was properly managed and that those in custody were safe.

532.    Defendant Pinkney did not exercise his authority as the County Sheriff to ensure that the jail was properly managed and that those in custody were safe.

533.    Defendant Ivey did not exercise his authority as the jail warden to ensure that the jail was properly managed and that those in custody were safe.

534.    Mills's contempt for those who served as corrections officers was palpable and created a toxic environment. As Defendant County's Inspector General reported, "Mills stated that a 'trained monkey' could do the job of a CO. The tone set at the top of an organization generally affects each layer within the chain of command." Defendant Mills's lack of respect for those in his employ—which he did not try to conceal —led to exceptionally low staff morale. Corrections staff perceived that their complaints would be ignored because their role was not highly regarded.

535.    Defendant County's Inspector General found that "a perceived culture of retaliation limited the County's ability to identify and correct problems." Personnel feared that management would retaliate if staff reported issues.

536.    Mills's refusal to acknowledge the difficulty and complexity of the profession of corrections officer was largely responsible for the training failures within the facility at every level.

537.    Defendant County permitted, tolerated, and sanctioned a persistent and widespread custom, policy, pattern, and practice of deliberate indifference to failing to train and supervise corrections officers (1) not to use excessive force including use of restraints and/or chemical agents like pepper spray, (2) to provide medical care to people in distress, (3) to permit access to showers, restrooms, clothing, and food, and (4) to follow its written policies rather than its actual abusive customs, policies, patterns, and practices. As a result, Plaintiff was assaulted and did not receive timely or humane medical care for injuries she sustained when attacked by corrections officers. Defendant Cuyahoga County deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

538.    As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM 12
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR A CUSTOM, POLICY, OR PRACTICE OF FAILING TO PROMPTLY AND EFFECTIVELY
### DECONTAMINATE INMATES SUBJECTED TO CHEMICAL AGENTS
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

539.    Plaintiff incorporates all previous allegations.

540.    Cuyahoga County has a custom, policy, pattern, and practice of failing to promptly and effectively decontaminate inmates following the use of chemical agents such as OC foam. This

failure to adequately decontaminate the targeted inmate is intended to purposefully prolong his or her agony.

541.    Cuyahoga County has a custom, policy, pattern, and practice of making people sprayed with OC foam respond to a series of questions before staff will rinse the burning residue from their skin. The questions are on a form that corrections staff call "the sheet."

542.    Regardless of the answers to the questions on "the sheet," the next step is to squirt the pepper-sprayed person with the hose.

543.    If a pepper-sprayed person refuses to answer the questions on "the sheet," they are still squirted with the hose.

544.    "The sheet" includes questions about recreational and prescription drug use and health conditions. There are no drugs or health conditions that would disqualify a pepper-sprayed person from being squirted with the hose.

545.    The corrections staff asking the questions and receiving the responses are not medical professionals. They are often unfamiliar with the names of medications and ask the pepper-sprayed person to repeat themselves, thus further delaying the administration of the hose water.

546.    Asking pepper-sprayed people questions about their medications, drug use, and health conditions—when the answers to those questions have no impact on what happens next—unnecessarily delays relief and prolongs the person's suffering.

547.    On information and belief, Cuyahoga County intentionally failed to specify in its written policies how long a person sprayed with OC foam should be rinsed with water to effectively remove the burning residue from the skin, which leads to the predictable result that staff would fail to effectively decontaminate pepper-sprayed inmates.

548.    Cuyahoga County's failure to remove Defendant Clark from further involvement with Ms. Glass after his unjustified and wildly excessive use of OC foam on a restrained inmate left

him in a position to further torture her by delaying and then ineffectively deploying decontamination efforts.

549.    Cuyahoga County's practice for "decontaminating" inmates sprayed with OC foam is to rinse them with water in the slop room. The practice appears to be three short sprays with a hose, but the duration varies among inmates. Rarely, if ever, is the duration sufficient to effectively decontaminate an affected individual. Cuyahoga County's decontamination protocol for inmates does not include soap or any other cleaning solution (though guards receive cleaning agents if they are contaminated). Cuyahoga County has no written policy that directs staff on how to go about effectively decontaminating someone exposed to OC foam.

550.    Cuyahoga County fails to follow manufacturer's recommendations regarding decontamination protocols.

551.    Other law-enforcement agencies provide clear direction to staff on how to effectively decontaminate someone exposed to OC foam. For example,

    a.  the Federal Bureau of Prisons directs its staff as follows: "As soon as possible, the person shall be allowed to wash all areas affected by the agent with soap and water, or assisted by staff as necessary."[12]

    b.  The Hamilton County Sheriff's policy is to "[w]ash the contaminated area with a cool solution of soap and water, or flush profusely with cold water for three to four minutes."[13]

    c.  The Franklin County Sheriff's OC policy specifies that following contamination the eyes should be rinsed with saline solution.[14]

    d.  The Seneca County jail's policy provides that "Personnel and inmate/detainees will be decontaminated after exposure to OC by flushing the contaminated areas with generous amount of water (especially the eyes) for five to ten minutes or until

---

[12] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement on Oleoresin Capsicum (OC), CPD/CSZB 5576.04 (Feb. 6, 2017).

[13] Hamilton County Sheriff's Office General Order on Firearms and Defensive Weapons 209.13.1.A.4.a (Jan. 31, 2020).

[14] Franklin County, Administrative Regulation No. ASR119 (Nov. 8, 2001).

the irritation is gone."[15] Seneca County's policy further provides that "Inmate/detainees exposed to OC shall be allowed and encouraged to shower and change both inner and outer wear for decontamination purposes."[16]

e.  Richland County jail's policy also provides that people contaminated with OC must be "allowed to change clothes and have access to water."[17]

f.  In Paulding County, the policy instructs to "[f]lush the contaminated skin areas of the subject with large amounts of cool water and expose to fresh air as soon as possible after the exposure."[18]

g.  Montgomery County's policy involves the officer "dousing the person's face, eyes, and nose areas with liberal amounts of water or by using decontamination towelettes."[19]

h.  And Mercer County instructs its personnel to "[f]lush the contaminated areas with large amounts of cold water and expose to fresh air" and to provide "further relief" by "showering and washing the affected areas with soap and water."[20]

552.  Cuyahoga County's practice of leaving those contaminated with OC foam alone in a wait room for at least an hour (though usually more) is unmoored from any legitimate purpose and is instead merely intended to serve a punitive function.

553.  As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

---

[15] Seneca County Jail Policy and Procedure Manual, Response to Resistance, page 10 (Feb. 12, 2019)

[16] *Id.*

[17] Richland County Jail General Order 24.9(H).

[18] Paulding County Sheriff's Office Policy No. CT-3, Use of Oleoresin Capsicum Spray (Oct. 17, 1997).

[19] Montgomery County Sheriff's Office, General Order No. 1.1.3.H.1, General Orders Manual (6th ed.) (Sept. 9, 2019).

[20] Mercer County Sheriff's Office, Policies and Procedures, 8.07 Pepper Spray (June 16, 2014).

## CLAIM 13
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR A DELIBERATE INDIFFERENCE/FAILURE TO TRAIN STAFF TO PROMPTLY AND
### EFFECTIVELY DECONTAMINATE INMATES SUBJECTED TO CHEMICAL AGENTS
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

554. Plaintiff incorporates all previous allegations.

555. Cuyahoga County has a custom, policy, pattern, and practice of failing to establish and enforce policies to ensure the prompt and effective decontamination of inmates following the use of chemical agents such as OC foam.

556. Consistent with its failure, the County held no one accountable for failing to promptly and effectively decontaminate Ms. Glass during her two-day jail stay.

557. Had staff been adequately trained, Defendant Clark would not have been the one holding that hose, holding the power to prolong Ms. Glass's agony through ineffective decontamination.

558. Had staff been adequately trained, Ms. Glass would have been adequately decontaminated, abating her suffering rather than prolonging it.

559. As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM 14
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR A CUSTOM, POLICY, PATTERN, AND PRACTICE OF UNREASONABLY RESTRAINING
### INMATES INCLUDING THOSE SUBJECTED TO CHEMICAL AGENTS
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

560. Plaintiff incorporates all previous allegations.

561. Cuyahoga County has a custom, policy, pattern, and practice of strapping inmates in restraint chairs as a punitive measure.

562.    Cuyahoga County has a custom, policy, pattern, and practice of requiring people sprayed with chemical agents to sit for long periods of time in a wait room, strapped in a restraint chair.

563.    After Ms. Glass was sprayed, staff told her that she would have to sit in the chair for at least an hour. This is consistent with pronouncements from jail guards to other inmates sprayed with OC foam.

564.    There is no valid reason for requiring an inmate sprayed with a chemical agent to then sit tied in a restraint chair for an hour or more.

565.    There is no valid reason to keep a compliant person tied up for an hour with burning chemicals on their skin.

566.    Cuyahoga County's custom, policy, pattern, and practice of requiring inmates to sit for an hour or more in a restraint chair after being pepper sprayed serves no purpose beyond prolonging their agony, compounding their humiliation, and punishing them.

567.    Cuyahoga County's custom, policy, pattern, and practice of denying access to restroom facilities to inmates held in restraint chairs serves no purpose beyond further punishing and humiliating them when they are left to urinate and defecate on themselves.

568.    As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM 15
### FOURTEENTH AMENDMENT EQUAL PROTECTION VIOLATION UNDER 42 U.S.C. § 1983 FOR RACIALLY DISPARATE TREATMENT IN OC DECONTAMINATION PRACTICES
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

569.    Plaintiff incorporates all previous allegations.

570.    As a general matter, Cuyahoga County's custom, policy, pattern, and practice is to spend less time decontaminating inmates of color than white inmates.

571.    Ms. Glass was pepper sprayed for six seconds, and "decontaminated" with water for less than six seconds.

572.    Ms. Glass, an African-American woman, was treated differently than one or more similarly situated white individuals, who were effectively or at least more effectively decontaminated than she was.

573.    As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM 16
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR DELIBERATE INDIFFERENCE TO LEGITIMATE MEDICAL NEEDS (AGAINST DEFENDANT CUYAHOGA COUNTY)

574.    Plaintiff incorporates all previous allegations.

575.    Defendant Cuyahoga County has a custom, policy, pattern, and practice of failing to provide adequate medical care to inmates subjected to chemical agents.

576.    Consistent with that policy, and despite her obvious need for medical care, Ms. Glass was not effectively decontaminated from the OC foam and her asthma and hypertension were not treated.

577.    As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

**CLAIM 17**
**FIRST AND FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983**
**FOR CUSTOM, POLICY, PATTERN, AND PRACTICE OF RETALIATING AGAINST**
**INMATES WHO COMPLAIN**
**(AGAINST DEFENDANT CUYAHOGA COUNTY)**

578.    Plaintiff incorporates all previous allegations.

579.    Defendant Cuyahoga County regularly condoned or approved retaliation against inmates

who complained about being mistreated.

580.    Consistent with Defendant County's custom, policy, pattern, and practice of permitting

retaliation against inmates who complain about their conditions of confinement, Ms. Glass was

subjected to the above-described misconduct.

581.    As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff

suffered and will continue to suffer economic and non-economic damages for which this

Defendant is liable, including, but not limited to, mental, emotional, and physical pain and

suffering.

**CLAIM 18**
**RECKLESS HIRING, TRAINING, SUPERVISION, DISCIPLINE, STAFFING, AND RETENTION**
**(AGAINST DEFENDANT CUYAHOGA COUNTY)**

582.    Plaintiff incorporates all previous allegations.

583.    Defendant Cuyahoga County failed to exercise due care and acted in a reckless manner

in hiring, training, supervising, disciplining, staffing, and retaining the individual defendants.

584.    The individual defendants were unfit for their positions and duties.

585.    Defendant Cuyahoga County's reckless conduct in this regard proximately caused Ms.

Glass's injuries alleged above.

586.    As a direct and proximate result of the misconduct and abuse of authority detailed above,

Ms. Glass sustained damages.

CLAIM 19
DESTRUCTION OF PUBLIC RECORDS UNDER R.C. 149.351
(AGAINST DEFENDANT CUYAHOGA COUNTY)

587.    Plaintiff incorporates all previous allegations.

588.    Ms. Glass's approximately 48 hours of incarceration were captured on one or more mounted surveillance cameras.

589.    The video footage from the cameras within the jail are public records documenting the activities of the jail and its officials.

590.    Public records may not be removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of except under a records-retention schedule approved by the county records commission, the state auditor, and the Ohio history connection (formerly the Ohio historical society).

591.    As of July 16, 2018 (the day Ms. Glass was attacked), the County had no records-retention schedule that would permit the destruction of any surveillance or body-worn camera footage documenting the activities at the jail.

592.    As of July 9, 2019 (the day Ms. Glass filed her complaint in this case), the County had no records-retention schedule that would permit the destruction of any surveillance or body-worn camera footage documenting the activities at the jail.

593.    Under Ohio law, public records may be deleted only in accordance with an approved records-retention schedule.

594.    Because the County had no records-retention schedule authorizing the destruction of videos captured at the jail, it was obligated by law to keep those records indefinitely.

595.    In response to Ms. Glass's April 24, 2019 request for the video footage of her time in custody from July 16–18, 2018, the County claimed it had no records of her intake, of her release from the wait room, or of her discharge.

596.    The footage from the various surveillance cameras that captured Ms. Glass's time incarcerated did not magically vanish into thin air. There is no reasonable explanation for why this footage—and the footage of so many other individuals in custody—allegedly no longer exists.

597.    In the criminal trial over the abuse Joshua Castleberry endured, FBI agent Dennis Timony testified that he found evidence that jail videos had been destroyed.

598.    In August 2019, Defendant Clark—who was already under indictment for attacking Ms. Glass—was arrested and indicted for extortion of another corrections officer. According to the indictment, Clark offered to delete incriminating video of the other corrections officer's involvement in a use-of-force incident. In response to a public-records request from Ms. Glass identifying the videos by name, Cuyahoga County has claimed that it cannot locate two of the three videos found to be in Defendant Clark's possession that he was using for attempted extortion.

599.    In October 2019, special assistant attorneys general with the Ohio Attorney General's office discovered that the County had defied the court order and deleted documents regarding a County employee's ongoing corruption case. The deletion of those documents precludes a review and examination of their metadata, which would reveal which County employees accessed the documents.

600.    On information and belief, employees at the jail can alter, delete, rename, download, or otherwise destroy or tamper with surveillance and body-camera videos and other public records at the jail.

601.    On information and belief, Defendant Cuyahoga County destroyed surveillance video and/or body-worn camera footage of Ms. Glass's confinement.

602.    Failing to preserve jail surveillance videos or failure to discipline officers who failed to appropriately use their body-worn cameras—and consistently upload the footage to the system—encourages more violence by lessening accountability.

603.    Ms. Glass is aggrieved by the destruction of the video evidence of her time in custody. Proving her civil claims and the extent of her damages may be more challenging without the videos.

604.    Ms. Glass commences this civil action for injunctive relief to compel compliance with R.C. 149.351(A), for her reasonable attorneys' fees in this action, and for the civil forfeiture of $1,000 per violation for the destruction of videos documenting her time in custody.

### CLAIM 20
### SPOLIATION OF EVIDENCE
### (AGAINST DEFENDANT CUYAHOGA COUNTY)

605.    Plaintiff incorporates all previous allegations.

606.    From the moment jail administration learned what Defendants Clark and Marsh had done to Ms. Glass, it was obvious that litigation was probable. Yet, despite knowing that video and other tangible evidence supporting her case existed, Cuyahoga County destroyed it.

607.    After making Ms. Glass remain in her OC-contaminated clothing for two days, jail personnel confiscated her clothing as she was being booked out on July 18, 2018.

608.    After confiscating her contaminated clothing, on information and belief, the County—acting through one or more of its personnel—intentionally destroyed Ms. Glass's clothing.

609.    The County also intentionally destroyed and failed to appropriately preserve public-record videos of Ms. Glass in the jail from booking through release.

610.    From Ms. Glass's period of incarceration (July 16–18, 2018) through April 24, 2019 when she requested videos of her time in jail, Cuyahoga County's applicable records-retention schedule did not permit the deletion of any surveillance or body-worn camera video.

611.    The County's intentional destruction of a crime victim's clothing and video of her time in custody was designed to disrupt Ms. Glass's case. Without being able to submit her dress for forensic examination, she will not have the opportunity to present scientific evidence regarding the location or concentration of OC foam dispersed on her clothing. Without videos of her time in custody, she is left with nothing but her own testimony about the events leading to the attack, e.g., during the booking process where Defendant Jackson threatened Ms. Glass with being tied down and maced. Without the videos of her time in custody, she may be left with nothing but her own testimony to prove that she was not permitted to shower or change clothes during her two days in jail (which surveillance video would clearly and unambiguously show). Cuyahoga County has destroyed video evidence that would have served as conclusive proof of those important facts.

612.    As a direct and proximate result of Defendant Cuyahoga County's willful destruction of Ms. Glass's clothing and videos of her time in custody, Ms. Glass sustained damages.

### CLAIM 21
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR DELIBERATE INDIFFERENCE/FAILURE TO TRAIN AND SUPERVISE CORRECTIONS OFFICERS AND PERSONNEL WITHIN THE JAIL
### (AGAINST DEFENDANTS BUDISH, LEIKEN, TAYLOR, PINKNEY, MILLS, AND IVEY)

613.    Plaintiff incorporates all previous allegations.

614.    The policymaking Defendants each were instrumental in helping to create the culture of violence and deliberate indifference that resulted in Ms. Glass and so many others suffering punitive brutality.

615.    Each of the policymaking Defendants facilitated civil-rights violations at the jail. Each implicitly or explicitly authorized, approved, and knowingly acquiesced to the unconstitutional conduct described by—time and again—failing to meet the most basic obligations to run a humane jail where inmates were treated as human beings and weren't regularly brutalized by staff without consequence.

616. The use of force against Ms. Glass wasn't an isolated incident. The policymaking Defendants allowed excessive use of force to flourish in the jail. Other supervisory personnel participated in fostering this brutal environment. In one use-of-force event after another, supervisors intentionally chose not to take appropriate steps to remedy constitutional violations, with the implicit approval of supervisors. These men encouraged each specific incident of violent misconduct by failing to appropriately address the acts of violence that preceded it. They also encouraged staff to cover for each other and lie to protect each other to the detriment of any inmate who might dare to complain about being brutalized.

617. Defendant Mills's disrespect of inmates and staff calloused and hardened jail personnel, resulting in the continual uptick of tolerated brutality.

618. The policymaking Defendants besides Mills all knew well that Mills was mismanaging the jail, but continued to allow Mills to run the jail.

619. Because of the actions and inactions of the policymaking Defendants at all relevant times, excessive use of force is deeply entrenched in the jail's culture, as current sheriff David Shilling's comments to media on January 24, 2020 following Defendant Clark's entry of his plea bargain confirm:

> Reporter Paul Orlousky: "Is the staff willing to change?"
>
> Sheriff Shilling: "Yeah, I'm encouraged by it, Paul. The staff is on board. Naturally it's getting that buy-in from them."

620. Despite knowledge of a variety of serious problems at the jail, the policymaking Defendants allowed the constitutional violations to continue. The current sheriff admits that the staff has to *change* to prevent what happened to Ms. Glass from happening to others.

621. Defendant Budish knew about the problems in the jail and failed to take appropriate steps to ensure that inmates constitutional rights were not violated.

622.    Defendant Leiken knew about the problems in the jail and failed to take appropriate steps to ensure that inmates constitutional rights were not violated.

623.    Defendant Taylor knew about the problems in the jail and failed to take appropriate steps to ensure that inmates constitutional rights were not violated.

624.    Defendant Pinkney knew about the problems in the jail and failed to take appropriate steps to ensure that inmates constitutional rights were not violated.

625.    Defendant Mills knew about the problems in the jail and failed to take appropriate steps to ensure that inmates constitutional rights were not violated.

626.    Defendant Ivey knew about the problems in the jail and failed to take appropriate steps to ensure that inmates constitutional rights were not violated. He encouraged jail staff to avoid capturing events on body-worn cameras to make it harder for victims to prove what happened to them.

627.    Defendant Clark, following the custom, policy, pattern, and practice that Defendant Ivey established and Defendant Mills approved or condoned, did not activating his body-worn camera until after he finished pepper spraying Ms. Glass. Defendant Clark, consistent with Defendant Ivey's established custom, policy, pattern, and practice, failed to record his attack on Ms. Glass so he could ensure there would be no body-worn camera footage—making it Ms. Glass's word against a slew of corrections staff what was said and done during those moments.

628.    Defendant Ivey's official policy was for staff to avoid using their body-worn cameras as the written policies required. The purpose of this was to avoid creating footage that would aid or assist victims in pursuing justice. This policy created conditions ripe for unconstitutional abuses.

629.    This deliberate indifference included failing to train staff about their constitutional obligation to intervene to prevent colleagues from using excessive force against those in custody.

630.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff suffered

and will continue to suffer economic and non-economic damages for which these Defendants are

liable, including, but not limited to, mental, emotional, and physical pain and suffering.

631.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter these Defendants and others from engaging in this unlawful

conduct.

### CLAIM 22
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER R.C. 2307.60(A)(1)
### (AGAINST DEFENDANTS BUDISH, LEIKEN, TAYLOR, PINKNEY, MILLS, AND IVEY)

632.    Plaintiff incorporates all previous allegations.

633.    The conduct complained of above constitutes criminal acts by the policymaking

Defendants. The crimes include, but are not limited to,

      a.  dereliction of duty (R.C. 2921.44); and

      b.  interfering with civil rights (R.C. 2921.45)

634.    As a direct and proximate result of these Defendants' criminal conduct, which showed a

spirit of ill-will, hatred, and wanton disregard for Plaintiff's rights, Plaintiff has suffered and will

continue to suffer economic and non-economic damages for which these Defendants are liable,

including, but not limited to mental, emotional, and physical pain and suffering, as well as

punitive damages.

635.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter these Defendants and others from engaging in this unlawful

conduct.

### . CLAIM 23
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR DELIBERATE INDIFFERENCE/FAILURE TO INTERVENE TO STOP EXCESSIVE
### FORCE (AGAINST DEFENDANTS CLARK, MARSH, JACKSON, BAILEY, YESHAK, SETTLES, AND BELLE)

636.    Plaintiff incorporates all previous allegations.

637.    Defendants Clark, Marsh, Jackson, Bailey, Yeshak, Settles, and Belle failed to intervene to stop all or part of the excessive force inflicted on Ms. Glass. These acts of omission are just as actionable as the acts of commission perpetrated by their colleagues. If just one of these staff members had intervened, they could have stopped or prevented the violence against Ms. Glass.

638.    Each officer had time to stop, intervene, and prevent the unlawful restraint of Ms. Glass.

639.    Each officer had time to stop, intervene, and prevent the use of force against Ms. Glass.

640.    Each officer had a constitutional duty to prevent use of excessive force against Ms. Glass.

641.    Each officer had a constitutional duty to protect Ms. Glass from being criminally attacked by jail staff.

642.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

643.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter these Defendants and others from engaging in this unlawful conduct.

### CLAIM 24
### INTIMIDATION UNDER R.C. 2921.03
### FOR KNOWINGLY FILING A MATERIALLY FALSE OR FRAUDULENT WRITING TO INFLUENCE OR HINDER A PUBLIC SERVANT OR WITNESS IN THE DISCHARGE OF THE PERSON'S DUTY
### (AGAINST DEFENDANTS BAILEY AND SETTLES)

644.    Plaintiff incorporates all previous allegations.

645.     Defendant Bailey and Defendant Settles filed their materially false reports to try to justify

the abuse that Ms. Glass endured and to try help their colleagues avoid accountablity for their

actions. And they did so in an attempt to influence or hinder one or more public officials in

discharging their duty to investigate incidents of abusive violence in the jail and discipline

corrections officers who perpetrate such acts. They also did so in an attempt to influence or

hinder jurors sitting in a criminal or civil action arising out of these events.

646.     As a direct and proximate result of these officers' false writings, Ms. Glass has suffered

damages.

### CLAIM 25
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR DELIBERATE INDIFFERENCE TO LEGITIMATE MEDICAL NEEDS
### (AGAINST DEFENDANT LESSMANN)

647.     Plaintiff incorporates all previous allegations.

648.     As seen in the body-camera video captured by Defendant Clark, Defendant Lessmann

observed Ms. Glass having difficulty breathing and experiencing dangerously high blood

pressure.

649.     Defendant Lessman, as a nurse, would have been aware based on her personal

observations of Ms. Glass that she required medical attention beyond briefly dabbing her eyes

with gauze and taking her blood pressure. Defendant Lessmann could clearly see that Ms. Glass

had not been adequately decontaminated, and could reasonably perceive that such failure would

cause Ms. Glass prolonged suffering.

650.     Defendant Lessmann did not try to mitigate Ms. Glass's suffering or attend to her

legitmate medical needs. She did not try to rinse the burning chemicals from Ms. Glass's skin or

eyes.

651.    A person whose skin is covered in a burning chemical has an obvious medical need to have their skin cleaned.

652.    A person whose eyes are contaminated with a burning chemical has an obvious medical need to have their eyes flushed with water.

653.    A person with a burning chemical on their body should be given the opportunity to clean the affected area with soap and water until the the chemical is removed.

654.    Asthma is a serious breathing condition and any lay person would recognize it as necessitating medical treatment, particularly following administration of a chemical agent that can cause complications with breathing.

655.    Hypertension is serious cardiovascular condition and any lay person would recognize it as necessitating medical treatment, particularly following administration of a chemical agent that can cause complications with breathing.

656.    Rather than attend to Ms. Glass's obvious medical needs, Defendant Lessmann declared Ms. Glass "done" despite not having assisted her in any meaningful way. Lessmann joked with corrections officers about Ms. Glass leaving a trail of pepper foam. And Lessmann allowed Ms. Glass to be locked up alone in a wait room and then returned to a cell for the next two days without removing Ms. Glass's contaminated clothing or permitting her to shower.

657.    Defendant Lessmann's falsification of Ms. Glass's blood-pressure numbers facilitated corrections staff's isolation of her in the wait room for over two hours while she desperately needed medical care.

658.    Defendant Lessmann's delay in providing basic medical care to Ms. Glass had the detrimental effect of prolonging her agony.

659.    Defendant Lessmann was not disciplined for her failure to ensure that Ms. Glass was effectively decontaminated.

660. Dedendant Lessmann was not disciplined for her failure to treat Ms. Glass's asthma or hypertension before releasing her to corrections officers for further unwarranted punishment.

661. Defendant Lessmann was not disciplined for falsifying Ms. Glass's medical records.

662. As a direct and proximate result of this Defendant's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

663. This Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter this Defendant and others from engaging in this unlawful conduct.

### PRAYER FOR RELIEF

Ms. Glass respectfully requests the following relief:

A. Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, and of 42 U.S.C. § 1983 and state law;

B. Enter judgment in Ms. Glass's favor on all claims for relief;

C. Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Ms. Glass has suffered and is reasonably certain to suffer;

D. Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct (note that, consistent with well-established law, Ms. Glass does not seek punitive damages from Cuyahoga County but instead only from the individual Defendants);

E. Declare that Cuyahoga County unlawfully destroyed public records regarding Ms. Glass's confinement under R.C. 149.351 and order all relief;

F. Award pre- and post-judgment interest at the highest lawful rate;

G. Award Ms. Glass her reasonable attorneys' fees and all other costs of suit; and

H. Award all other relief in law or equity, including injunctive relief, to which Ms. Glass is entitled and that the Court deems equitable, just, and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues within this complaint.

Dated: August 12, 2020

THE CHANDRA LAW FIRM LLC

*/s/Subodh Chandra*
Subodh Chandra (0069233)
Jessica S. Savoie (LA33378)[21]
Brian Bardwell (0098423)
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, Ohio 44113
216.578.1700 Phone/216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Jessica.Savoie@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

Respectfully submitted,

PEIFFER, WOLF, CARR, KANE & CONWAY,
APLC

*/s/per consent*
Ashlie Case Sletvold (0079477)
1422 Euclid Avenue, Suite 1610
Cleveland, Ohio 44115
216.260.0808 Phone/504.608.1465 Fax
asletvold@pwcklegal.com

*Attorneys for Plaintiff Chantelle Glass*

## CERTIFICATE OF SERVICE

I certify that on August 12, 2020, our office mailed a copy of the above document to the Clerk of Court and sent copies by email to all counsel of record.

*/s/Subodh Chandra*
*One of the attorneys for Plaintiff*

---

[21] Ms. Savoie is licensed to practice in Louisiana and certified to practice pending admission in Ohio. (Practice temporarily authorized pending admission under Gov. Bar R. I., Sec. 19. Ohio Attorney Registration No. 0099330).



# QUALITY ASSURANCE REVIEW

Cuyahoga County Correctional Center
Facility Review
October 30 - November 1, 2018

EXHIBIT

1

#136619.1

CUYAHOGA
COUNTY
CORRECTIONAL
CENTER

Oct 30-Nov 1, 2018

Quality Assurance Report

## Table of Contents

Executive Summary...................................................................................................................2

Facility Review Team................................................................................................................3

USMS Personnel........................................................................................................................3

Facility Information...................................................................................................................5

Staffing By Functional Areas....................................................................................................6

Functional Area Ratings............................................................................................................6

Overall Performance Ratings.....................................................................................................7

Deficient Areas..........................................................................................................................8

Capacity...................................................................................................................................24

**General Overview by Functional Area ......................................................... 25**

A - Administration and Management........................................................................................25

B - Health Care........................................................................................................................28

C - Security and Control..........................................................................................................33

D - Food Service......................................................................................................................36

G - Services and Programs.......................................................................................................45

**Detailed Findings by Functional Area......................................................... 48**

A - Administration and Management........................................................................................48

B - Health Care........................................................................................................................49

C - Security and Control..........................................................................................................49

D - Food Service......................................................................................................................50

E - Restrictive Housing............................................................................................................50

F - Safety and Sanitation.........................................................................................................51

G - Services and Programs.......................................................................................................51



**Executive Summary**

The purpose of this Facility Review is to provide the United States Marshals Service (USMS), Prisoner Operations Division (POD) a comprehensive overview of operations at the Cuyahoga County Correctional Center (CCCC) located in Cleveland, Ohio. The Facility Review uses the Federal Performance-Based Detention Standards (FPBDS) for non-federal detention facilities. The FPBDS are designed to ensure the safe, secure, and humane confinement of federal detainees and provide a document to indicate the facility's level of performance. The overall facility operation received a rating of **"Unsatisfactory/At-Risk"**.

The Facility Review was conducted by a team of contract correctional subject matter experts (SMEs) from the Correctional Management and Communications Group, LLC. CCCC co-houses USMS detainees in the same housing units (USMS detainees are not separated out, identified or defined by any distinguished or unique identifying factor, or housed in USMS only pods or housing units) with other county inmates, therefore the focus of this review is on the conditions of confinement for the entire population and references both USMS detainees and CCCC inmates. During the three-day onsite visit, the team toured and observed operations of all CCCC facilities including the Cuyahoga County Jail I Annex in Bedford and the Cuyahoga County Jail II Annex, in Euclid. The Facility Review included review of all relevant policies, procedures, and other supporting documentation. Facility Review team staff conducted numerous interviews with facility staff, contractors, USMS detainees and Cuyahoga County inmates.

Facility staff and contractors were professional and responsive to the Facility Review team members' requests for information, documentation and access throughout all facilities. Some staff members approached Facility Review team SME's willingly shared information beyond the interview questions while others were guarded in their responses.

Facility Review team members interviewed a sampling (200+) of the detainee/inmate populations to determine their perception of personal treatment, health care, food service, sanitation and overall facility operations. 80% of the detainees/inmates interviewed expressed concern with health care, food service, sanitation, and 100% of the detainees/inmates feared retaliation by or from the Security Response Team (SRT) staff or other Correctional Officer staff members for speaking with Facility Review team members. More than 20 anonymous notes or letters were passed to Facility Review team members directly by detainees/inmates confined to the Restrictive Housing Unit, expressing fear of brutal retaliation and in some cases fear for their life.

Non-compliances with the FPBDS were identified in all functional areas. Overall, Administration and Management, Food Service, Restrictive Housing and Safety and Sanitation were determined to be **"Unsatisfactory/At-Risk"**, Security and Control and Health Care are "Marginal", and Services and Programs is "Satisfactory".

The **"Unsatisfactory/At-Risk"** designation indicates performance of the functional area does not meet most contractual requirements and recovery is not likely in a timely manner. Additionally the performance of the function is so defective or deficient, it actually presents a risk to the safety of staff and detainees; the risk include life and safety concerns as well as inhumane conditions of confinement, which violate safe, secure, humane conditions and/or violate detainee/inmate Constitutional Rights.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

Attributing to the overall **"Unsatisfactory/At-Risk"** rating is significant **"At-Risk"** findings and behaviors associated is:

➢ An inadequate medical program, unexplained causes of two detainee deaths which occurred while the inmates were in CCCC custody, failure to perform post mortem mortality reviews, and insufficient and unclear answers regarding six recent inmate deaths (which includes the two previous unexplained deaths).  There is no documentation available for review in absence of Mortality Reviews to identify life safety issues or to verify or discredit CCCC contributory factors;

➢ The intentional and deliberate use of food as a punitive measure; the diet for detainees/inmates in Restrictive Housing Units (RHU) lacks basic daily nutritional requirements, fails to meet daily nutritional caloric intake standards, is not varied and does not meet needs of detainees/inmates housed in the RHU who also present with medical conditions which require dietary variety and consideration;

➢ Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed access to showers, telephones and recreation due to CCCC's implementation of a lockdown system known as "Red Zone".  The "Red Zone" RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering;

➢ Refusal to install shower curtains for detainees/inmates housed in the "Red Zone" RHU, detainees/inmates are afforded not privacy when they are eventually allowed to take a shower; during showering detainees are in full view of any staff, or detainees in the shower area, as well as visible through narrow oblong windows which look directly into the showering area from the common access hallway;

➢ The co-locating of juvenile detainees with adult offenders in the RHU; detainees are not sight and sound separated, are not receiving the enhanced developmental nutritional intake requirements and are provided not educational or brain development programming. Juveniles are subjected to the same harsh "Red Zone" RHU conditions as the adult offenders in every fashion from hygiene to recreations and out of cell time;

➢ Detainee/inmates assigned to "No Contact Housing" (Special confinement restrictions ordered by the court which include no access to mail, telephones, or general population) are denied general housing privileges to which they are entitled, as they are not confined for disciplinary reasons. Detainee/inmates assigned to "No Contact Housing" confinement are up to 27 hours, are not allowed daily access to showers, and recreation and are subjected to the same "Red Zone" lockdown system as RHU detainee/inmates.  Additionally, interviews with detainees/inmates in



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

the "No Contact Housing" who are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering;

➢ CCCC is not Prison Rape Elimination Act (PREA) compliant despite undergoing a voluntary pre-PREA AUDIT 2015.  The voluntary pre-PREA Audit identified 119 deficiencies or non-compliance findings; further inquiry and review of documentation reveal not one of the identified 119 deficiencies or non-compliance findings since 2015 has been corrected;

➢ CCCC fire emergency drills are not being performed and facility staff could not demonstrate they can safely evacuate detainees/inmates from the facility;

➢ The CCCC is currently operating over the American Correctional Associations rated capacity, as such detainees/inmates must regularly sleep on mattresses on the floor; during the review two pregnant females were found to be sleeping on mattresses on the floor;

➢ Detainee/inmate court meals were not properly refrigerated or stored and were found placed in an unused office area which reeked of dead vermin; and

➢ Detainees/inmates are placed in cells awaiting court which are not equipped with functioning toilets or have access to running water, are stripped of all furnishing to include a place to sit, and were found to house up to 12 detainees/inmates, in an cell who's design capacity is for only up to 2 persons.  Additionally, these detainees are left unsupervised and locked in these cells for periods greater than 10 hours.

A closeout briefing was conducted on Thursday, November 1, 2018. Those present included: Theo Anderson, Chief, Detention Standards and Compliance, POD, USMS; Rickye Rice, Assistant Chief, Detention Standards and Compliance, POD, USMS; Heather Bonsell, Chief, MMB, USMS; Laura Gardner, Detention Contract Administrator, Northeast Ohio, USMS; Peter Elliott, US Marshal, Northern District of Ohio, Troy Mizel, Northern District of Ohio, USMS, Anne Murphy, Northern District of Ohio, USMS; Lisa Kaplan, CV, Special Agent, Civil Rights, FBI, Preetham Rao, Special Agent, Federal Bureau of Investigations (FBI); Sicily Woods, Deputy Inspector General, Agency of Inspector General, Cuyahoga County; and members of the Review Team.

**Facility Review Team**

| Facility Name | Name | Title |
|---|---|---|
| Cuyahoga County Correctional Center | Flora Brooks Boyd | Lead Reviewer, Administration and Management and Services and Programs SME |
| | Francisca Terrero-Leibel | Health Care SME |
| | Marcus Baldwin | Security and Control SME: |
| | Bernard Higgins | Restrictive Housing SME: |
| | Rene Garcia | Food Service SME |
| | Ezell Jackson | Safety and Sanitation SME |
| | Jeffery Foster | Lead Reviewer Trainee |



SENSITIVE LIMITED DISTRIBUTION          **#136619.5**

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

**USMS Personnel**

| Name | Title |
|---|---|
| Theo Anderson | Chief, Detention Standards and Compliance, POD, USMS |
| Rickye Rice | Assistant Chief, Detention Standards and Compliance, POD, USMS |
| Heather Bonsell | Chief, Medical Management Branch, POD, USMS |
| Laura Gardner | Detention Contract Administrator, POD, (Northeast Ohio) USMS |

**Accompanying Review Personnel**

| Name | Title |
|---|---|
| Anne Murphy | (A) Assistant Chief Deputy, Northern District of Ohio, USMS |
| Troy Mizel | Supervising Deputy, Northern District of Ohio, USMS |
| Lisa Kaplan | Federal Bureau of Investigations, Fraud and Economics Unit, Cleveland |
| Preetham Rao | Special Agent, Federal Bureau of Investigations, Cleveland |
| Sicily Woods | Deputy Inspector General, Office of the Inspector General, Cuyahoga County |

**Facility Information**

The CCCC is located in downtown Cleveland, Ohio, CCCC is owned by Cuyahoga County and operated by the Cuyahoga County Sheriff's Department. CCCC consists of two high rise buildings (Jail I and Jail II) and two satellite locations (Bedford Heights Comprehensive Re-entry Programming Center and Euclid Jail Annex). The facility houses all levels of security statuses, from maximum security to weekenders.

The current contract agreement (60-10-0049) between the USMS and CCCC allows for housing 15 male USMS detainees. The contract became effective September 30, 2010 and indicates a fixed rate of $81 per day for housing USMS detainees. Sheriff's Deputies provide court transportation for USMS detainees to the federal courthouse which is approximately a half a mile from the facility. The contract requires detainees to be housed in a manner consistent with federal law and the Federal Performance-Based Detention Standards

The facility's rated capacity is 1765 (1455 males and 310 females). On the first day of the Facility Review, there were a total of 2420 inmates (2360) and detainees (60). The average length of stay is 29 days.

Jail I consist of seven floors (3rd-10th) with a total of 45 pods. Jail II has seven floors (2nd, 3rd, 4th, 5th, 7th, 9th and 11th) with a total of 29 pods. Nine pods in Jail II are dedicated to house the Cleveland City inmates. Bedford Heights' total capacity is 83 males and Euclid Jail Annex total capacity is 179 (176 males and 3 females). CCCC's organizational structure includes: a Director of Regional Corrections who reports to the Cuyahoga County Sheriff and oversees administrative and program functional areas for the CCCC and its Annex Jail I and Jail II facilities: a Medical Director who also reports to the Sheriff and manages health care services for the CCCC and its Annex Jail I and Jail II facilities; and a Warden, who is responsible for managing and supervising the Sergeants who oversee the day-to-day operations of the CCCC and its Annex Jail I and Jail II facilities. The total authorized correctional officer custody staff compliment is 677 however, at the time of the Facility Review there are approximately 96 vacancies.

CCCC has no national accreditations. The Department of Justice Prison Rate Elimination Act (PREA) field auditors' training program conducted a PREA audit in 2015 and the Interim report dated January 2016



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

identified 119 deficient findings or areas of non-compliance which required corrective actions. The 119 findings require addressing and correcting prior to the CCCC being prepared for a formal PREA Compliance Audit; review of the CCCCs PREA corrective action plan reveal no corrective action has been taken. The facility is unable to provide information regarding the number of non-English-speaking detainees/inmates nor is the number of staff who speak languages other than English available. CCCC does not track the languages staff speak or attempt to determine how the Spanish population is accommodated. The detainee/inmate handbook is only available in English. The facility is not under any court orders or pending litigation.

**Staffing by Functional Areas**

| Functional Area | # of Authorized Staff | # of Staff on Board | # of Authorized Subcontract Staff | # of Subcontract Staff |
|---|---|---|---|---|
| A - Administration and Management | | | 0 | 0 |
| B - Health Care | 67 | 55 | 23 | 14 |
| C - Security and Control | 673 | 577 | 0 | 0 |
| D - Food Service | 12 | 11 | 0 | 0 |
| E - Restrictive Housing | 28 | 28 | 0 | 0 |
| F - Safety and Sanitation | 14 | 14 | 0 | 0 |
| G - Services and Programs | 9 | 6 | 0 | 0 |
| Total | 810 | 698 | 23 | 14 |

**Contingency/Emergency Sites: None**

**Functional Area Ratings**

**Exceptional** - The level of performance exceeds the requirements of the FPBDS with exceptional internal controls. Policies and procedures for achieving the program standards are documented and specific to the mission of the facility; the policies and procedures are communicated to the staff; fully implemented; and the desired outcome is achieved. Findings and Deficiencies are non-existent.

**Very Good** - The level of performance exceeds the requirements of the FPBDS. Internal controls limit Findings and Deficiencies. Policies and procedures for achieving the program standards are documented and specific to the mission of the facility, the policies and procedures are communicated to the staff, implemented and the desired outcome is achieved. Findings and or Deficiencies are minimal and do not affect the performance of the facility.

**Satisfactory** - The program is meeting the requirements of the FPBDS. Lapses in internal controls are minimal. Findings and Deficiencies do not affect the performance of the facility.

**Marginal** - The program is unable to meet the requirements of any one of the 6 Functional Areas or one or more of the 47 Standards. Deficiencies are the result of weak internal controls in one or more areas. The facility is meeting the minimal requirements of the performance standards.

**Unsatisfactory** - Operation of the program is impaired to the point that the facility is unable to



accomplish its mission.  The program is unable to meet the requirements of the FPBDS and is  unlikely to meet those requirements without immediate corrective action to ensure the safety and  security of both staff and detainees.

**Overall Performance Ratings**

| Rating | Contract Requirements | Problems | Corrective Actions |
|---|---|---|---|
| **Exceptional** | Exceeds Many - Gov't Benefit | Few Minor | Highly Effective |
| **Very Good** | Exceeds Some - Gov't Benefits | Some Minor | Effective |
| **Satisfactory** | Meets All | Some Minor | Satisfactory |
| **Marginal** | Does Not Meet Some - Gov't Impact | Serious: Recovery Still Possible | Marginally Effective; Not Fully Implemented |
| **Unsatisfactory** | Does Not Meet Most - Gov't Impact | Serious: Recovery Not Likely | Ineffective |

**Exceptional -** Performance meets contractual requirements and exceeds many to the  Government's benefit. The contractual performance of the element or sub-element being  evaluated was accomplished with few minor problems for which corrective actions taken by the  contractor were highly effective.  To justify an Exceptional rating, identify multiple significant  events and state how they were of benefit to the Government. A singular benefit, however, could  be of such magnitude that it alone constitutes an Exceptional rating. Also, there should have been  NO significant weaknesses identified.

**Very Good -** Performance meets contractual requirements and exceeds some to the  Government's benefit. The contractual performance of the element or sub-element being  evaluated was accomplished with some minor problems for which corrective actions taken by the  contractor was effective. To justify a Very Good rating, identify a significant event and state how  it was a benefit to the Government. There should have been no significant weaknesses identified.

**Satisfactory -** Performance meets contractual requirements. The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory.  To justify a Satisfactory rating, there should have been  only minor problems, or major problems the contractor recovered from without impact to the  contract/order. There should have been NO significant weaknesses identified. A fundamental  principle of assigning ratings is that contractors will not be evaluated with a rating lower than  Satisfactory solely for not performing beyond the requirements of the contract/order.

**Marginal -** Performance does not meet some contractual requirements. The contractual  performance of the element or sub-element being evaluated reflects a serious problem for which  the contractor has not yet identified corrective actions. The contractor's proposed actions appear  only marginally effective or were not fully implemented. To justify Marginal performance,  identify a significant event in each category that the contractor had trouble overcoming and state how it impacted the Government. A Marginal rating should be supported by referencing the  management tool that notified the contractor of the contractual deficiency (e.g., management,  quality, safety, or environmental deficiency report or letter).

**Unsatisfactory -** Performance does not meet most contractual requirements and recovery is not  likely in a timely manner. The contractual performance of the element or sub-element contains a  serious



problem(s) for which the contractor's corrective actions appear or were ineffective.  To  justify an unsatisfactory rating, identify multiple significant events in each category that the  contractor had trouble overcoming and state how it impacted the Government. A singular  problem, however, could be of such serious magnitude that it alone constitutes an unsatisfactory  rating. An Unsatisfactory rating should be supported by referencing the management tools used  to notify the contractor of the contractual deficiencies (e.g., management, quality, safety, or  environmental deficiency reports, or letters). Compliance with FBPD Standards - By Functional Area

| Functional Area | Exceptional | Very Good | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| A - Administration and Management | | | 3 | 5 | 4 |
| B - Health Care | | | 2 | 4 | |
| C - Security and Control | | | 4 | 2 | 4 |
| D - Food Service | | | 1 | 1 | 3 |
| E - Restrictive Housing | | | 1 | | 7 |
| F - Safety and Sanitation | | | 3 | | 2 |
| G - Services and Programs | | | 7 | | 2 |
| J - PREA | | | | | |
| Total | 0 | 0 | 21 | 12 | 22 |

**Deficient Areas.**

**Administration and Management**

**(A.1.1)** The facility director ensures that written policies and procedures describe all facets of facility operation, maintenance, and administration.**4- ALDF-7D-06**

**(A.1.3)** Detainees can obtain copies of facility policies and procedures unless security concerns justly limit access. **4-ALDF-7D-06**

**(A.1.4)** Policies and procedures are reviewed and updated on an annual basis.
**4-ALDF-7D-06**

**(A.2.1)** An internal quality control plan requires an annual review of the facility operations to ensure compliance with facility policies and procedures. Corrective measures are identified and completed. **4-ALDF-7D-09**

**(A.2.2)** At a minimum, the internal quality control plan addresses the following areas:
**(A.2.2.a)** Detainee Health Care
**(A.2.2.b)** Security and Control
**(A.2.2.c)** Safety and Sanitation
**(A.2.2.d)** Food Service
**(A.2.2.e)** Detainee Grievance Program
**(A.2.2.f)** Staff Training/Professional Certifications



**(A.2.3)** The review of the detainee grievance program not only ensures the viability of the grievance program but identifies grievance trends pertaining to facility functions and staff.

**(A.2.4)** Documentation of the previous quality control review and the corrective action measures are kept on file.

**(A.2.5)** The facility administrator or assistant facility administrator, and designated department heads visit the facility's living and activity areas at least weekly to encourage information contact with staff and detainees and to encourage informal contact with staff and detainees and to informally observe living and working conditions. **4-ALDF-2A-06**

**(A.3.1)** The facility maintains custody records on all detainees committed or assigned to the facility

**(A.3.2)** Each detainee custody record will include the following:
**(A.3.2.a)** Intake/booking information
**(A.3.2.b)** Cash and property receipts
**(A.3.2.c)** Reports of disciplinary actions, grievances, incidents, or crimes(s) committed while in custody
**(A.3.2.d)** Frequency and cumulative length of restrictive housing placements **DOJ-Restrictive Housing Report**
**(A.3.2.e)** Records of program participation
**(A.3.2.f)** Work assignments
**(A.3.2.g)** Classification records

**(A.3.3)** The contents of detainee records are identified and separated according to a format approved by the facility director. **4-ALDF 7D-20**

**(A.4.1)** The admission process for newly admitted detainees includes but is not limited to: **4-ALDF 2A-21**
**(A.4.1.c)** Medical, dental, and mental health screenings

**(A.4.5)** Prior to being placed in the general population, each detainee is provided with an orientation to the facility, which includes at a minimum
**(4-ALDF-2A-27; 4-ALDF-4D-22)**:
**(A.4.5.c)** Explanation of transportation options for visitors
**(A.4.5.d)** Explanation of grievance procedures
**(A.4.5.i)** The handbook is translated into those languages spoken by significant numbers of detainees

**(A.4.7)** Detainees verify, by signature, the receipt of their initial orientation and of the detainee handbook and written orientation materials. Signed acknowledgement of the handbook is maintained in the detainee's file.
**4-ALDF-2A-28**



**(A.4.8)** If a detainee cannot read orientation materials then they are read to the detainee by a staff member or are provided through the use of an audio or video tape. For detainees who do not speak English, interpretive services are provided. **4-ALDF-2A-28**

**(A.5.2)** Space is provided for storing the personal property of detainee's safety and securely. **4-ALDF 2A-24**

**(A.6.3)** Absent a compelling reason, detainees are not released directly from restrictive housing to the community. **DOJ-Restrictive Housing Report**

**(A.7.3)** Program and service areas are accessible to detainees with disabilities housed at the facility. **4-ALDF-6B-04**

**(A.8.1)** There is no discrimination regarding administrative decisions or program access based on a detainee's race, religion, national origin, gender, sexual orientation, or disability. **4-ALDF-6B-02**

**(A.9.1)** A comprehensive staffing analysis is conducted annually. Essential posts and positions, as identified in the staffing plan, are consistently filled with qualified personnel. **4-ALDF 2A-14**

**(A.9.3)** Background investigations include:
**(A.9.3.c)** Credit history

**(A.9.4)** A pre-employment physical examination is conducted for all potential Security personnel. **4-ALDF-7B-04**

**(A.9.6)** The facility conducts re-investigations of employees, contractors, and volunteers.

**(A.9.7)** Compliance with restrictive housing policies is reflected in the employee- evaluations of staff assigned to restrictive housing units. **DOJ-Restrictive Housing Report**

**(A.10.3)** All new professional and support employees, including contractors, who have regular or daily detainee contact receive training during their first year of employment. Forty hours are completed prior to being independently assigned to a particular job. An additional 40 hours of training is provided each subsequent year of employment. At a minimum, this training covers the following areas:
**(A.10.3.a)** Security procedures and regulations
**(A.10.3.b)** Supervision of detainees
**(A.10.3.c)** Signs of suicide risk
**(A.10.3.d)** Suicide precautions
**(A.10.3.e)** Use-of-force regulations and tactics
**(A.10.3.f)** Report writing
**(A.10.3.g)** Detainee rules and regulations
**(A.10.3.h)** Key control



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018          Facility Review Report

**(A.10.3.i)** Rights and responsibilities of detainees

**(A.10.3.j)** Safety procedures

**(A.10.3.l)** Social/cultural lifestyles of the detainee population

**(A.10.3.m)** Cultural diversity

**(A.10.3.n)** Communication skills

**(A.10.3.p)** Counseling techniques

**(A.10.5)** All new correctional officers receive 160 hours of training during their first year of employment. At least 40 of these hours are completed prior to being independently assigned to any post. At a minimum, this training covers the following areas **(4-ALDF-7B-10)**:
**(A.10.5.o)** Correctional implications of young adult (age 18-24) brain development and associated de-escalation tactics. **DOJ- Restrictive Housing Report**

**(A.10.6)** Written policy, procedure, and practice provide that all correctional officers receive at least 40 hours of annual training. This training shall include at a minimum the following areas **(4-ALDF-7B-10-1)**:
**(A.10.6.a)** Standards of conduct/ethics
**(A.10.6.b)** Security/safety/fire/medical/emergency procedures
**(A.10.6.c)** Supervision of offenders including training on sexual abuse and assault
**(A.10.6.d)** Use of force

**(A.10.7)** Facility management and supervisory staff receive at least 40 hours of management and supervision training during their first year and at least 24 hours of management training each year thereafter. **4-ALDF-7B-11**

**(A.11.1)** There is a plan that specifies the procedures to be followed in situations that threaten facility security. Such situations include but are not limited to:
**(A.11.1.c)** Disturbances

**(A.11.2)** The facility has written agreements securing the provision of emergency assistance as identified by the emergency plans.

**(A.11.3)** A plan provides for continuing operations in the event of a staff work stoppage or other job action. Copies of this plan are available to appropriate supervisory personnel. **4-ALDF-1C-06**

**(A.12.1)** The facility director ensures the immediate notification to the agency of jurisdiction of serious incidents including, but not limited to:
**(A.12.1.a)** Deaths;
**(A.12.1.b)** Suicide attempts;
**(A.12.1.c)** Hunger Strikes;
**(A.12.1.d)** Emergency medical trips;
**(A.12.1.e)** Escapes;
**(A.12.1.f)** Use of Force;



**(A.12.1.g)** Full or partial facility lockdowns;

**(A.12.1.h)** Incidents impacting facility operations (Riots, Disturbances, Food Strikes, Fires, Natural Disasters);

**(A.12.1.i)** Assaults on staff or detainees requiring medical attention;

**(A.12.1.j)** Detainee transportation incidents;

**(A.12.1.k)** Incidents attracting unusual interest or publicity.

## Health Care

**(B.1.2)** The responsibilities of the health authority include: **4-D-ALDF-4D-01**

**(B.1.2b)** Developing a facility's operational health policy and procedures.

**(B.1.2e)** Developing a quality management program

**(B.1.5)** Health care services are provided by qualified healthcare personnel whose duties and responsibilities are governed by job descriptions that include qualifications and specific duties and responsibilities. **4-ALDF-4D-03**

**(B.1.7)** All professional staff comply with applicable state and federal licensure, certifications, or registration requirements. Verification of current credentials are on file in the facility. **4D-ALDF-4D-05**

**(B.1.13)** An automatic defibrillator is available for use at the facility. **4-ALDF-4D-09**

**(B.1.14)** Correctional and health care personnel are trained to respond to health-related situations within a four-minute response time. The training program is conducted on an annual basis and is established by the responsible heath authority in cooperation with the facility or program administrator and includes instruction on the following: **4-ALDF-4D-08**

**(B.1.14a)** Recognition of signs and symptoms and knowledge of action that is required in potential emergency situations.

**(B.1.14b)** Administration of basic first aid.

**(B.1.14c)** Certification in CPR.

**(B.1.14d)** Method of obtaining assistance.

**(B.1.14e)** Signs and symptoms of mental illness, violent behavior, and acute chemical intoxication and withdrawal.

**(B.1.14f)** Procedures for patient transfers to appropriate medical facilities or health care providers

**(B.1.15)** Individual health emergency (man-down) drill are conducted once a year on each shift where health staff are assigned. Each drill is evaluated. **NCCHC J-A-07**

**(B.2.5)** Medical screenings result in one of the following dispositions: Cleared for general population; Cleared for general population with prompt referral to appropriate health care service; or Referral to appropriate health care service for emergency treatment. **4-ALD-4C-22**



SENSITIVE LIMITED DISTRIBUTION            **#136619.13**

**(B.3.1)** A comprehensive health appraisal for each detainee is completed health care professional within 14-days after arrival at the facility. If there is documented evidence of a health appraisal within the previous 90-days, a new health appraisal is not required except as determined by the designation health authority. **4-ALDF-4C-24**

**(B.3.2)** Health appraisals include the following: **4-ALDF-4C-24**
**(B.3.2h)** Development and implementation of treatment plan including recommendations concerning housing, job assignment, and program participation, when appropriate.

**(B.3.6)** An oral screening by dentist or qualified health care professional trained by a dentist is performed within 14-days of admission. **4-ALDF-4C-20**

**(B.4.1)** All detainees are informed about how to access health services during the intake/admission process in a manner understood by the detainee to include translation into languages spoken by a significant number of detainees, or verbally communicated to the detainee if literacy is an issue. **NCCHC 4C-01**

**(B.4.7)** Detainees who require health care beyond the capacity of the facility as determined by the responsible physician are transferred under appropriate security to a facility where such care is available. (All non-emergency outside are of USMS detainees shall require pre-authorization of the USMS to ensure consistency with the USMS detainee Heath Care Standards.) **NCCHC 4C-05**

**(B.5.2)** Patients with chronic diseases are identified and enrolled in a chronic disease program to decrease the frequency and severity of symptoms, prevent disease progression and complication, and foster improved function. Chronic diseases include, but are not limited to: asthma, diabetes, high blood cholesterol, HIV, hypertension, seizure disorder, tuberculosis, and major mental illnesses. **NCCHC J-G-01**

**(B.5.4)** The health authority maintains a list of chronic care patients. **NCCHC J-G-01**

**(B.5.5)** A proactive program exists that provides care for special needs patients who require medical supervision or multidisciplinary care. Special needs patients include, but are not limited to developmentally disabled individuals, frail/elderly, physical impairments which impair mobility, and patients with serious mental health needs. **NCCHC J-G-02**

**(B.5.6)** The health authority maintains a list of special needs patients. **NCCHC J-G-02**

**(B.5.13)** Management of bio-hazardous waste and decontamination of medical and dental equipment complies with applicable local, state, and federal regulations. **4-ALDF-4C-18 (Mandatory)**



**(B.5.17)** Management of pharmaceuticals includes: **4-ALDF-4C-38; NCCHC J-D-01; NCCHC J-D-02**
**(B.5.17d)** Secure storage and perpetual inventory of all controlled substances, syringes, and needles.
**(B.5.17e)** Administration of medication is by persons properly trained and under the supervision of the health authority and facility administrator or designee.
**(B.5.17f)** Providing a 7-day supply of prescribed medication to detainees transferring/releasing from the facility.

**(B.5.21)** Dental care includes the following: **4-ALDF-4C-20; NCCHC J-E-06**
**(B.5.21e)** Detainees in USMS custody for more than 12 months receive an oral examination

**(B.6.1)** Detainee Suicides
**(B.6.1h)** Suicide review debriefings include administration, health services, and security representatives.

**(B.6.5)** Detainee Death
**(B.6.5a)** As part of an overall protocol that describes the actions to be taken in the event of a detainee's death, the facility will immediately notify the agency of jurisdiction. **4-ALDF-4D-23**
**(B.6.5b)** All deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study.  This process will ensure: **NCCHC J-A-10**
**(B.6.5b.1)** All deaths are reviewed within 30 days
**(B.6.5b.2)** A death review consists:
**(B.6.5b.2.1)** An administrative review
**(B.6.5b.2.2)** A clinical mortality review
**(B.6.5b.2.3)** A psychological autopsy if death is by suicide
**(B.6.5b.3)** Treating staff are informed of the clinical mortality review and administrative review findings.

**(B.6.6)** Restrictive Housing
**(B.6.6b)** If a detainee with serious mental illness is paced in restrictive housing: DOJ-Restrictive Housing Report
**(B.6.6b.2)** The detainee receives intensive, clinically appropriate mental health treatment for the entirety of the detainee's placement in restrictive housing;
**(B.6.6b.3)** At least once per week, a qualified mental health practitioner, assigned to supervise mental health treatment in the restrictive housing unit, conducts a face-to-face clinical contact with the detainee, to monitor the detainee's mental health status and identify sign of deterioration.

**Security and Control**

**(C.1.1)** Space is provided for a 24-hour secure control center for monitoring and coordinating the facility's security, life safety, and communications systems. 4-ALDF-2A-01



SENSITIVE LIMITED DISTRIBUTION          **#136619.15**

**(C.1.9)** Correctional supervisors review permanent logs on each shift to provide responsible department heads/shift supervisors with relevant information. These reviews are documented. 4-ALDF-2A-11

**(C.1.10)** Supervisory staff conduct a daily patrol, including holidays and weekends, of all areas occupied by detainees. Unoccupied areas are to be inspected at least weekly. Patrols and inspections are documented. 4-ALDF-2A-12

**(C.1.11)** A qualified person conducts at least weekly inspections of all security devices, identifying those needing repair or maintenance. Results of the weekly security inspections are reported in writing. 4-ALDF-2A-13

**(C.4.8)** The agency of jurisdiction is immediately notified of any Use of Force Incident or Non-Routine Application of Restraints.

**(C.4.9)** All Use of Force incidents are reviewed by the facility director to ensure compliance with the facility's Use of Force policy.

**(C.6.1)** The use of keys is controlled and inventoried. 4-ALDF-2D-01

**(C.6.2d)** Emergency key usage is documented.

**(C.6.4)** In the event detainee workers are assigned to work details involving the use of tools, facility policy identifies what tools may be used by detainees and identifies the level of required staff supervision.

**(C.6.5)** Medical and dental instruments, equipment, and supplies (syringes, needles, and other sharps) are controlled and inventoried. 4-ALDF-2D-03

**(C.7.1)** There are current written orders for every correctional officer post, which clearly outline duties, responsibilities, and expectations of that post. 4-ALDF-2A-04

**(C.7.3)** Officers assigned to those posts acknowledge in writing that they have read and understand the orders and record the date. 4-ALDF-2A-04

**(C.7.4)** The facility administrator or designee reviews post orders annually and updates them as needed. 4-ALDF-2A-04

**(C.8.2)** Disciplinary Segregation, as a penalty for committing a prohibited act, is reserved for offenses involving violence, escape or posting a threat to institutional safety by encouraging others to engage in such conduct. DOJ-Restrictive Housing Report

**(C.8.17)** Disciplinary decisions are based solely on information obtained in the hearing process, including staff reports, the statements of the inmate charged, and the evidence derived from witnesses and documents. 4-ALDF-6C-14

**(C.8.20)** Disciplinary sentences for offenses resulting from the same incident are served concurrently. DOJ-Restrictive Housing Report



CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018        Facility Review Report

## Food Service

**(D.1.2)** The Food Service Administrator or designee conducts daily inspections of all food service areas, including dining and food preparation areas and equipment. **4-ALDF-4A-15**

**(D.2.1)** Volunteer, detainee food service workers receive a pre-assignment medical examination and periodic reexamination to ensure freedom from diarrhea, skin infections, and other illnesses transmissible by food or utensils. **4-ALDF-4A-13**

**(D.2.5)** Food service employees/workers are required to wear clean outer clothing to prevent contamination of food, equipment, utensils, linens, and single-service and single-use articles. **2013 U.S. Food Code: 2-304.11**

**(D.2.6)** Food service employees/workers are required to wear hair restraints such as hats, hair coverings or nets, beard restraints, and clothing to keep their hair from contacting exposed food; clean equipment, utensils and linens. **2013 U.S. Food Code: 2-402.11**

**(D.3.1)** Refrigerated, potentially hazardous food deliveries are checked on delivery to ensure compliance with Food Code. **2013 U.S. Food Code: 3-202.11, 3-202.15**

**(D.3.2)** Food is stored in a manner compliant with Food Code. **2013U.S. Food Code: 3-3**

**(D.3.3)** Food is protected from contamination from equipment, utensils, and linens in a manner compliant with Food Code. **2013 U.S. Food Code: 3-305.11, 3-305.12**

**(D.4.2)** Ware washing (dishwashing) machines are operating within designed specifications and/or in a manner compliant with Food Code. **2013 U.S. Food Code: 4-204.113, 4-204.114, 4-204.115, 4-204.117, 4-204.118, 4-204.119, 4-501.110, 4-501.112, 4-501.113, 4-501-114, 4-501.116**

**(D.4.9)** Food service equipment shall be cleaned, maintained in good repair and in a manner compliant with Food Code. **2013 Food Code: 4-501.11, 4-501.12, 4-501.14**

**(D.4.13)** Equipment, Food-Contact Surfaces, and Utensils shall be clean to sight and touch. **2013 U.S. Food Code: 4-601.11a**

**(D.4.14)** The food-contact surfaces of cooking equipment and pans shall be kept free of encrusted grease deposits and other soil accumulations. **2013 U.S. Food Code: 4.601.11b**

**(D.4.15)** Nonfood-contact surfaces of equipment shall be kept free of an accumulation of dust, dirt, food residue, and other debris. **2013 U.S. Food Code: 4.601.11c**

**(D.4.16)** Equipment, food-contact surfaces, utensils, cooking equipment, baking equipment, non-food contact surfaces, and linens, shall be cleaned in frequency and method compliant with Food Code. **2013 U.S. Food Code: 4-602.11, 4-602.12, 4-602.13, 4-603.11, 4-603.12, 4-603.13, 4-603.14, 4-**



603.15, 4-603.16, 4-603.17, 4-701.10, 4-702.11, 4-703.11, 4-801.11, 4-802.11, 4-803.11, 4-803.12, 4-803.13

**(D.4.19)** Food Service equipment, utensils, linens, and single service and single use articles are stored in a manner compliant with Food Code. **2013 U.S. Food Code: 4-903.11, 4-903.12, 4-904.11, 4-904.12, 4-904.13**

**(D.5.1)** Detainee meal menus and religious diets are reviewed annually by a qualified nutritionist or dietician to ensure that they meet the nationally recommended dietary allowances for basic nutrition for appropriate age groups. **4-ALDF-4A-07**

**(D.5.4)** Menu evaluations are conducted at least quarterly by food service supervisory staff to verify adherence to the established basic daily servings. **4-ALDF-4A-07**

**(D.5.6)** Three meals, including at least two hot meals, are provided at regular times during each 24-hour period, with no more than 14-hours between the evening meal and breakfast. Variations may be allowed based on weekend and holiday food service demands provided basic nutritional goals are met. **4-ALDF-4A-18**

**(D.5.7)** Therapeutic diets are provided as prescribed by appropriate clinicians. **4-ALDF-4A-09**

**(D.5.9)** Special diets are provided for detainees whose religious beliefs require the adherence to religious dietary laws when approved by the facility chaplain. **4-ALDF-4A-10**

**Restrictive Housing**

**(E.1.1)** Frequency and cumulative length of restrictive housing placement. **DOJ-Restrictive Housing Report**

**(E.2.1)** Absent a compelling reason, detainees are not released directly from restrictive housing to the community. **DOJ-Restrictive Housing Report**

**(E.3.1)** Compliance with restrictive housing policies is reflected in the employee-evaluations of staff assigned to restrictive housing units. **DOJ-Restrictive Housing Report**

**(E.4.1)** Correctional implications of young adult (age (18-24) brain development and associated de-escalation tactics. **DOJ-Restrictive Housing Report**

**(E.5.2)** If a detainee with serious mental illness is placed in restrictive housing: **DOJ-Restrictive Housing Report**
**(E.5.2b)** The detainee receives intensive, clinically appropriate mental health treatment for the entirety of the detainee's placement in restrictive housing.
**(E.5.2c)** At least once per week, a qualified mental health practitioner, assigned to supervise mental health treatment in the restrictive housing unit, conducts face- to- face clinical contact with the detainee, to monitor signs of deterioration.



SENSITIVE LIMITED DISTRIBUTION          **#136619.18**

**(E.6.1)** Disciplinary Segregation, as a penalty for committing a prohibited act, is reserved for offenses involving violence, escape, or posing a threat to institutional safety by encouraging others to engage in such conduct. **DOJ-Restrictive Housing Report**

**(E.6.7)** Disciplinary sentences for offenses resulting from the same incident are served concurrently. **DOJ-Restrictive Housing Report**

**(E.7.2)** Policy identifies the conditions in which a detainee may be placed in restrictive housing in response to an alleged disciplinary violation. Such placement are limited to an investigation into those offenses for disciplinary segregation is an approved sanction. (Offenses involving violence, escape, or a threat to institutional safety by encouraging others to engage in such misconduct.) **DOJ-Restrictive Housing Report**

**(E.7.3)** Policy prohibits the placement of juveniles in restrictive housing. **DOJ-Restrictive Housing Report**

**(E.7.5)** Detainees are not placed in restrictive housing unless correctional officials conclude, based on evidence, that no other form of housing will ensure the detainee's safety and the safety of staff, other detainees and the public. **DOJ-Restrictive Housing Report**

**(E.7.9)** Detainees with serious mental illness are not placed in restrictive housing, unless: **DOJ-Restrictive Housing Report**

**(E.7.9b)** In disciplinary circumstances, the detainee's lack of responsibility due to mental illness or mitigating factors related to the mental illness should also preclude the detainee's placement in restrictive housing.

**(E.7.10)** If the detainee with serious mental illness is placed in restrictive housing: **DOJ-Restrictive Housing Report**

**(E.7.10c)** The detainees receive enhanced opportunities for in-cell and out-of-cell therapeutic activities and additional unstructured out-of-cell time, to the extent such activities can be conducted while ensuring the safety of the detainee, staff, other detainees and the public.

**(E.7.11)** Unless medical attention is needed more frequently, all detainees in restrictive housing receives a daily visit from a qualified health care provider. The presence of a health care provider in restrictive housing is announced and recorded.

**(E.7.13)** After 30 days in restrictive housing, and every 30 days thereafter, all detainees in restrictive housing receives a face-to-face psychological review by mental health staff. **DOJ-Restrictive Housing Report**

**(E.7.14)** A detainee's initial and ongoing placement in restrictive housing is reviewed every seven days by a multi-disciplinary staff committee, which includes facility leadership and medical and mental health professional. **DOJ-Restrictive Housing Report**



**(E.7.16)** For every detainee in restrictive housing correctional staff develop a clear plan for returning the detainee to less restrictive conditions as promptly as possible. This plan is shared with the detainee, unless doing so would jeopardize the safety of the detainee, staff, other detainees, or the public. **DOJ-Restrictive Housing Report**

**(E.7.17)** Detainees placed in restrictive housing for preventative purposes are provided an opportunity to participate in a step-down program to allow them to progress to less restrictive housing. **DOJ-Restrictive Housing Report**

**(E.7.20)** Restrictive housing units provide living conditions that approximate those of the general detainee population. All exceptions are clearly documented. **4-ALDF-2A-51**

**(E.7.23)** Detainees in restrictive housing receive daily visits from the facility administrator or designee, and weekly visits from members of the program staff.

**(E.7.24)** Staff assigned, on a regular basis, to work directly with detainees in restrictive housing are selected based on criteria that includes:

**(E.7.24c)** Suitability for the population
**(E.7.24d)** Specialized training which includes: (1) a review of restrictive housing policy and procedures, and (2) identifying and reporting signs of mental health decomposition of detainees in restrictive housing. **DOJ-Restrictive Housing Report**

**(E7.26)** Staff operating restrictive housing units maintain a permanent log that contains at a minimum the following for each detainee admitted to restrictive housing:

**(E.7.26f):** Tentative/actual transition date

**(E.7.29)** Written policy, procedure, and practice that all detainees in restrictive housing are provided suitable clothing, and access to basic personal items for use in their cell unless there is imminent danger that a detainee or any other detainee(s) will destroy an item or induce self-injury. **4-ALDF-2A-56-1**

**(E.7.30)** Detainees in restrictive housing unit have the opportunity to shave and shower at least three times per week. Detainees in restrictive housing units receive and exchange clothing, bedding, and linen on the same basis as detainees in general population, exceptions are permitted only when determined to be necessary. Any exception is recorded in the unit log and justified in writing. **4ALDF-2A-58**

**(E.7.31)** When a detainee in restrictive housing is deprived of any usual authorized item or activity, a report of the action is made and forwarded to the facility administrator or designee. **4-ALDF-2A-58**

**(E.7.32)** If a detainee uses food or food service equipment in a manner that hazardous to self, staff, or other detainees, alternative meal service may be provided. Alternative meal service is on an individual basis, is based on health or safety considerations only, meets basic nutritional requirements, and occurs with the



written approval of the facility administrator or designee and responsible health authority. The substitution does not exceed seven days. **4-ALDF-2A-59**

**(E.7.33)** Detainees in restrictive housing units can write and receive letters on the same basis as detainees in general population. **4-ALDF-2A-60**

**(E.7.34)** Detainees in restrictive housing units have opportunities for visitation unless there are substantial reasons for withholding such privileges. All denials for visitation are documented. **4-ALDF-2A-61**

**(E.7.36)** Detainees in restrictive housing units have access to reading materials. **4-ALDF-2A-63**

**(E.7.37)** Detainees in restrictive housing units are offered a minimum of one hour of exercise five days a week outside their cells, unless security or safety considerations dictate otherwise. **4-ALDF-2A-64**

**(E.7.38)** In addition to the minimum of recreation, the multi-disciplinary committee identifies ways to increase out-of-cell opportunities for recreation, education, clinically appropriate treatment therapies, skill-building, and social interaction with staff and other detainees. **DOJ-Restrictive Housing Report**

**(E.7.40)** Detainees in restrictive housing have access to programs and services that include, but are not limited to the following:

**(E.7.40a)** Educational services
**(E.7.40b)** Commissary services
**(E.7.40c)** Library services
**(E.7.40e)** Religious guidance
**(E.7.40g)** Telephone access

**(E.7.41)** Data is available about several aspects of restrictive housing units. This data includes:
**DOJ-Restrictive Housing Report**

**(E.7.41a)** Total number of each type of restrictive housing placement
**(E.7.41b)** Restrictive housing recidivism rates
**(E.7.41c)** Average length of restrictive housing placement
**(E.7.41d)** Demographic information of detainees placed in restrictive housing to include: race, national origin, religion, gender identity, sexual orientation, disability, and age.

**Safety and Sanitation**

**(F.1.1)** The facility conforms to all applicable federal, state, and/or local fire safety codes; in addition to those set forth by the National Fire Protection Association (NFPA), and the Occupational Safety and Health Administration (OSHA).

**(F.1.2)** The facility's fire prevention regulations and practices ensure the safety of staff, detainees, and visitors. These include, but not limited to: 4-ALDF-1C-08
**(F.1.2a)** An adequate fire protection service;



SENSITIVE LIMITED DISTRIBUTION    **#136619.21**

**(F.1.2b)** Availability of fire hoses or extinguishers at appropriate locations throughout the facility.

**(F.1.5)** The facility fire safety inspection includes: **4-ALDF-1C-09**
**(F.1.5a)** A weekly fire and safety inspection of the facility by a qualified departmental staff member;
**(F.1.5b)** A comprehensive and through monthly inspection of the facility by a qualified fire and safety officer for compliance with safety and fire prevention standards.
**(F.1.5c)** An annual inspection by local or state fire officials.

**(F.1.6)** Fire safety equipment is tested at least quarterly. **4-ALDF-1C-09**

**(F.1.7)** Facility furnishings meet fire safety performance requirements. **4-ALDF-1C-10**

**(F.1.8)** An evacuation plan is used in the event of a fire or major emergency. The plan is approved by an independent outside inspector trained in the application of national fire safety codes and is reviewed annually, updated if necessary, and reissued to the local fire jurisdiction. The plan includes the following: **4-ALDF-1C-02**
**(F.1.8a)** The evacuation plan does not identify the location of building/room floor plan.
**(F.1.8b)** The evacuation plan does not identify use of exit signs and directional arrows for flow of traffic.
**(F.1.8c)** The evacuation plan does not identify location of publicly posted plan.

**(F.1.10)** The facility has exits that are properly positioned, are clear from obstruction, and are distinctly and permanently marked to ensure the timely evacuations of detainees and staff in the event of fire or other emergency. **4-ALDF-1C-04**

**(F.1.11)** Fire drills are conducted **(NFPA Life Safety Code 101 Section 4.7)**:

**(F.1.11a)** Fire drills conducted monthly or with sufficient frequency that observed fire drills demonstrate fire drill procedures are a matter of routine.
**(F.1.11b)** Fire drill locations and times are varied and unexpected.
**(F.1.11c)** Fire drills are documented and evaluated.

**(F.1.13)** The use and storage of flammable, toxic, and caustic chemicals include:
**(F.1.13a)** Controlled access
**(F.1.13b)** A current inventory
**(F.1.13c)** Material Data Safety Sheets
**(F.1.13d)** Personal Protective Equipment
**(F.1.13e)** Staff and detainee safety training

**(F.2.1)** The facility is kept clean and in good repair. A housekeeping and maintenance plan address all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and detainees. **4-ALDF-1A-04**

**(F.2.2)** The facility complies with all applicable laws and regulations of the governing jurisdiction, and there is documentation by an independent, outside source that any past deficiencies noted in annual inspections have been corrected. The following inspections are implemented: **4-ALDF-1A-01**



SENSITIVE LIMITED DISTRIBUTION          **#136619.22**

**(F.2.2a)** Weekly sanitation inspection of all facility areas by a qualified department staff member.
**(F.2.2b)** Comprehensive and thorough monthly inspection by a safety/sanitation specialist.

**(F.2.4)** Vermin and pests are controlled through monthly inspections and treatment by a qualified pest control technician. **4-ALDF-4D-04**

**(F.2.7)** The facility's potable water source and supply, whether owned and operated by the public water department or the facility, is certified at least annually by an independent, outside source to be in compliance with jurisdictional laws and regulations. **4-ALDF-1A-07**

**(F.2.8)** A program exists to monitor environmental conditions of the facility. This program ensures:

**(F.2.8b)** A ventilation system supplies at least 15 cubic ft. per minutes of circulated air per occupant with a minimum of five cubic ft. per minute of outside air. Toilet rooms, and cells with toilets, have no less than four air changes. Air quantities are documented by a qualified technician not less than once every three years. **4-ALDF-1A-19**
**(F.2.8c)** Noise levels in detainee housing do not exceed 70 dBA (A scale) in daytime and 45 dBA (A scale) at night. Measurements are documented by a qualified, independent source and checked not less than every three years. **4-ALDF-1A-18**

**(F.2.10)** The number of detainees does not exceed the facility's rated bed capacity. **4-ALDF-1A-05**

**(F.2.11)** Detainee sleeping surfaces and mattresses are 12 inches off the floor.

**(F.2.12)** Detainees are provided a place to store clothes and personal belongings.

**(F.3.2)** Detainees are issued clean well-maintained clothing items in a sufficient quantity of each item, or provided an opportunity to exchange or have laundered, each item on a weekly equivalent basis:

**(F.3.2a)** Detainees are issued clean well-maintained clothing in a sufficient quantity of each item, or provided an opportunity to exchange, or have laundered, each item on a weekly equivalent basis: Two outer garments (two shirts and pants, or two jumpsuits).
**(F.3.2b)** Seven pairs of underwear.
**(F.3.2c)** Seven pairs of socks.

**(F.3.6)** Detainees are issued one mattress, not to include a mattress with integrated pillow.

**4-ALDF-4B-02**

**(F.4.1)** Detainees have access to toilets and washbasins with temperature controlled hot and cold running water 24 hours per day and are able to use toilet facilities without staff assistance when they are confined in their cells/sleeping areas. **4-ALDF-4B-08**

**(F.4.2)** Detainees have access to operable showers with temperature controlled hot and cold running water. **4-ALDF-4B-09**

**(F.4.5)** Detainees have access to hair care services. Hair care tools and equipment are cleaned and disinfected. **4-ALDF-4B-07**



**Services and Programs**

**(G.2.2)** Detainee access to counsel is ensured. Detainees are assisted in making confidential contact with attorneys and their authorized representatives. Such contact includes, but is not limited to **(4-ALDF-6A-02)**:
**(G.2.2.a)** Telephone communications

**(G.3.5)** Excluding weekends and holidays or emergency situations, incoming and outgoing letters are held for no more than 24-hours, and packages are held for not more than 48-hours. **4-ALDF-5B-10**

**(G.5.2)** There is a chaplain with the minimum qualifications of clinical pastoral education or equivalent specialized training, and endorsement by the appropriate religious-certifying body. The chaplain assures equal status and protection for all religions. 4-ALDF-5C-19

**(G.5.5)** When a religious leader of a detainee's faith is not represented through the chaplaincy staff or volunteers, the religious coordinator and chaplain assist the detainee in contacting such a person. That person must have the appropriate credentials from the faith's judiciary and may minister to the detainee under the supervision of the religious coordinator or chaplain. **4-ALDF-5C-22**

**(G.6.1)** Detainees have access to exercise opportunities and equipment, including at least one-hour daily of physical exercise outside the cell and outdoors, when weather permits. (Access to the housing unit's dayroom does not satisfy the standard's requirement.) **4-ALDF-5C-01**

**(G.6.2)** Detainees have opportunities to participate in leisure-time activities outside their respective cell or living room on a daily basis. **4-ALDF-5C-02**

**(G.8.7)** Detainees are compensated for work performed. **4-ALDF-5C-12**

**(G.9.1)** A grievance procedure is made available to all detainees and includes at least one level of appeal. **4-ALDF-6B-01**

**(G.9.2)** Grievance forms are readily available and easily accessible to detainees.

**(G.9.4)** Detainee's grievance forms provide the opportunity for detainees to retain a copy of the grievance filed.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

**Incidents**

|  | Grand Total | Total with a Weapon |
|---|---|---|
| Number of inmate assaults on staff in past 12 months: | 14 | 0 |
| Number of inmate assaults on other inmates in the past 12 month | 11 | 3 |
| Number of staff assaults on inmates in the past 12 months: | 1 | 0 |
| Number of assaults on visitors in the past 12 months: | 0 | 0 |
| Number of attempted suicides in the past 12 months: | 55 | 0 |
| Number of completed suicides in the past 12 months: | 3 | 0 |
| Number of attempted escapes in the past 12 months: | 16 | 0 |
| Number of completed escapes in the past 12 months: | 0 | 0 |
| Number of detainee PREA incident in the past 12 months: | 52 | 0 |

**Capacity**

| Capacity Metrics: Facility |  |
|---|---|
| Total Capacity: | 1765 |
| Adult Male Capacity: | 1455 |
| Adult Female Capacity: | 310 |
| Total Juvenile Capacity: | 26 |
| Juvenile Male Capacity: | 21 |
| Juvenile Female Capacity: | 5 |
| Disabled Capacity: | 88 |
| Description for Disabled Capacity: | Hospital beds and low bunks |

| Capacity Metrics: USMS | Maximum | Minimum |
|---|---|---|
| Total Capacity: |  | 75 |
| Adult Male Capacity: |  | 60 |
| Adult Female Capacity: |  | 10 |
| Total Juvenile Capacity: |  | 0 |
| Juvenile Male Capacity: |  | 0 |
| Juvenile Female Capacity: |  | 0 |
| Disabled Capacity: |  | 10 |
| Description for Disabled Capacity: | Hospital beds and low bunks | |

| Capacity Metrics: ICE | Maximum | Minimum |
|---|---|---|
| Total Capacity: |  | 0 |
| Adult Male Capacity: |  | 0 |
| Adult Female Capacity: |  | 0 |
| Total Juvenile Capacity: |  | 0 |
| Juvenile Male Capacity: |  | 0 |
| Juvenile Female Capacity: |  | 0 |
| Disabled Capacity: |  | 0 |
| Description for Disabled Capacity: | N/A | |



## General Overview by Functional Area

**A - Administration and Management**                                    **Unsatisfactory ("At-Risk")**

Review of Administration and Management is based on review of policies, procedures, supporting documentation, direct observation, and interviews with staff and detainees/inmates. All facilities operate under CCCC's limited policies and procedures and there are no site-specific procedures for the facility's management of USMS detainees. All facets of the operation are not addressed in policy as required by FPBDS. Examples include: no written policy and procedure for policy development, annual policy review/updates, and employees' and detainees'/inmates' access to policies and procedures; the "Red Zone" system or the temporary lockdown of detainees/inmates when security staffing levels are insufficient to ensure detainees/inmates safety and required supervision of the population; and grievance procedures described in the detainees'/inmates' handbook is completely inconsistent with facility's policy.

Policies and procedures are accessible to staff through hard copy manuals available in each control room and electronically on the My Human Resources (MY HR) website. Policies and procedures which do not present security concerns have not been identified and are not available to detainees/inmates. No convincing documentation was made available to verify or prove the CCCCs annual policies and procedures are reviewed/updated annually as needed or required.

There is no internal quality control plan in place to provide an annual review of CCCCs operations to ensure compliance with CCCCs policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was conducted on November 14, 2017; review of the November 14, 2017 previous inspection documentation reveal CCCCs staff did not comply, address or provide corrective actions for identified deficiencies which included; exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not being  provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review.

 A review of housing unit logs and detainee interviews reveal the Warden and Associate Wardens do not consistently make weekly visits to housing units and visits are not documented.

There is no centrally located detainees/inmates record; detainees/inmates records are maintained in various locations. The facility only maintains electronic booking and screening information entered in the Jail Management System (JMS) during intake. Detainees/inmates legal documents or criminal files are maintained in the Sheriff's Records department. Documents such as cash receipts, disciplinary actions, grievances, and program participation are maintained in other areas by various staff members. The contents of detainees/inmates records is not separated or maintained in a standardized format as required by CCCCs facility policy. The frequency and cumulative length of RHU placement is not included or documented in any files. Detainees'/inmates criminal records are located in a secure area with no public access.



Intake staff interviews confirm staff review arrest documents including the USM-129 Individual Custody Detention Report and USM-130 Prison Custody Alert Notice, enters basic personal information and completes intake screening interviews. During the intake process detainees/inmates are escorted to medical department's intake screening area where medical staff conduct medical, dental, mental health and suicide assessments. Medical staff is responsible for conducting the history of sexual aggression and risk of sexual victimization vulnerabilities within 24-hours of a detainees/inmates arrival.

Detainees/inmates, except for the Cleveland City inmates, upon intake are searched, provided an opportunity to a shower, issued clothing, linens and hygiene items, shown a PREA video and issued a CCCC handbook. Due to the short stay of Cleveland City inmates, they remain in their person clothing and are housed separate from other detainees/inmates. Handbooks describing facility rules and sanctions are only provided in English, the CCCC detainees/inmates handbook is not available in Spanish; detainees/inmates acknowledge receipt of the handbook in writing. The CCCC detainees/inmates handbooks issued at Jail I (Bedford) and Jail II (Euclid) are dated June 2017, and is outdated and does not contain all pertinent information detainees need to successfully adjust to the facility. The information provided on how to file a grievance is not consistent with the current policy. The handbook issued at the Euclid Jail Annex, are dated January 2016. Prior to placement in general population housing, detainees/inmates are temporarily housed in an Orientation unit until medically cleared. Intake policy and procedures review along with staff and detainees/inmates interviews reveal detainees/inmates are not provided a detailed orientation while in the Orientation unit. There is no policy requiring staff to read or explain the handbook to detainees/inmates who cannot read or understand English.

Detainees'/inmate's personal property and monies is inventoried upon intake, and a copy of the itemized inventory is given to the detainee/inmate. Due to insufficient detainees/inmates personal property storage space, detainees/inmates' personal property is stored in three separate locations. Non-clothing personal property items and small items are stored in one property room while clothing items, footwear and other larger items are stored in another property room. A third property room contained soiled clothing in plastic bags awaiting cleaning. Personal property storage areas were observed and found to be disorderly, and the tracking system is complicated and not easy to follow. The current multiple storage areas do not ensure the safety and security of detainees'/inmates' personal property.

Direct observation and staff interviews reveal CCCC custody staff do not release USMS detainees. Once staff confirm a USMS detainees' identification and perform a search of the detainees in Intake, detainees are released directly to the USMS. Upon verifying inmates' release documents, staff confirm positive identification and inmates are released. Detainees/inmates are released directly from RHU to the community.

Detainees/inmates with disabilities are generally housed in the medical housing area which can accommodate wheel chairs. Interviews with detainees/inmates with disabilities and staff reveal programs and service areas such as outside recreation is not accessible to detainees/inmates with limited mobility or disabilities.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

Programs and work opportunities for female detainees/inmates are comparable to male detainees however USMS detainees are not afforded the opportunity to participate in the CCCCs work programs. Inmates are not monetarily compensated for work.
Staff receive pre-service training on cultural and ethnic sensitivity.

Review of the CCCCs annual staffing analysis reveal essential posts and positions are not identified; currently, there are 96 correctional officer vacancies. As a result of a high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding providing for detainees'/inmate's basic needs. To address staffing shortages and call outs CCCC implemented a "Red Zone" system whereby detainees/inmates are confined to their cells for periods of 27+ hours and not let out during times they normally have access to dayrooms, showers, telephones and outside recreation areas. A housing unit log book and detainee/inmate interviews indicate the "Red Zone" system was in effect in one housing unit for 12 days in a row. CCCC does not have a policy or written directive outlining specific procedures for the "Red Zone" system.

An interview with the Cuyahoga County Sheriff's Human Resource staff and a review of several personnel documents confirm background investigations are conducted for all employees and contractors. Background checks include: employment reference checks; verification of citizenship; pre-employment interviews; and drug screenings. Credit history checks, re-investigations and pre-employment physicals are not conducted. A review of the performance evaluations for Special Response Team (SRT) members who work exclusively in the RHUs, do not reflect compliance with restrictive housing policies as required for staff assigned to RHU.

New employee receive an orientation prior to assuming their duties. Orientation training includes all topics required by FPBDS. During orientation training, staff sign and acknowledge receipt of the code of ethics which describes ethical rules, prohibited acts, disciplinary sanctions and staff requirements. The Cuyahoga County Sheriff's Office provides a hotline for employees to confidentially report misconduct by other staff and/or detainees.

The Training Manager has received specialized training including an 80-hour Instructional Skills training course. Newly hired Correctional Officers receive at total 143 training hours of basic classroom training and 80 hours of field training during their first year of employment for a total of 226 hours. However, correctional implications of young adults (18-24) brain development and associated de-escalation tactics are not included in the curriculum for staff assigned to RHU. CCCC facilities base their staff training requirements on the Ohio Rehabilitation and Corrections Bureau of Adult Detention's Minimum Adult Detention Standards which only require eight hours of in-service training annually instead of 40 hours as required by FPBDS. As a result, Correctional Officers do not receive annual training on the following topics: security/safety/fire/medical emergency procedures; and supervision of offenders including training on sexual abuse and assault.

Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION          **#136619.28**

Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter.

New professional staff and support employees receive 40 hours of training prior to being independently assigned to a particular job however, they only receive two hours of annual training. FPBDS requires 40 hours of annual in-service training to include: security procedures and regulations; supervision of detainees/inmates; signs of suicide risks; suicide precautions; use of force regulations and tactics; report writing; detainees'/inmates' rules and regulations; key control; rights and responsibilities of detainees/inmates; safety precautions; and social cultural life styles of the detainee/inmate population.

Review of emergency plans confirm specific plans for emergency situations are in place except for disturbances. CCCC does not have written support agreements with external entities to provide emergency assistance as identified in the CCCC emergency plans.

There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications.

Interviews with staff reveal numerous staff at all levels express concerns for their safety and security due to staffing shortages; concerns were also expressed regarding morale and sense of inability to make changes or voice concerns to leadership or management.

**B - Health Care**                                                          **Marginal ("At-Risk")**

Review of health care at CCCC is based on review of facility's policies and procedures, supplied relevant documents, staff interviews, review of electronic health records (EHRs), direct observation and tracing methodology. There are 65 allocated positions in the Medical department. These positions are staffed by county employees and MetroHealth (MH) contract staff. MetroHealth also supplies telemedicine services for psychiatry and other specialties.

As of September 2018, a temporary staffing company, EduCare Medical Staffing, provides staff for vacant clinical positions, as needed. The healthcare positions include an Administrative Director, a Clinical Director, a Health Service Administrator, a Director of Nursing, a Physician, a Behavioral Health Physician, a Physician's Assistant, Mental Health Nurse Practitioners, two Clinical Nurse Practitioners, twenty-one Nurses, fourteen Licensed Practical Nurses, six Medical Technical Assistants, a Radiology Technician, an Ultrasound Technician, a Paramedic, a Dentist, a Dental Hygienist, a Dental Assistant, a Pharmacist, two Pharmacy Technicians, three Medical Records Representatives and two Clerks. Physical Therapy is provided through a personal contract. Optometry is provided by MetroHealth off site.

The Administrative Director is the designated health authority. The Clinical Director has sole province of the clinical decisions. An interview with the health authority and the HSA and review of available files, reveal not all files are maintained in the Medical department, nor were provided



to reviewer.  There are no job descriptions for the Pharmacy staff, Physical Therapist or the Mental Health Nurse Practitioner. Files presented for review contained personnel documentation such as disciplinary actions and personal leave. In October 2018, ten new nurses were hired and are receiving on the job training. None of the newly hired nurse's files or of the files of the Pharmacy staff were available for review. The files made available for review reveal: 1 medical staff had expired CPR certifications; four have expired licenses; one Licensed Practical Nurse has no license on file; one Medical Technical Assistant did not have a diploma; two EduCare nurses had partial CPR certifications; and one Licensed Practical Nurse and one Nurse Practitioner have board actions on their verification but no documentation of the disposition. A National Practitioner Data Bank query is not used for health care professional disciplinary or sanctions inquiries

The CCCC' Medical department is staffed 24/7 and includes the satellite jail facilities of Bedford and Euclid. A physician, psychiatrist, mental health practitioner and dentist are available on call. Male and female detainees/inmates are seen in the dispensary on the 6th floor at the main CCCC facility. The satellite Bedford and Euclid facilities only have male detainees/inmates, detainees/inmates in these facilities are seen in each facilities respective medical offices. The dispensary has several holding cells, exam rooms, radiology, treatment room and dental office. There is also a female dispensary next to the female housing unit on the 6th floor which was not open at the time of the review. Moreover, a mental health dispensary is located on the 7th floor; Sanitation on the 7th floor mental health dispensary was minimally acceptable.

Examination of the policies and procedures reveal they are not updated and there is no documentation of an annual review.  According to the health authority, policies and procedures are available to staff on line.  Hardcopies of policies and procedures are not available in case of computer failure. The quality management program or Continuous Quality Improvement (CQI) Program, has not had a meeting in the past year.  There is no documentation of monitored health care aspects nor corrective actions of problems identified by staff and Pharmacy and Therapeutic (P&T) meetings. Review of the past three quarterly P&T meeting minutes identified problems with medication delivery and duplication of orders by providers. The annual training program confirm medical staff is trained to respond to health-related situations within four-minutes. Correctional staff receive respond to health-related situation training every two years.

There are four designated sealed first aid kits in the facility and one in each satellite facility (Bedford and Euclid). The Medical department has an automated External Defibrillator (AED) with their emergency equipment at the facility and three at Bedford. The AED at Bedford is not checked daily or its operability status documented. Man-down drills are not conducted annually on each shift. Documentation presented contained only clinical tabletop exercises with no response action or evaluation. Direct observation of the fire drill/man down drill conducted during the review reveal first responding staff, the Safety Manager and a nurse, arrived within four minutes. The nurse did not attempt to assess the victim and start CPR. The Safety Manager started CPR.  On the suspicion of an overdose, the Safety Manager administered Narcan. The nurse did not respond to this suspicion however, nurses do not carry Narcan on their person. Subsequent medical staff arrived within five minutes with a gurney, oxygen, AED and emergency bag. One of the nurses took charge and the victim was prepared for evacuation.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

In 2015 the CCCC began using electronic health records (EHR); a system called EPIC, which was implemented by MetroHealth. Through observation and interviews with staff, it was revealed detainees/inmates chronic care and/or urgent care rosters cannot be generated; chronic care clinics cannot be flagged and EHR has no ability to print documents. There is no alternate plan if the system is down or if the contract with MH is terminated. Confidentiality of medical information is maintained.

Medical staff complete intake screenings within 24 hours of detainee's/inmate's admission to the facility. The screening probes into past medical history, chronic illness, mental status and present condition, history of sexual aggression and risk of sexual victimization. The screenings reviewed did not indicate disposition if a detainee/inmate is cleared for general population housing however a nurse interviewed stated "it's assumed".

Inmates admitted and held for the City of Cleveland on the 3rd floor, are not afforded the process of screening by medical. Medical is made aware of an inmate's health need only when the need, issue or situation digresses to urgent or emergency, such as a diabetic inmate who has not had his/her insulin for four days, or others who become symptomatic due to not having hypertensive or psychotropic medications.

Medical staff stated a language line, through Metro Health, is used for non-English speaking detainee/inmate interviews. The detainees/inmates handbook is available only in English, there is no there is no written material available for limited English speaking or non-English speaking detainees/inmates to explain how to access medical care and services or the procedures at the facility.

A Mental Health screening and Tuberculosis (TB) screening and testing is performed within 72 hours of the detainee's/inmate's admission.

Comprehensive medical and mental health appraisals are not conducted within 14 calendar days of detainee's/inmate's arrival. A review of the EHR of 25 detainees from the facility roster demonstrated eight were not completed within 14 calendar days. Recommendations for job assignments, housing or program participation are not noted. Only detainees/inmates with referrals to the physician or mental health practitioner are documented in the EHR. Appraisals with positive findings and medication are signed off by the CD/physician. Detainees/inmates on medication are provided with current prescriptions. The dentist or qualified dental staff do not conduct 14 calendar day oral screenings. When a detainee/inmate requests dental services, an oral exam is done which includes examination of teeth, gums and dental hygiene instructions.

Detainees/inmates request medical/dental care by submitting a request form known as "Kite". The detainee/inmate deposits the "Kites" request in a box. Clerical staff collect the "Kites" daily, sorts them and leave the "Kites" for medical staff to pick up in the 4th floor control room. Medical staff review the medical request "Kites" and process them accordingly (i.e. sick call appointment or medication renewal). The "Kite" is then scanned into the EHR. Presently, there is a back log of "Kites" to be scanned and entered in the EHR. Information in the detainees/inmates handbook explaining how to access health service, is not available in Spanish; however, Spanish is spoken by a significant number of detainees/inmates. The co-payment fee at CCCC was abolished in 2017, yet



service fee signs are still posted throughout the facility. Interview with the health authority confirmed the USMS is not contacted for pre-authorization of detainees' non-emergency outside care.

CCCC does not have an infirmary. Detainees needing this type of monitoring are sent to Metro Health. Random detainee/inmate chart review reveal chronic care clinics are not flagged nor identified in the EHR. A roster of chronic care clinics cannot be generated. The health authority does not maintain a list of chronic care patients and could not produce one. There is no proactive program to discuss and implement an individually tailored plan for special needs patients which include, but are not limited to: developmentally disabled individuals, frail/elderly, physical impairments and serious mental health needs. Furthermore, adolescents fall into this category because during this period they require special attention to diet, exercise and nutrition. A list of special needs patients could not be produced. Juvenile detainees/inmates are not receiving special attention to diet, exercise and nutrition; and a request for an increased caloric diet for juvenile detainees/inmates in not sent to the Food Service department by medical, even when medical staff is aware the detainee/inmate is a juvenile.

CCCC does not have an on-site Obstetric/Gynecologist (OB/GYN) physician. The county's OB/GYN physician resigned in June 2018. Females are seen for prenatal at Metro Health. Women needing gynecological services beyond the medical staff capacity are sent to Metro Health. Female charts reviewed reflected gynecological exams comparable to community standards. Two known pregnant females were interviewed. One is 32 weeks pregnant and the other one is five months pregnant and sleeps on the floor. It was confirmed both have seen the OB/GYN appropriate times. Interview with the health authority reveal pregnant females receive pre-natal vitamins and a request for an increased caloric diet is sent to the Food Service department.

The infectious disease program tests for communicable diseases such as tuberculosis, MRSA, sexually transmitted diseases like gonorrhea and chlamydia, hepatitis and HIV. Interview with medical staff and chart review reveal a compliant infectious disease program. The list for annual tuberculosis testing is created manually by reviewing the electronic charts since there is no method of creating an electronic list in EPIC. This increases the risk of missing a detainee/inmate for testing. The facility has a negative pressure room however, it is not operational.

Biohazard waste or infectious waste (IW) is processed by the company Advantra. IW is collected from the medical department by a custody staff and taken to the 5th floor mechanical room for packaging and storage until pick up. Pick up is scheduled twice a month. The IW bags and full sharp containers are placed directly in a carton box and stored in an open area. This violates local, state and federal regulations which requires all IW to be stored in a manner which maintains the integrity of the package, i.e. off the floor, and the storage area must be clearly marked IW and locked. CCCC's IW is not properly packaged for off-site transport; for IW to be transported off-site it must be placed inside a second sealed plastic bag or one single bag within a fully enclosed, rigid, sturdy container.



Detainees identified as needing detoxification or chemical dependency treatment, manageable at the facility, are monitored and treated per Substance Abuse and Mental Health Services Administration (SAMHSA).

Pharmacy service is provided by an onsite pharmacist. Medications are obtained through Metro Health. Tour of the pharmacy reveal a non-formulary procedure and a procedure for providing medication orders. The pharmacy has an automated dispensing machine, Pyxis, for all controlled substances. Main stock and Pyxis count of various controlled substances was correct. Needles and syringes are not overseen by the pharmacy staff. The supply clerk orders needles and syringes electronically through a Metro Health Store Room inventory program to restock. When the clerk receives the order, the clerk places it in the locked cabinet in the dispensary. Medical staff withdraw needles and syringes as needed but do not sign them out on a log. A review of the syringe and hypodermic needle log reveal syringe and hypodermic needles are restocked however, no balance is indicated. The lack of a perpetual inventory makes it impossible to detect if needles or syringes are missing and poses a custody violation.

Three of the Medication Administration Records (MAR) reviewed contained numbers in lieu of initials. The nurse conducting the medication administration explained the numbers are codes for detainee/inmate missed medication; however, the nurse was not able to indicate where a legend for these codes could be located. Also, when detainees/inmates who are scheduled for court or change housing, their medication is not consistently processed. Training for medication administration is not thorough and consistent. Staff interviewed reveal training for medication administration is passed on. The release list of detainee/inmates indicate only detainees/inmates transferring to another facility are ordered a 7-day supply of medication. Experiments and investigational or experimental drugs, devices and procedures are not allowed.

All facility staff receive Suicide Prevention and Prison Rape Elimination Act (PREA) training. In addition, medical staff receive hunger strikes, medical restraints, seclusion and detainee deaths training. There have been no hunger strikes or medical restraints used for the past year. Ten PREA investigative cases were reviewed and found compliant with sexual assault procedures.

The CCCCs suicide prevention program outlines the identification of suicidal detainees/inmates, intake/admission and housing procedures. CCCC had six deaths from June to October in 2016. One death was confirmed as a suicide. Debriefing reports or mortality reviews are not conducted. Required documentation, minutes of debriefing, medical summary, timeline of incarceration, notifications, autopsy reports were not available in the medical department; despite CCCC policy which requires aforementioned documentation be maintained in the medical department. Additionally, no information regarding the 6 inmates death was available or maintained in the Warden's office either.

Review of 15 Restrictive Housing (RH) charts reveal medical conducts a medical assessment of a detainee/inmate before they are placed in RH. Interview with the Mental Health practitioner reveal a detainee/inmate with a stable serious mental illness can be placed in RH for a rule violation. If the detainee/inmate is stable intensive, clinically mental health treatment is not provided for the



entirety of the detainee/inmates stay in RH, nor is a face-to-face conducted at least once a week. Review also denoted detainees/inmates are not kept in RH past 30 days.

### C - Security and Control                                     Marginal ("At-Risk")

The Security and Control review is based on staff and detainee interviews, review of policies and procedures, post orders, and direct observation.

Main Control is staffed on a 24-hour basis with a sally port to control access. The Main Control Room contains video surveillance monitoring, electronic locking systems, emergency keys, fire annunciator panels, perimeter alarms, radio communications, an intercom system, and tinting on windows. Observations of the sally port usage during the Facility Review reveal the Main Control officer operates███████████████████████████████████████████████████████████ ████████████████████████████████████████████ Several times during the review process, ████████████████████████████████████████████████████████████████ Additionally, Main Control's ██████████████████████████████████████████████ ██████████████████████████████████ This creates a concern if the control center staff become incapacitated.

Correctional Officer posts are located immediately adjacent to detainee living quarters ensuring continued observation of detainee activities and allows staff to quickly respond to emergencies. Officer's stations is centrally located in each housing unit to provide observation of detainee/inmate activity.

Detainees/inmates are escorted by correctional staff when moving about the facility, pat searched and screened with a magnetometer upon entering and exiting the housing unit.████████████ ██████████████████████

A permanent log is maintained at each correctional post, ensuring staff record all routine information, emergencies, and unusual incidents. However, when reviewing logs for information regarding recent suicides no information was reflected. Investigative staff stated the logs were immediately confiscated and taken into evidence and replaced with new ones. However, the new log did not mention the reason for replacement.

Weekly security inspections of all areas of the facility is not being conducted and staff do not perform daily security inspections upon assuming a post. According to staff, areas in need of repair are called into Main Control and Main Control staff then notify county maintenance personnel. A record of such calls or incidents could not be provided. Additionally, correctional supervisors are not signing permanent logs on each shift indicating they have visited the area. There is no documentation of weekly rounds made by the Warden and other facility managers.

A population management system includes records on admissions, processing, and releases of detainees in the Intake area and Main Control via the IMACS system. The facility has a system of physically counting detainees, which also includes counting detainees outside of their assigned living areas. Nevertheless, there are no written procedures to specify how outcounts should be



SENSITIVE LIMITED DISTRIBUTION          **#136619.34**

conducted. CCCC conducts three formal counts within each 24-hour period (i.e., 0445, 1200, and 2200). There are no standing or face to photo (Bed Book) counts conducted.

Review of Use of Force (UOF) incidents determined staff are not utilizing all tools and techniques generally accepted as best practices for UOF teams to ensure staff and detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and debriefings, removing staff involved at the on-set of the incident from the immediate area, and a review of all UOF incidents by the agency administrator or designee, and medical assessment of all involved). Additionally, video tapes involving UOF are not tagged and labeled as evidence. Written reports are not required from all persons involved in the use of force or any staff who played a role in the incident (i.e., medical, correctional personnel, SRT, etc.). ███████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████

Over 100 detainee/inmate interviews reveal strong and consistent allegation of brutality, UOF punishment, and cruel treatment at the hands of the Security Response Team (SRT), whom the detainee/inmates refer to as "The Men in Black", based on their black para-military uniforms.

During the review, review team members observed SRT members verbally abusing and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF and SRT body-cam video reveal and contain aggressive conduct and behavior as well as abusive, explicit language used by SRT members direct at detainees/inmates.

SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches", as they escorted them to and from the interview location.  The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety.

CCCC does not use or maintain firearms however, the facility does use and maintain less-than-lethal equipment and chemical agents.  Chemical agents are properly controlled and stored as required. The facility does not use electrical disablers Storage space is provided for secure storage of less than lethal devices and security equipment in the Special Response Team (SRT) area located on the 5th floor.

Facility keys are not controlled, as indicated through observation by the team during the week. The lack of key control is pervasive throughout the facility, ██████████████████████████████
█████████████████████ Additionally, a daily accounting of facility keys is not conducted to ensure keys haven't been lost or stolen. Emergency keys are contained in a main control and other locations throughout the facility; however, there are no formal procedures in place to ensure strict accountability is maintained.

Security equipment in the SRT area is inventoried each shift to determine condition and expiration dates. Tools are not maintained in the facility. Tools are brought in by county maintenance crewman to repair various items within the facility, as needed. However, an inventory process is not in place to ensure accountability of those tools brought into the facility. Culinary tools and



equipment are stored and maintained in the Food Service department and inventoried as required. Detainee/inmate workers are issued tools to prepare meals however, there are no written procedures on the issuance of tools and equipment. Furthermore, inventories of medical and dental instruments, equipment, and supplies (syringes, needles, and other sharps) are not conducted to ensure these items are not removed by unauthorized persons.

Review of the detainee/inmate handbook reveal rules of detainee conduct specify acts prohibited within the facility and penalties which can be imposed. Disciplinary hearings are normally conducted within 7 days of the detainee/inmate being notified of the charges against them. An investigation is held within 24 hours of the time the violation is reported.

A secure area is provided in Intake for the processing, transferring, searching and applying and removing restraints. Detainees are fully restrained during transportation, unless medically exempt. CCCC does not maintain a transportation fleet, as all transportation is conducted by the Cuyahoga County Sheriff's Department.

On Wednesday during the Facility Review, the entire team arrived in the "Bull Pen" area at approximately 6:00 a.m. to observe the processing and supervision of inmates. Upon arrival, approximately three correctional officers were assigned to this floor to provide supervision of the impending population. The routine staffing assignments for this location is four correctional officers (3 males and 1 female); however, a female officer called in and staff indicated when this occurs, the post is often left vacant. This creates a concern, as policy does not allow cross gender searches. ██████████████████████████████████████████████████
██████████████████████████████████████████████. Additionally, all inmates escorted to the "Bull Pen" area are escorted restraint free. Staff indicate they are often not aware of separation concerns. Detainee/inmate names are called and upon an affirmative reply are moved from the corridor, to an assigned holding cell.

Detainees/inmates are not required to recite their register numbers, nor are they confirmed with a photo card. Some detainees/inmates were observed not in possession of any identification and staff had no clear or consistent response to the question "How do you verify the identity of detainees/inmates who have the same last name". This question was provoked, as the processes was being observed and staff called out a common Hispanic last name, to which there was more than one detainee/inmate present with the last name; on this occasion the detainees/inmates said "which one", and allowed the detainees/inmates to confirm (without positive verification) who the officer was allegedly calling for. Based on the physical footprint of the area, four officers are not enough to provide adequate security in this area.

Staff and detainee/inmate interviews reveal the lighting in the court call staging hallway had only been repaired Tuesday, evening, and prior to this, there was only one operable hallway light.

Detainees/inmates are placed in cells awaiting court which are not equipped with functioning toilets or have access to running water, are stripped of all furnishing to include a place to sit, and were found to house up to 12 detainees/inmates, in an cell who's design capacity is for only up to 2 persons. Additionally, these detainees are left unsupervised and locked in these cells for periods greater than 10 hours. ████████████████████████████████████████████████████████████



██████████████████████████████████████████████████

████████████████████████████

Detainees/inmates interviews on Wednesday reveal detainees were fed 2 doughnuts and a carton of milk for breakfast prior to being placed in the holding cell. The breakfast received was woefully inadequate and met no medical or nutritional guidelines or standards.  Inspection of detainee/inmate court meals which were brought down to be fed to the detainee/inmates in the holding cells reveal baloney sandwiches were not individually wrapped, but rather 20 to 30 sandwiches packed in one bread loaf bag, the sandwiches not properly refrigerated or stored and were located in an unused office area which reeked of dead vermin.

An inmate was observed getting a haircut before going to court in the corridor prior to entering the Bull Pen area. Interview with the staff and detainee/inmate receiving the haircut reveal, detainee/inmates have no access to barbering and haircare in their living areas and as a last minute fix, detainees are provided a hasty pre-court appearance haircut in the hallway.  The hallway is not an appropriate area to ensure safety and sanitation for the barbering process.

████████████████████████████████████████████

███████████████████████. The keys were never affixed to the employee's person to reduce the possibility of them being compromised.

**D - Food Service**                                   **Unsatisfactory ("At-Risk")**

A review of the CCCC Food Service department is based on staff and detainee/inmate interviews, food service policies and procedures, and direct observation of operations. Policies and procedures are minimal and policies and procedures are not reviewed and updated annually.

The Food Service department staff consists of a Sergeant who manages the food service operation, a Corporal who serves as assistant manager, and eight civilian staff who supervise approximately 60 male detainee/inmate workers. Correctional Officers assigned to the department handle the security duties within the department. Food service staff working in the department have completed ServSafe certification in their respective areas including food service supervision, food preparation, safety and sanitation.

Policies and cleaning schedules have not been developed and posted to ensure sanitation of equipment and to ensure areas are cleaned in a frequent and consistent manner. Direct observation and food service operation inspection reveal lack of documentation, and no daily sanitation inspections are not conducted by the supervisory staff of the department.

All sheet pans are heavily encrusted with grease deposits and soil accumulation. Equipment and walls throughout the department have accumulated dirt and food debris. Food-contact surfaces of cooking equipment, serving pans and sheet pans inspection reveal baked-on food and encrusted grease on all pans.  Sanitation buckets are not used to keep areas clean and sanitized. Several pieces of equipment are non-operational. Vent hoods, filters and surrounding ceiling areas have



accumulated grease and dirt. Mice/vermin are present and were observed running in various throughout the foodservice areas.

The dish washing machine temperatures is not properly documented. The dishwashing machine was found with the wash tank temperature at 180 degrees which is above the manufacturer's requirement of 163 degrees. Food trays are not checked for cracks after being washed and many trays have water seeping inside the trays and causing unsanitary conditions. Insulated food trays are cracked, heavily stained, leaking molded and dirty water from cracks in the food tray perforated seal and is contributing to contamination of food product plated in unserviceable trays.

No gauges are visible on the pot and pan ware washing machine to verify required wash and rinse temperatures. Test strips are available if the need arises for the low temperature sanitation solution to be used. The State of Ohio, City of Cleveland-Department of Public Health conducted an inspection on August 17, 2018. The three violations identified were corrected on site during the inspection.

Food Service civilian staff are medical cleared to work in food service. However, there are no procedures or documentation in place indicating detainees receive a pre-assignment medical examination to work in food service. Staff and detainees/inmates are monitored daily for health and cleanliness. Staff and detainees/inmates are trained in hand washing procedures and are required to wash their hands upon entering the food service area, or when changing tasks during the work period.

Observation of staff and detainee/inmate workers reveals not all were appropriately wearing hair covering and beard guards. Additionally, detainee/inmate workers are not wearing proper foot wear for a food service environment. All detainee/inmate workers are wearing orange clog type footwear and some without socks.

Observation reveals that staff and detainees/inmates in areas outside of food service where food is served are not wearing gloves when handling food delivered.

Review of training documentation for Food Service staff and detainees/inmates reveal training is conducted and documented.

Observation of dry storage rooms and refrigerated and freezer areas reveal required food code temperatures are being maintained. However, all dry and refrigerated storage areas are cluttered and not organized. One of the freezer units has a frozen water leak on the condensing unit with food being stored underneath the leaking unit, creating cross contamination. Perishable food deliveries are not checked for proper temperature requirements by the vendor and there is no documentation to adequately document temperatures.

The facility utilizes a satellite tray feeding operation. Prior to meal service, hot foods are placed in pans and held in hot holding cabinets. Cold foods are placed in pans and placed in the cooler. Meals are then plated on insulated food trays and Correctional Officers deliver these trays within the required time frame to the various housing units. Approved menus are followed and ensures proper



food portioning is controlled. Observation of meal service reveal portion sizes are adequate and food temperatures are maintained and within the required ranges.

A two-week cycle menu is used for meal rotation. A complete menu analysis of regular and religious diets is not conducted annually or certified to be nutritionally adequate by a registered dietitian. The general population menu provide for an average daily caloric intake of approximately 2800 calories. Substitutions to the menu are made in accordance with dietitian approved guidelines. Production worksheets document all meals served, recorded temperatures and special requirements.

The intentional and deliberate use of food as a punitive measure; the diet for detainees/inmates in Restrictive Housing Units (RHU) lacks basic daily nutritional requirements, fails to meet daily nutritional caloric intake standards, is not varied and does not meet needs of detainees/inmates housed in the RHU who also present with medical conditions which require dietary variety and consideration. There are no juvenile meal request for an increased caloric diet on file for juveniles housed in the facility in the Food Service department.

Detainees voiced concerns regarding the repetitious nature of the menu and the lack of variety and sufficiency of meals. Meals are not well received by the detained population and no meal surveys are conducted to solicit the input and feedback from the detainees/inmates population regarding meals.

Taste tests of the meals reveal food is seasoned, and served at the appropriate temperature. Three meals are served daily; at least two of the meals are hot. Food service is not providing medical diets. Diet orders required but not being provided include the type of diet prescribed, duration of the diet and any special instructions. There was no religious diet menu available for those whose dietary requirements cannot be met via the common fare menu.

The facility uses the same two-week cycle menu for regular trays and religious and or medical trays. A nutritional analysis is on file for the two-week cycle menu but current credentials for the dietician could not be found. There are no diet menus developed to follow medical diet requirements. Therefore, medical diet trays are not consistent and have no nutritional analysis on file for items served to the detainees/inmates on a medical diet requirement.

Religious diets are not being adhered to as there is no Religious Diet menu to follow to meet the religious dietary laws. Additionally, as there is no religious diet menu to follow nor a nutritional analysis on file for items served to the detainees/inmates on a religious diet.

Observation reveal Food Service staff do most of the preparation of the meals and serve the detainee/inmate population. Detainee/inmate food service workers are mainly utilized for sanitation duties and assist in the preparation of trays served to the detainee population. Detainees/inmates are observed to be under proper supervision at all times. Correctional officers pick up meals and are responsible for handing out meals to the detainees/inmates in a timely and orderly fashion in each



SENSITIVE LIMITED DISTRIBUTION          **#136619.39**

housing unit. Appropriate hair and beard restraints and disposable gloves are not used to handle food trays during satellite feeding.

**E - Restrictive Housing**                                            **Unsatisfactory ("At-Risk")**

A review of CCCC's RHU management is based on staff, detainee/inmate interviews, review of policy and procedures, and direct observation. The results reveal CCCC has not updated policies and procedures to reflect the United States Department of Justice restrictive housing requirements. There are no specific procedures for the operation and management of the CCCC's RHU.

CCCC's policy on detainees'/inmates' records does not describe or contain procedures for maintaining detainee/inmate RHU file upon release from RHU. Jail-1 has four RHU's on the 10th floor for male detainees/inmates, and Jail-2 have one RHU on the 2nd floor for female detainees/inmates with a Control Pod. The Control Pod manages staff and detainee/inmate access into the unit.

Review of detainees'/inmates' records reveal the frequency and cumulative length of placement in Administrative Segregation or Disciplinary Isolation (RHU) is not documented. Interview with Intake staff reveal detainees/inmates are release from RHU to the community. Review of human resource file for employees assigned to RHU reveal employees assigned to RHU are not evaluated on compliance with RHU policies and procedures as required by FPBDS. The facility does not provide correctional implications of young adult (age (18-24) brain development and associated de-escalation tactics training for assigned RHU staff.

CCCC medical staff conduct a pre-admission to restrictive housing medical evaluation prior to detainees'/inmates' placement in RHU. Detainees/inmates with serious mental illness are housed on the 7th floor mental health pods and dormitory. An interview with mental health staff reveal stable detainees/inmates with mental health issues are place in RHU for rule violations. However, when a detainee/inmate with mental health issues becomes disruptive, mental health staff report to RHU to assess the detainee/inmate and determine the appropriate course of action.

There is no documentation confirming mental health staff visit RHU and conduct face-to-face clinical contact with mental health detainees/inmates as required by FPBDS. The facility has not developed enhanced opportunities for in-cell and out- of- cell therapeutic activities and additional unstructured out-of-cell time for detainees/inmates with mental health issues in RHU.

Review of the list of infractions subject to disciplinary isolation, reveal not all infractions listed meet the standard (i.e. refusing a direct order from staff, refusing to work, stealing or possession of stolen property). Additionally, upon completion of a rule violation investigation for Major or Serious Rule Violations, the designated facility Investigator forwards the disciplinary packet to the Warden for review. The Warden, upon review of the disciplinary packet imposes up to 30 days in disciplinary isolation without a disciplinary hearing; violating detainees/inmates 5th and 14th Amendment Rights under the United States Constitution as they relate to Due-Process.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

Disciplinary Board Hearings are initiated when a detainee/inmate commit a rule violation which will likely result in disciplinary isolation over 30 days.  Moreover, detainees/inmates may appeal disciplinary actions to the Warden who imposed the sanction. Because the Warden is the imposing and appeal authority, detainees/inmates have no access to an impartial disciplinary hearing process. Review of several completed detainees'/inmates' disciplinary records and interview with the chair person on the Disciplinary Board, confirms rules violation resulting from the same incident are served consecutively and not concurrently as required by FPBDS.

During the Facility Review two juveniles were found to be housed in the adult RHU for rule violation; the juveniles were not separated by sight and sound from adult detainees/inmates as required by facility policy.
The co-locating of juvenile detainees with adult offenders in the RHU is a direct violation of FPBDS for juvenile detainees/inmates.  The juvenile detainee/inmates are not sight and sound separated, are not receiving enhanced developmental nutritional intake requirements and are provided not educational or brain development programming. Juveniles are subjected to the same harsh "Red Zone" RHU conditions as the adult offenders in every fashion from hygiene to recreations and out of cell time;

A review of detainees'/inmates' disciplinary isolation status reveal rule violations committed by detainees/inmates do not meet requirements of the FPBDS for disciplinary isolation. CCCC Inmate Discipline policy and procedures and detainee/inmate handbook's description of CCCCs rules and sanctions subject to disciplinary isolation are not in compliance with the FPBDS. Specifically, the FPBDS indicate rule violations approved for disciplinary isolation should involve violence, escape or a threat to institution safety.

Detainees/inmates were issued rule violation reports and appeared before the Disciplinary Board for possession of narcotics and given sixty days in disciplinary isolation. However, interview with chairperson and a review of the disciplinary records reveal the unknown substance was sent to the Sheriff Office for testing and the results have not been confirmed. In another case, a Correctional Officer failed to secure the entrance door of the pod and a detainee/inmate ran out of the pod. The detainee/inmate was charged and received a rule violation for escape and disciplinary isolation without any evidence of an escape plan. Additionally, a detainee/inmate received a rule violation of escape and attempted escape for possession of a cell phone and there was no evidence of an escape plan. The detainee was sanctioned to disciplinary isolation by the Disciplinary Board.

Review of Health Services policy and procedures confirm medical staff are required to visit detainees/inmates in RHU for two or more days three times a week; however, detainee/inmates in RHU receive no daily visit from medical staff. Observation of medical entering the RHU reveal medical staff enter RHU for medication distribution and did not announced their presence. Interview with management staff and observation of the multidisciplinary committee's weekly meeting reveal medical and mental health staff do not attend the meeting. Those in attendance include the Warden, Investigators, and other Correctional Supervisors. The facility has not developed a program for returning detainee/inmates to less restrictive conditions as promptly as possible, nor implemented a step-down program for detainees/inmates in RHU for preventative purposes to less restrictive housing.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

CCCC detainees/inmates on disciplinary isolation status and administrative segregation pending investigation are given oatmeal, a piece of bread, and milk for breakfast and a bologna sandwich, a piece of fruit and milk for lunch. Detainees/inmates interviewed complained the bologna is rotten and the food trays smell. However, detainee/inmates in general population are provided a different meal. There are no policy and procedures regarding serving detainees/inmates alternative meal that meet basic nutritional requirements when detainee/inmates use food or food tray in a manner to harm staff. Interviews with RHU staff reveal meal restriction is imposed upon inmates by the Warden as punishment. Additionally, detainees/inmates are not provided with cleaning solution or equipment to clean their cells the same as detainees/inmates in general population.

Many RHU were cells were cold, and despite numerous request by detainees/inmates for a second blanket, the request was denied. When asked for CCCCs policy and or procedures regarding issuance of as second blanket, especially during winter; RHU SRT supervisory staff responded, "There is no policy, it's up to us if they get a second blanket or not". Continued interview with RHU SRT supervisor and custody staff reveal SRT members use prejudice and unofficial authority to dictate and control detainees/inmates behavior while housed in the RHU, this includes the withholding or denial of personal hygiene items, and deliberate indifference to humane needs such as blankets when it's cold.

Review of RHU watch log and direct observation confirm Correctional Officers observe each detainee/inmate in RHU every 10-minutes on an irregular schedule. However, Correctional Officers indicated the 10-minute observation of each detainee/inmate was implemented by the Warden due to the recent suicides at the facility. There are no policy and procedures requiring all detainees/inmates in RHU are personally observed every 10-minutes. However, a memorandum dated October 17, 2018 was posted on the bulletin board in the Special Response Team (SRT) office regarding the revised procedures when conducting security rounds on all detainees/inmates in RHU.

Review of RHU log books reveal the Warden, Assistant Wardens, Shift Sergeant do not visit RHU's as required by FPBDS. Interviews with detainees/inmates in RHU and observation of the SRT officers who work in RHU reveal considerable tension between the two. SRT officers are dressed in black tactical uniforms and wear stab resistance vests and the focus of their training is tactical deployment. Detainees/inmates are intimidated, and express having difficulty obtaining basic personal needs such as toothpaste, and toilet paper from SRT officers. According to a detainee/inmate, a SRT member told him toilet paper is given out on Wednesdays and the detainee/inmate was given some paper towels to use. Additionally, detainees/inmates advised reviewers SRT officers use excessive force during cell extractions.

The CCCC's staff training curriculum does not consist of RHU policy review and identifying and reporting signs of detainee/inmate mental health decomposition in RHU. Review of Privileges and Rights of Inmates in Disciplinary Isolation form reveal several detainees/inmates did not receive this form and were unaware of their release date from isolation. Moreover, staff do not post the detainees/inmates form on their door as required by CCCC policy.

Just as detainees/inmates in RHU indicate their cells are extremely cold and request a second blanket from the SRT Officers; Detainee/inmates assigned to "No Contact Housing" (Special confinement



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

restrictions ordered by the court which include no access to mail, telephones, or general population) make the request to SRT Officers and they too are refused a second blanket. Detainees/inmates in both the RHU and No Contact Housing are not afforded the opportunity to shave and there is no policy or procedures to document when a detainee/inmate is deprived of any authorized item or activity.

Detainee/inmates assigned to "No Contact Housing" are denied general housing privileges to which they are entitled, as they are not confined for disciplinary reasons. Detainee/inmates assigned to "No Contact Housing" confinement are up to 27 hours, are not allowed daily access to showers, and recreation and are subjected to the same "Red Zone" lockdown system as RHU detainee/inmates. Additionally, interviews with detainees/inmates in the "No Contact Housing" who are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering.

Detainees/inmates in the RHU reported using articles of clothing and towels or rags for toilet paper, when they are not issued or denied toilet paper by SRT staff.

Detainees/inmates in disciplinary isolation status can write letters to family and friends however, they cannot receive letters as detainees/inmates in the general population, nor can they have social visitation, access to reading materials, telephone and recreation. These privileges are suspended by the Warden. The multidisciplinary committee has not identified programs, in addition to the minimum period of recreation, to increase out-of-cell opportunities for recreation, clinically appropriate treatment therapies, skill-building, and social interaction with staff and other detainees/inmates as required by FPBDS.

Detainees/inmates on disciplinary isolation status do not have access to education services, basic commissary services and library services. Additionally, the facility does not have an Imam for Muslim detainees/inmates.

CCCC has not developed a data base which includes the following: race, national origin, religion, gender identity, sexual orientation, disability, and age as required by FPBDS. CCCC's policy and procedures identify the most common reasons detainees/inmates request protective housing (e.g. with prior cooperation with law enforcement, a conviction for a sex offense, gang affiliation, and sex or gender identification) and identify procedures for safely housing these detainees/inmates outside of RHU.


**F - Safety and Sanitation**                                                    **Unsatisfactory**

The Safety and Sanitation review consists of staff and detainee/inmate interviews, review of the facility's policies and procedures and direct observation of the daily operations. The facility does not conform to all applicable federal, state, and local fire safety codes; to those set forth by the National Fire Protection Association (NFPA); and the Occupational Safety and Health Administration (OSHA).

The facility is not fully covered with an automatic sprinkler system. Jail I has the deluge wet sprinkler system which is manually operated by the pod officer while Jail II has an automatic sprinkler system. There is no visual and audible signaling devices in the detainees'/inmates' housing pods. Fire detection and alarm system is tested quarterly.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

Standpipe and hose systems, fire extinguishers and self-contained breathing apparatuses is available at appropriate locations throughout the facility; however, monthly inspections documentation is not available. Additionally, training and medical clearance documentations for staff to use self-contained breathing apparatuses is not available.

Daily pods sanitation/physical security inspections are conducted by the pod officer/supervisor using the monthly facility inspection form; however, the Safety Sergeant does not conduct monthly comprehensive safety and sanitation inspections.

An annual fire inspection was conducted by the Cleveland, Ohio Fire Department on October 26, 2018, however there is no documentation available. The Fire Response/Evacuation plan has not been approved by an independent outside inspector. Additionally, the plan does not identify the location of the facility building/room floor plans, the use of exit signs and directional arrows for flow of traffic and location of publicly posted plan.

Fire evacuation plan diagrams are not posted in ample locations for staff, detainees/inmates, and visitors to find the information they need in the event of an emergency. Two exit signs are damaged and unserviceable.

There is no fire rating documentation for detainees' mattresses, shower curtains and trash receptacles in the housing pods to ensure they are fire-resistant, non-toxic, and non-hazardous. There is no documentation available for the current inspection and testing of the Food Service department's fire detection and suppression hood system.

Fire drills are not conducted every three months on each shift as required by the facility's Fire Safety Plan. Drills are not being documented and evaluated. Staff confirm fire drill are simulated training drills. Direct observation of a fire/man down evacuation exercise conducted in the Restrictive Housing Pod (cell A24/25/26) reveal the need for staff to practice more live evacuation drills. RHU detainees/inmates were released from their cells without restraints at one time. Responding staff did not bring emergency keys and fire extinguishers and there is no emergency visual and audible signaling devices in the detainees/inmates housing pods. The first responding staff; the Safety Manager, a unit officer and nurse, arrived within a minute. The nurse did not carry any emergency equipment and failed to immediately assess the victim while the Safety Manager proceeded to assess and start CPR.

No direction or assistance was provided to the staff performing CPR. The nurse did not exhibit a sense of urgency when calling for back up and emergency equipment. The victim was moved out of the cell within four minutes of the man-down call. On the suspicion of an overdose, the Safety Manager responded by administering nasal Narcan he carried in his belt pouch. Nurses do not carry Narcan. Within five minutes from the start of the man-down drill, three additional nurses responded with a gurney, AED, oxygen and emergency bag. One of the nurses took the lead, assessed the victim and gave direction to stabilize victim and place on the gurney for transport. All responding staff had primary personal protection equipment (PPE – gloves). The medical staff demonstrated competency with the use of the emergency equipment. Many of the responding staff appeared to lack a sense of urgency appropriate to the exercise.



Direct observation reveal inappropriate storage, use and accountability of flammable, toxic, and caustic materials in accordance with OSHA regulations in the following areas; in the Food Service department, Maintenance department, sanitation chemicals storage area, housing pods and roving barber's carts. Several unlabeled bottles with chemicals inside, were found throughout the facility. Also, there is no written documentation of safety training for detainees handling chemicals.

The facility's housekeeping plan/sanitation policy and procedures for cleaning and maintaining the facility is not being enforced. Sanitation levels throughout the facility including the housing pods and cells are poor. Multiple housing pods contained no cleaning chemicals for detainees/inmates to clean their cells. Detainees'/inmates' clothing storage areas are cluttered and unsanitary. In several pods, detainees/inmates are using cardboard boxes as trash receptacles and/or property storage containers.

On the 5th floor of the facility is an area referred to as the "Bull Pen" which at one time was a housing unit with double and single occupancy cells. At some point, the housing unit was repurposed to holding cells for inmates being held for appearance in county court. On the first day of the Facility Review, a facility staff member suggested to this reviewer to visit the "Bull Pen" area. While touring the area, several inmates in one holding cell standing or seating on the floor because there are no benches or other suitable seating for up to eleven inmates per cell who remain in these conditions for approximately 8 to 10 hours. Some inmates were observed eating with no area to place food items other than on the floor. Numerous inmates complained they were thirsty or needed to use the restroom. Observation revealed toilets/washbasins were unserviceable due to the water being turned off by staff.

Two showers located in the male booking area are dirty and unserviceable.

Detainees/inmates in other pods have access to toilets and washbasins with temperature controlled hot and cold running water 24-hours a day. Additionally, detainees/inmates can use toilets without staff assistance when confined to their cells and housing pods. Access to operable and clean showers with temperature controlled hot and cold water is available.

The City of Cleveland, Department of Public Health conducted an annual health inspection on August 17, 2018 with three deficiencies in the Food Service department which were corrected during the inspection. Vermin and pests are controlled through inspections and treatments by Orkin Pest Control Company. However, in 10C housing pod showers, there are flying bugs on the ceiling and walls. During the review, mice were seen in the food service dry storage warehouse.

The facility's water supply is regulated by the Cuyahoga County Department of Public Works. However, the facility's potable water source and supply is not certified annually by an independent outside source.

A ventilation system survey was conducted by Johnson Controls Company however there is no date when the survey was conducted nor signature of the person conducting the survey. Noise levels measurements in detainees'/inmates' housing pods are being documented. Lighting throughout the



facility meets FPBDS. Lighting levels in detainees'/inmates' cells are at least 20 ft. candles in grooming and writing areas.

The number of detainees/inmates exceed the facility's rated bed capacity. The rated bed capacity is 1,765 detainees/inmates however during the Facility Review the detainees/inmates count was 2,420. In several housing pods detainees/inmates sleep with mattresses on the floor. In several housing pods detainees/inmates are not provided a place to store their clothes and personal belongings.

Detainees/inmates have access to hygiene items through the commissary. Indigent detainees/inmates may receive necessity items from the pod officer weekly without cost.

Observation of the admission process confirm detainees/inmates are issued one set of clothing. All detainees/inmates booked into the facility and have their own personal underclothing and socks will be allowed to keep them. Detainees/inmates who are proven to be indigent at the time of their booking and or not possessing underclothing will receive county issued underclothing. If they receive monies at a later date, they are required to purchase underclothing from the commissary and return county issued underclothing to the laundry. Detainees/inmates are issued one mattress in the housing pods. Several housing pods cells have worn and damaged mattresses. Mattresses are not being cleaned monthly or after use according to the facility's sanitation policy.

The detainee/inmate hair care policy and program is not effective. Detainees/inmates are not afforded an opportunity for hair care services on a regularly scheduled basis. Barbering equipment is maintained on two roving barber carts, which are not cleaned and disinfected regularly. There are two unlabeled chemical spray bottles and two unlabeled containers with a dirty/hairy chemical solution for disinfecting the hair combs and clipper guides. Neck strips are not available. An inventory of barbering tools and equipment is not available. The schedule for haircuts is not posted in the housing pods.

Essential lighting and life sustaining functions is maintained inside the facility and can operate in an emergency. Power generators are inspected weekly and load tested quarterly. CCCC is a tobacco-free facility.

### G - Services and Programs                                              Satisfactory

The review of Services and Programs is based on a review of policies and procedures, direct observation and interviews with staff and detainees/inmates. CCCC has a formal classification process and plan which begins at admissions for managing and separating detainees. The policy states and the Intake Sergeant confirms, the classification process ensures detainees/inmates are housed in the least restrictive setting necessary to ensure the safety of detainees and staff. The classification system identifies the most common reasons detainees/inmates request protective housing.

Detainee/inmate housing assignments are determined by gender, age, legal status, custody level and special needs. Jail I and II detainees/inmates housing plan consists of the following designations: ages



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

45+, 40+, 30 +, and 26+; gang affiliation; vulnerable; special needs; step down; veterans; diabetic; Cleveland City; juveniles; and females.

Detainees have access to courts, legal counsel and legal materials however according to staff, detainees/inmates must go through another agency, the Department of Social Services to obtain an unmonitored telephone call with his/her attorney.  Attorney/client visiting rooms are available. Detainees may request access to computers with Lexus Nexus software for legal material.

Detainees can send and receive uncensored correspondence from federal, state, and county courts, executive and legislative branch officials of the United States, county and state officials and officers, attorneys and the media. Legal mail to and from attorneys must be properly marked as legal.

The detainee handbook and direct observation confirms detainees' outgoing mail is sealed and not inspected. Indigent detainees/inmates may receive two envelops and writing paper weekly. Detainees/inmates in RHUs disciplinary isolation status can send letters to family and friends however, they cannot receive letters, nor can they have social visitation, access to reading materials, telephone and recreation. The detainee handbook provides a list of authorized and unauthorized items detainees/inmates may be received in packages.

CCCC policy and direct observation verifies general population detainees/inmates have access to smart touch telephones in their pod dayrooms.  A Telecommunications Device for the Deaf (TDD) telephone is available in the Sergeant's office on the 4th floor for detainees who are hearing impaired. Security staff are required to check detainee telephones to ensure they are operable and request repairs as needed.

There are three full-time and one part time Chaplains for CCCC facilities. The Administrative Chaplain is responsible for coordinating religious programs for the detainee/inmate population. The Chaplains' endorsements by their appropriate religious certifying bodies were not available for review as requested. Chaplains have physical access to all areas of the facility and rotate weekly to visit detainees in their housing pods. Muslim detainees/inmates complained about not having access to an Imam. According to the Administrative Chaplain, he has made several attempts to recruit an Imam to come into the facilities on a regular basis however he has not documented his attempts. Various other faith group volunteers provide programs and services weekly.

Leisure activities and outside physical activity programs are not consistently provided as stated in the CCCC's policy due primarily to the implementation of the previously described "Red Zone" system.

Visitation is available for detainees/inmates to maintain community and family ties. Social visits are non-contact and limited to two fifteen-minute visits per week. Visitors are required to make an appointment to visit detainees/inmates based upon their housing unit's assigned visiting days. Special visits may be requested for visitors traveling from out of town.

A review of the facility's work program policy and staff interviews reveal USMS detainees are not allowed to participate in the facilities' volunteer work program. Institutional inmate positions include: Food Service Workers, Laundry Room Workers, and General Maintenance Workers; detainees/inmates workers are not compensated for the work they perform.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

The Grievance Program is managed by the Sergeant who is also responsible for handling detainee/inmate hearings, staff rosters and other operational duties. The facility policy addressing the grievance process totally contradicts information provided in the detainee/inmate handbook.

The handbook instructs detainees/inmates to initiate grievances, other than those medical related, by writing to the Cuyahoga County Sheriff (at his business street address), while the CCCC policy indicates informal and formal grievance options. The facility provides detainees/inmates with two-ply carbonless request forms or Kites which can also be used to file grievances however, detainees/inmates are required to draw in a box and check it for non-medical grievance issues.

Detainees/inmates are not allowed to retain a copy of the form. They must submit both copies to ensure a response is received. A request to review the grievance logs for the past six months was unfulfilled due to the computer system's inability to print the logs by the month. The Grievance Sergeant receives all grievances, logs them in and forwards them to appropriate staff member for response. According to the reviewer's examination of the grievance log on the computer screen, timelines, basis for grievances and dispositions were vague and difficult to determine. Grievance trends are not tracked.



CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018      Facility Review Report

## Detailed Findings by Functional Area

### A - Administration and Management

| | Standard | Finding Options |
|---|---|---|
| | | - Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
| A.1 | Policies and Procedures | Unsatisfactory |
| A.2 | Quality Control | Unsatisfactory |
| A.3 | Detainee Records | Unsatisfactory |
| A.4 | Facility Admission and Orientation Program | Marginal |
| A.5 | Detainee Property | Marginal |
| A.6 | Detainee Transfers and Releases | Satisfactory |
| A.7 | Detainees with Disabilities | Satisfactory |
| A.8 | Discrimination Prevention | Marginal |
| A.9 | Staffing | Satisfactory |
| A.10 | Staff Training | Marginal |
| A.11 | Emergency Plans | Marginal |
| A.12 | External Agency Notifications | Unsatisfactory |

**Additional Comments**



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

**B - Health Care**

| | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| B.1 | Health Care Administration | Marginal |
| B.2 | Intake Health Screening | Satisfactory |
| B.3 | Medical, Mental Health, and Dental Appraisals | Marginal |
| B.4 | Access to Health Care | Satisfactory |
| B.5 | Provision of Health Care | Marginal |
| B.6 | Incident Health Care | Marginal |

**Additional Comments**

**C - Security and Control**

| | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| C.1 | Correctional Supervision | Unsatisfactory |
| C.2 | Detainee Accountability | Satisfactory |
| C.3 | Control of Contraband | Satisfactory |
| C.4 | Use of Force/Non-Routine Application of Restraints | Marginal |
| C.5 | Weapons Control | Satisfactory |
| C.6 | Keys, Tools, and Medical Equipment Control | Unsatisfactory |
| C.7 | Post Orders | Unsatisfactory |
| C.8 | Detainee Discipline | Marginal |
| C.9 | Restrictive Housing | Unsatisfactory |
| C.10 | Detainee Transportation | Satisfactory |

**Additional Comments**



SENSITIVE LIMITED DISTRIBUTION                    **#136619.50**

CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018      Facility Review Report

**D - Food Service**

| | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| D.1 | Food Service Administration | Satisfactory |
| D.2 | Food Service Employee/Worker Health | Marginal |
| D.3 | Food Storage and Preparation | Unsatisfactory |
| D.4 | Equipment, Utensils, and Linens | Unsatisfactory |
| D.5 | Detainee Meals and Special Diets | Unsatisfactory |

**Additional Comments**

**E - Restrictive Housing**

| | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| E.1 | Detainee Records | Unsatisfactory |
| E.2 | Detainee Transfers and Releases | Unsatisfactory |
| E.3 | Staffing | Unsatisfactory |
| E.4 | Staff Training | Unsatisfactory |
| E.5 | Incident Health Care | Unsatisfactory |
| E.6 | Detainee Discipline | Unsatisfactory |
| E.7 | Administrative/Disciplinary Segregation | Unsatisfactory |
| E.8 | Classification and Housing | Satisfactory |

**Additional Comments**



SENSITIVE LIMITED DISTRIBUTION

**#136619.51**

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

**F - Safety and Sanitation**

| | Standard | Finding Options - Exceptional - Very Good - Satisfactory - Marginal - Unsatisfactory |
|---|---|---|
| F.1 | Fire Safety and Chemical Control | Unsatisfactory |
| F.2 | Sanitation and Environmental Control | Unsatisfactory |
| F.3 | Clothing and Bedding | Satisfactory |
| F.4 | Detainee Hygiene | Satisfactory |
| F.5 | Emergency Power and Communications | Satisfactory |

**Additional Comments**

**G - Services and Programs**

| | Standard | Finding Options - Exceptional - Very Good - Satisfactory - Marginal - Unsatisfactory |
|---|---|---|
| G.1 | Classification and Housing | Satisfactory |
| G.2 | Access to the Courts and Legal Materials | Satisfactory |
| G.3 | Mail | Satisfactory |
| G.4 | Telephones | Satisfactory |
| G.5 | Religious Programs | Satisfactory |
| G.6 | Recreation | Unsatisfactory |
| G.7 | Visitation | Satisfactory |
| G.8 | Work Programs | Satisfactory |
| G.9 | Grievance Program | Unsatisfactory |

**Additional Comments**





Confidential Draft – For Review

**Cuyahoga County**
**Agency of Inspector General**



# Cuyahoga County Corrections Center
# Report of Investigation
# February 12, 2019
Inspector General Mark D. Griffin

EXHIBIT
2

Table of Contents

I. Executive Summary ....................................................................................... 5

II. Background ................................................................................................... 10

A. Agency of Inspector General ........................................................................ 10

B. Cuyahoga County Sheriff's Department ....................................................... 12

C. Cuyahoga County Sheriff's Department – Corrections Division ..................... 13

III. Materials Reviewed & Interviews Conducted .............................................. 14

A. Documents Reviewed by AIG in the Course of this Investigation ................. 14

B. Interviews Conducted .................................................................................... 15

C. Physical Inspection of CCCC ........................................................................ 16

███████████████████████████████████████
█████████████████ ................................................................ 17

IV. Discussion & Analysis ................................................................................. 18

A. U.S. Marshals Service Review of CCCC Found Violations of Federal Standards
Which Parallel Analogous State Standards. All Such Violations Should be
Corrected. ........................................................................................................ 19

B. CCCC's Command, Control and Culture. ...................................................... 19

1. CCCC's Chain of Command Was Not Consistently Respected ..................... 19

2. No Prior Jail Management Experience ........................................................ 20

3. Chain of Command. .................................................................................... 21

4. Management Ignored Objective Data ......................................................... 22

5. A Culture of Contempt for COs .................................................................. 22

6. A Perceived Culture of Retaliation Limited the County's Ability to Identify and
Correct Problems. ........................................................................................... 24

7. Policies Not Communicated ....................................................................... 24

C. Years of Over-Crowding – A Systemic Failure to Correct ............................... 25

D. Inadequate Planning Will Likely Cause the County to Lose $2 Million As A Result of The Cleveland Regionalizaton Project............................................................ 26

E. Staffing Shortages, Absenteeism and "Red Zoning" ....................................... 27

1. CCCC Staffing Levels Are Below Authorization ............................................ 28

2. In Three Years, CCCC's Turnover of COs Increased 118%............................ 29

3. High Level of Call-Offs Negatively Impacts Understaffing and Increases in Red-zoning ............................................................................................................... 30

a. During an Average Week, 40% of COs Call Off From Work ........................... 30

b. Red-Zoning, Limited Relief Workers and Mandatory Overtime are Results Of Not Being Fully Staffed. .................................................................................... 31

c. CCCC's Revised Overtime Policy Negatively Affected Absenteeism and Increased Red-zoning. ........................................................................................ 31

d. Complaints Regarding Persistent Red-zoning Were Routinely Denied Based Upon Information Provided By CCCC Or Because They. ..................................... 33

F. Access to Medical Care ................................................................................... 34

1. Alleged Delays and Denial in the Delivery of Care. ....................................... 34

2. Reduced Security for Medical Staff Limits the Care Provided to Detainees. ...36

G. Concerns Regarding Retaliation...................................................................... 37

1. Employee Retaliation Concerns.................................................................... 37

2. Inmates Fear Retaliation for Reporting Complaints ...................................... 39

H. Jail Oversight................................................................................................. 40

1. Quarterly Grand Jury Inspections ................................................................ 40

2. CCCC's Efforts to Influence or Evade Effective State Oversight ...................... 42

a. When Provided Advance Notice of Jail Inspections, CCCC Altered Its Standard Conduct........................................................................................................... 42

b. Relationships with State Inspectors May Have Impaired The Independence of State Investigations ............................................................................................. 43

c. State Inspectors Frequently Relied Upon Information Provided By The Subject of the Complaint. ..................................................................................44

I. Health and Safety Issues ...................................................................... 48

1. Grievances Regarding Health and Safety Issues ........................................... 48

2. COs Alleged That Bolted Stations Are A Workplace Hazard ...........................50

3. CCCC Improperly Used Food As Punishment ................................................ 51

4. The Cost Per Meal Declined 19% - From $0.83 to $0.64 Per Meal. .................52

5. Inmates Were Limited to One Roll Per Week of Toilet Paper ........................53

6. Mold and Sanitation...................................................................................54

J. Discrimination Issues In CCCC .........................................................55

1. Reports of Religious Discrimination. ..........................................................55

2. Female COs...............................................................................................55

3. Female Inmates .........................................................................................56

K. Access to the Courts....................................................................................58

V. Conclusions .................................................................................................59

Exhibits............................................................................................................ 60

Exhibit A: Comparison of Ohio State Minimum Standards for Jails and the Federal Performance Based Detention Standards ......................................................... 60

Exhibit B: U.S. Marshal Service Facility Review for Cuyahoga County Correctional Facility October 30-November 1, 2018 ...............................................................79

Exhibit C: Minimum Standards for Jails ........................................................... 80

Confidential Draft

**REPORT OF INVESTIGATION**

## I. Executive Summary

A jail is not intended to provide a pleasant experience. But neither should it be a death sentence.

In 2018, eight (8) citizens died after entering the Cuyahoga County Correctional Center ("CCCC"). In September 2018, in response to the first four (4) deaths, the Agency of Inspector General ("AIG") initiated an investigation into the conditions of the County Jail. Later that month, after the deaths of two (2) more detainees, the County Executive ███████████████████████████████████████████████████████████

As required by County Code § 204.01, the AIG suspended its investigation in order to avoid any interference with the federal review. Thanks to U.S. Marshal Peter Elliott and County Executive Budish, the AIG participated in the inspection conducted by the federal team. The professionalism of the U.S. Marshals Service cannot be overstated. They are outstanding. Eleven (11) jail management experts undertook a detailed and specific examination as to whether the CCCC complied with federal standards for federal detainees. The U.S. Marshals Service, in a 52-page report issued November 21, concluded that the CCCC failed numerous standards and identified 24 of 55 criteria in which the CCCC was rated either "unsatisfactory" or "marginal."

The AIG strongly concurs with the U.S. Marshals findings. The AIG does acknowledge that, since the issuance of this report, the County has taken important steps to correct the problems identified.

After the issuance of the federal report, the AIG resumed its own investigation. This review is strictly limited because of the AIG's:

    1) obligation to avoid interfering with any ██████ investigations;

    2) agreement with the findings of the federal subject matter experts; and

    3) desire to avoid duplication of effort and findings of others.

Confidential Draft

The AIG refocused its inquiry to review issues that were not otherwise investigated, and which would also avoid any semblance of potential interference.

The AIG investigators toured and inspected the CCCC on 12 separate occasions, spoke with more than 30 staff, officials, independent medical professionals, union representatives, CCCC detainees, other citizens and reviewed thousands of pages of documents and emails.

The AIG's investigation revealed a fundamental failure of leadership, management and oversight. In 2015, the County appointed a Regional Director of Corrections who had no previous jail management experience. The Regional Director was allowed at times to circumvent the formal chain of command and the oversight of the County Sheriff. Within the CCCC leadership, despite objective evidence of unexplained deaths, increased staff turnover and high rates of staff absenteeism, there was sentiment that any problems were overstated or were caused by external factors and that the jail itself was well-run. This disconnected reasoning was reinforced by a culture of perceived retaliation that impeded the open and honest discussion of failings in the CCCC.

The simultaneous overcrowding, understaffing and "red-zoning" of the CCCC are equal parts symptoms and causes of the systemic failings. Every year since 2012, the CCCC's average daily prisoner population exceeded the level permitted by its certification. Rather than correct this problem, the CCCC increased its overcrowded population by 18%. It is both commendable and evidence of past management failures, that after the federal report, the County was able to reduce its average daily population by nearly 20% within two months.

The CCCC continues to be below the authorized staffing levels for corrections officers ("COs"). CO turnover increased 118% between 2015 and 2018. It is not unusual for 40% of COs to "call off" for their shifts. As a result of these staff shortages, and a change in the overtime policy, many COs are required to work 16 hour shifts and detainees are "red-zoned" -- a process that requires a single CO to lock down and monitor multiple prisoner pods. Red-zoning increases the stress on COs as well as on detainees.

Deficiencies were also found in the provision of medical services. Medical staff reported that inmates were unable to receive necessary medical care in a timely fashion. At times,

requests for medical care were allegedly delayed, ignored or deleted from the case tracking system without receiving care. Because of a change in CO staffing, medical personnel can be stymied from providing care due to a lack of sufficient COs assigned to the medical center. Similarly, nurses reported concerns over risks related to distributing medication from the medical cart without an assigned CO.

The AIG also found a failure of oversight. At its core, the primary responsibility for correcting management problems lies with management itself. The wardens, Regional Jail Director and those who supervise them -- or are supposed to supervise them -- are responsible for managing the jails. However, there are also additional sources of oversight that were not effective. First, RC 2939.21 requires the average citizens empaneled on a Grand Jury to inspect the CCCC on a quarterly basis. Considering the fact that grand jurors are not subject matter experts, cannot effectively review failures of systems or practices, it is unreasonable to expect such inspections to identify the types of problems at issue here. ██████████████████████████████████ These state inspections - subject to recent budget constraints -- were often announced in advance, understaffed and were rarely as comprehensive as the federal effort.

Based upon the findings discussed herein, the AIG makes the following recommendations:

1. **Correct the Deficiencies Identified by the U.S. Marshals Service.**
The AIG concurs with the findings of the U.S. Marshal, including findings regarding violations of federal standards. These violations mirror violations of the equivalent Ohio Jail State Minimums in most cases. Rather than repeat those findings, the AIG globally recommends that each violation be rectified. Thus, because the AIG agrees with the U.S. Marshals report, this review examines related issues from a different perspective.

2. **Additional Recommendations.**
In addition to correcting the issues identified by the U.S. Marshals Service, the AIG also makes the following recommendations:

Confidential Draft

a. **Management & Leadership:**

   1. Establish and maintain a clear chain of command from COs to the Warden to the Regional Jail Director, to the County Sheriff and the County Executive;

   2. Empower the County Sheriff with effective primary responsibility, institutional support and authority regarding the operations of the Regional Jail System.

   3. Hire qualified leadership with extensive experience in managing a system of correctional facilities.

b. **Oversight:**

   1. Implement regular unannounced walk-throughs and inspections by the Regional Jail Director and Wardens that will cover all aspects of County jail facilities on a monthly basis;

   2. Provide semi-annual follow-up reports regarding the County's compliance with the recommendations and standards of state and federal authorities;

   3. Work with the County Courts and Grand Juries to educate grand jurors regarding standards, past challenges, and systems by providing guidance, checklists, past reports and context to enhance the effectiveness of mandated Grand Jury inspections;

   4. Work with State Inspectors to permit unannounced inspections on a quarterly basis;

   5. Request that State Inspectors be rotated to permit fresh perspectives on a regular basis;

   6. Request annual or biennial follow-up inspections by the U.S. Marshals service;

   7. Request annual inspections by the American Correctional Association or other equivalent independent, private accrediting body.

c. **Whistleblower Protection: Improved Information, Reduced Fear of Retaliation and Increased Responsiveness.**

8

Confidential Draft

1. The County should address staff concerns by creating and advertising an anonymous channel for reporting misfeasance, malfeasance, and improper conduct.
2. The County should establish a reporting and evaluation mechanism that reviews complaints regarding jail operations for complaints that are not otherwise subject to collective bargaining agreements. Any such complaints should be evaluated by persons who would include, but should not be limited to, Jail administrators.

d. **Capacity:** Reduce the average daily inmate population to the capacity approved by the Bureau of Adult Detention by working cooperatively with the Courts regarding case review, bond reform, expedited procedures, and enhanced electronic monitoring.

e. **Medical Care:**
    1. Significantly increase the medical resources available to CCCC including, if necessary, additional medical staff and enhanced wages;
    2. Clarify the authority of medical staff regarding the provision of inmate medical care and staffing;
    3. Return to the prior policy of assigning consistent teams of security and medical staff to the medical facilities;
    4. Require **all** inmates to be medically screened within 12 hours of admission.

f. **Staffing:**
    1. Correct discrepancies in employment data between the Personnel Review Commission, HR and the Sheriff's Department.
    2. Significantly increase the number of CCCC staff in order to minimize red-zoning, improve safety and security, improve morale, and reduce inmate incidents;
    3. Review the competitiveness of wages paid to CCCC staff;
    4. Work to create a culture of respect between all levels of CCCC employees;

9

Confidential Draft

5. Return to a policy of scheduled overtime during periods when CCCC is reasonably anticipated to be short-staffed.

g. **Physical Condition of the Jail:**
   1. Continue the recently-implemented weekly reviews of the Jail's physical condition performed by Public Works;
   2. Reinstate the prior policy of charging inmates for damage they intentionally cause to County facilities.

In light of the above, this report will be forwarded to **County Executive Armond Budish, Chief Safety and Protection Officer Brandy Carney and Sheriff Clifford Pinkney** for informational purposes.

## II. Background
### A. Agency of Inspector General
#### 1. AIG's Authority, Focused Jurisdiction and Obligation to Suspend Investigations

In 2011, the County created the AIG to serve as an independent watchdog to protect taxpayers' dollars and to provide information regarding the effective and efficient operation of County affairs. Pursuant to County Code § 204.01(b)(3), the AIG was created and empowered "to investigate fraud, corruption, waste, abuse, misfeasance, malfeasance, and nonfeasance without interference or pressure from any other Public Official or Employee." Although the AIG has broad authority to investigate and to report its findings, the AIG was created without the authority to enforce proposed remedies or implement recommendations.

Moreover, the AIG "shall not interfere with any ongoing criminal, administrative, or civil investigation or prosecution in the performance of his/her duties. If necessary, the Inspector General shall suspend all investigative activities to ensure that the Agency's actions do not interfere with any such investigations." County Code §204.01(B)(4)(A). Thus, one of the roles of the AIG is, whenever possible, to assist the investigations of other

10

Confidential Draft

entities. If the AIG has a pending investigation, it typically suspends its activities until the other entity completes its own investigation.

### 2.    AIG Initiated Its Jail Investigation on September 18, 2018

By August 30, 2018, four inmates incarcerated at CCCC died. Questions regarding the conditions of the jail began to surface and on September 18, 2018 a former medical supervisor in the jail filed a complaint with the AIG. This prompted the AIG to look not only into the allegations against Regional Director of Corrections Kenneth Mills, but also into the jail operations. The AIG conducted more than 20 interviews between September 27, 2018 and February 7, 2019. The interviews included former and current County employees, MetroHealth Medical Center employees and a State Jail Inspector.

### 3.    In Cooperation with United States Marshals Service, the AIG Suspended its Investigation Pending the Federal Investigation

During the pendency of the AIG's jail investigation, a sixth inmate at CCCC died and ███████ ██████████████████████████████████████████ Consistent with its obligations under County Code Section 204.01(B)(4), and to avoid any potential interference, the AIG suspended its pending investigation regarding the CCCC and collaborated with the team of U.S. Marshal investigators. The US Marshal investigators used the Federal Performance Based Standards as a guide to inspect the CCCC for violations of health, safety and human rights violations.

October 30 – November 1, 2018, the U.S. Marshals sent a Facility Review Team to CCCC for an in-depth inspection. The review team was comprised of six (6) U.S. Marshal personnel, seven (7) subject matter experts, three (3) representatives from the Federal Bureau of Investigation, and the AIG staff. The AIG is grateful to U.S. Marshal Pete Elliott for including AIG staff in the inspection and review process.

11

Confidential Draft

The team of investigators worked in small groups and dispersed to different locations within the jail system. Over the course of three days, investigators interviewed staff and inmates, and inspected areas using the Federal Performance Based Detention Standards as a guideline. CCCC provided security escorts to navigate the secure facility. After each full day of inspection, the team reconvened at the U.S. Marshals Office to debrief on the day's findings.

The Facility Review Team submitted the 52-page report to the County Executive approximately three weeks after the conclusion of the CCCC inspection. The team found CCCC violated specific federal standards and constitutional norms. ████████████████████████████████████████████████████████████

### 4. The AIG Resumed and Refocused Its Investigation After the Release of the U.S. Marshals Report on November 21, 2018

Upon the conclusion of the U.S. Marshals investigation, the AIG resumed its investigations. Among other activities, the AIG participated in the State Inspector review which was conducted on November 6 -7, 2018. Additionally, rather than re-iterate the findings of the U.S. Marshal Service, the AIG focused primarily on other issues that were not directly based upon the application of federal standards.

### B. Cuyahoga County Sheriff's Department[1]

The mission of the Cuyahoga County Sheriff's Department ("CCSD") is as follows:

> Our mission as caretaker of the public's safety is dedicated to maintaining the trust and respect of those we serve by resolutely and aggressively

---
[1] https://sheriff.cuyahogacounty.us/

12

Confidential Draft

enforcing the law and by committing ourselves to the efficient and effective delivery of safety services. As agents of the community, we strive to provide appropriate custodial care along with programs that support the physical, spiritual and constitutional needs of individuals committed to our custody. Further, every effort will be made to assist the inmates in our custody to understand and take responsibility for their involvement in the justice system.

The Department has three divisions – Civil, Law Enforcement and Corrections. The County Sheriff is Clifford Pinkney.

### C. Cuyahoga County Sheriff's Department – Corrections Division

The CCCC is the second largest jail in the state and is full-service serving over 26,000 inmates annually. There are currently three locations, one in Downtown Cleveland, one in Euclid, Ohio and the third in Bedford Heights, Ohio. The Downtown Jail, which is the primary facility, consists of two high rise buildings housing all levels of security statuses, from maximum security to weekenders.

The CCCC operates a full-service kitchen, medical clinic and pharmacy. It also provides social service programing. Between all of the facilities, there are over 700 full-time employees and the CCCC partners with MetroHealth as a provider of medical services.

The CCCC is managed by a Regional Director of Corrections, a Warden, three Associate Wardens, a Facility Services Manager, a Mental Health Services Manager, and a Health Care Services Director. The daily operations are managed by sergeants who oversee Corporals and a complement of approximately 550 COs.

13

Confidential Draft

## CCCC Organizational Chart depicts the structure of management



## III. Materials Reviewed & Interviews Conducted

### A. Documents Reviewed by AIG in the Course of this Investigation

During this review, the AIG reviewed numerous written materials, including without
limitation:

14

Confidential Draft

1. State of Ohio Minimum Jail Standards;
2. Federal Performance Based Detention Standards;
3. U.S. Marshals Facility Review Report Dated November 2018;
4. Officer Manual of Instruction & Direction Revised January 2016;
5. National Commission on Correctional Health Care – Standards for Health Services in Jail 2018;
6. Staffing numbers from 2014 – 2018 from Cuyahoga County Sheriff's Department Fiscal Division;
7. Annual State Inspection Reports for years 2012-2013, 2015-2017;



10. Grand Jury Inspection Reports 2017-2018; and
11. 2015-2017 Annual Sheriff's Department Reports;

## B. Interviews Conducted

The AIG also interviewed the following current and former County employees CCCC inmates and citizens:

1. Sheriff Clifford Pinkney



- Mills spoke with AIG investigators on multiple occasions during the review. However, he did not submit to a formal interview.

4. Corrections Officer/Union Director Brian Klak
5. Corrections Officer/Union Director Frank Hocker
6. Donna Kaleal – Sheriff's Department Fiscal Division
7. Laura Sims – Sheriff's Department Fiscal Division
8. Director of Office of Budget Management Maggie Keenan
9. Correction Officer 1
10. Correction Officer 2

15

Confidential Draft

11. Correction Officer 3
12. Associate Warden Damara Shemo
13. Associate Warden Phillip Christopher
14. Associate Warden Kevin O'Donnell
15. Nurse 1
16. Nurse 2
17. Nurse 3
18. Doctor Thomas A. Tallman
19. State Jail Inspector Joel Commins
20. Inmates
21. Citizens

## C. Physical Inspection of CCCC

Finally, the AIG made numerous visits to the jail to conduct physical inspections of the facilities on the following dates:

1. October 16, 2018
2. October 30, 2018
3. October 31, 2018
4. November 1, 2018
5. November 6, 2018
6. November 7, 2018
7. January 3, 2019
8. January 10, 2019
9. January 18, 2019
10. January 24, 2019
11. February 7, 2019
12. February 14, 2019

16

Confidential Draft

**D.** 

| DATE | CONTACT TYPE | NUMBER/EMAIL/ ADDRESS | NOTES |
|---|---|---|---|
| ███████ | █████████ | ████████ | ██████████ |
| ███████ | █████████ | ████████ | ██████████ |
| ███████ | █████████ | ████████ ████████ | |
| ███████ | █████████ | ████████ ████████ | █████████ |
| ███████ | █████████ | | █████████ |

17



IV. Discussion & Analysis

18

Confidential Draft

### A. U.S. Marshals Service Review of CCCC Found Violations of Federal Standards Which Parallel Analogous State Standards. All Such Violations Should be Corrected.

████████████████████████████████████████████████████  The U.S. Marshals Service, in a 52-page report[2] issued November 21, concluded that the CCCC was rated was rated either "unsatisfactory" or "marginal" on 24 of the 55 criteria in which the CCCC was rated either "unsatisfactory" or "marginal." The AIG strongly concurs with the U.S. Marshals' findings. These violations also indicate violations of similar State standards.

AIG investigators compared the 2017 and 2016 Annual State Inspections with the 2018 Inspection conducted by the US Marshal task force. Exhibit A pairs the unsatisfactory Federal Performance Based standards with the State Minimum Standards for Full service jails. [3] Exhibit A provides a concordance of federal and state violations. The County should address these deficiencies — regardless of whether they are federal or state standards — as soon as possible.

After the issuance of the U.S. Marshals findings, the AIG refocused its review to ensure that it addressed issues that were not otherwise investigated, and which would also avoid any semblance of potential interference.

### B. CCCC's Command, Control and Culture.

#### 1. CCCC's Chain of Command Was Not Consistently Respected

Quality leadership and strong organizational culture are both necessary for an organization to operate efficiently. According to the CCCC Officer Manual of Instruction

---

[1] Cite
[2] 2017 and 2016 Annual State Inspections and 2018 US Marshal Facility Review Report

19

Confidential Draft

and Direction[4], revised January 2016, each position is required to answer to the next highest rank in all matters regarding their job duties. A request must be made to an Officer's immediate supervisor before consulting one of the higher-ranking Officers. This Chain of Command is designed to maintain authority and responsibility of supervisory personnel and to eliminate officers from "going over a supervisor's head."



On paper, the CCSD appears to have very clear lines in the chain of command, however in practice this process may not have always been followed. As documented, the Regional Director of Corrections reported to the County Sheriff, who reported to the Director of Public Safety who ultimately reported to the County Executive ██████████

**2. No Prior Jail Management Experience.**

Leading a regional system of correctional facilities requires skills and experience that are both profoundly deep and extremely specialized. These are extremely complicated and important jobs that require tremendous skills and a legacy of practical experience. "To become a prison warden, you must first start as a correctional officer to gain

---

[4] Cite

20

Confidential Draft

experience and familiarize yourself with the workings of a correctional facility. . . . With vast experience and an advanced degree, you can become the head of prisons in your county or state."[5] To become a successful leader of correctional facilities, "you should have:

- A detailed knowledge of administration of correctional facilities
- A good understanding of human behavior and psychology
- Strong administrative and leadership skills
- Strong problem-solving skills
- The ability to work with people from diverse backgrounds
- An intricate understanding of prisoners' rights
- An awareness of safety and health issues in correctional facilities."[6]



### 3. Chain of Command.

[1] https://www.careeraddict.com/become-a-prison-warden-in-the-us
[2] Id.
[3] Donna Kaleal, Chief George Taylor, Maggie Kaleal
[4] Chief George Taylor, Sheriff Clifford Pinkney
[5] Id.

Confidential Draft

### 4. Management Ignored Objective Data

Mills reorganized the CCCC and appointed direct reports who served in their positions at his will. By the end of September 2018, six detainees had died in the CCCC, staff turnover had increased 118% over three years and absenteeism by COs was frequently at 40% or higher.

### 5. A Culture of Contempt for COs

The job of a CO is one of the ten most dangerous jobs in America.[13] "As a profession, corrections work is one of the most stressful in law enforcement. Officers must remain continually alert during eight- to 16-hour shifts to avoid being attacked or killed by the offenders that they supervise. The intensity of these environments often prompts officers to shut down emotionally, reducing their ability to function effectively within the institution."[14]

For example, between February and December of 2018, the CCCC Medical Department documented 1,068 altercations requiring medical attention that involved inmates. [15]

Interviews with Lauryn Harwell, Associate Wardens Kevin O'Donnell and Phillip Christopher and ████████
[13] https://www.forbes.com/sites/susanadams/2015/07/23/americas-most-dangerous-jobs/#7bce11d657ce
[14] https://work.chron.com/disadvantages-being-correctional-officer-10287.html
[15] Metro Health Dr. Tallman provided altercations data provided January 15 and 17, 2019

Confidential Draft



Thus, on the average day, there are approximately three altercations that require medical assessment or treatment.



Nonetheless, Mills stated that "a trained monkey" could do the job of a CO.[16] The tone set at the top of an organization generally affects each layer within the chain of command. Within the CCCC, it was reported that staff morale was extremely low, it was perceived that complaints would not be acted upon, and a sense that the role of the CO was not highly regarded.[17]

---

[16] Former CCCC employee stated during interview October 11, 2018
[17] Brian Klak interview January 7, 2019

23

Confidential Draft

### 6. A Perceived Culture of Retaliation Limited the County's Ability to Identify and Correct Problems.

COs who were interviewed by the AIG consistently voiced fears that they would be retaliated against by management for reporting issues.[18] Whether real or imagined, the reluctance of COs and other staff to report issues to management prevents many problems from being identified and resolved. These concerns are discussed in greater detail below.

### 7. Policies Not Communicated



In one example, a correction officer was injured when opening a cell in a Red-Zoned pod when the inmate attempted to leave the cell. A physical altercation ensued. The Union leaders sent a letter reminding correction officers that there is a policy that states a supervisor should be present when opening a cell door in a pod that is on lock down status. In a 2014 arbitration regarding a different correction officer, former Associate Warden McArthur testified that a correction officer "opening the cell door of an inmate in a lockdown situation, without a supervisor present, was contrary to policy."

To the extent that CCCC has written policies, the CCCC management and leadership has failed to adequately disseminate those policies or train staff.

---

[18] Letter from Union Director Frank Hocker sent to Executive staff including County Executive, Interim Regional Director, and Human Resource Executive provided to AIG on January 9, 2019

Confidential Draft

### C. Years of Over-Crowding — A Systemic Failure to Correct

CCCC is approved to hold **1,765 detainees,** including 1,455 men, 310 women, 26 juveniles and 88 people with physical disabilities. In every annual state inspection since 2012, CCCC has been cited by the state jail inspector for having more than the recommended detainee population.[21]



CCCC Average Daily Population per Year

The average daily population of the jail increased 18% from 2012 to 2018.[22] In fact, instead of correcting this failure to comply with state standards, the County allowed its average daily population to increase in five of the last six years. On Oct. 30, 2018, according to the U.S. Marshals report, the CCCC housed 2,420 detainees which is 655 detainees more than the facility is approved to house.[23] Inmate pods that were intended

---

[21] Bureau of Adult Detention Full Service Jail Annual Inspection Reports 2012-2017
[22] Average Daily Population data obtained from Sheriff's Department Fiscal Division on Oct. 3, 2018
[23] Since the issuance of the federal report, the County has substantially reduced the detainee population. Within two months of the federal report, the detainee population dropped by 15%. According to average daily population counts obtained by the CCCC on Jan. 18, 2019

25

Confidential Draft

to hold 40 men, often held as many as 60; and without beds to sleep on, inmates slept on mattresses placed on the floor.[24]

A review of the average population data reveled that, over the past 7 years, CCCC has averaged more than 22% over capacity:

| Year | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|
| CCCC Average Daily Population | 2,005 | 2,029 | 2,166 | 2,176 | 2,161 | 2,268 | 2,357 |
| BAD Rated Capacity | 1,842 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 | 1,762 |
| Over Capacity % | 109% | 115% | 123% | 123% | 123% | 129% | 134% |

By the close of 2018, the facility was nearly 134% of its rated capacity.[25] ███████

███████████████████████████████████████

## D. Inadequate Planning Will Likely Cause the County to Lose $2 Million As A Result of The Cleveland Regionalizaton Project.

███████████████████████████████████████

meet with leaders of the surrounding municipalities to move their inmate population to CCCC. The regionalization plans however, failed to account for the increase in housing, staff, food, uniforms, feminine hygiene, as well as other supplies necessary to house additional inmates in an already over-populated facility. █

---

[24] Employee Grievance filed July 12, 2018 by CO Tony Fountaine
[ ] Data computed using Average Daily Population data obtained from Associate Warden Kevin O'Donnell on January 18, 2019
[ ] Interview with Laura Sims, Business Administrator - Sheriff's Department Fiscal Division on October 4, 2018
[25] Id.

26

Confidential Draft



### E. Staffing Shortages, Absenteeism and "Red Zoning"

The Employee Handbook for Cuyahoga County Employees states

> [t]imely and regular attendance is an expectation of performance for all County employees. To ensure appropriate staffing levels, positive employee morale, and to meet expected productivity standards throughout the organization, employees will be held accountable for adhering to their workplace schedule. . . . Employees are required to maintain a satisfactory record of attendance.

The Ohio Minimum Standards for Full Service Jails ("Ohio Minimum Standards"), Section 5120:1-8-17 D[29] states:

> There shall be a written, implemented staffing plan that includes jail personnel assignments, days of the week and hours of the day that assignments are covered and any deviations from the plan with respect to weekends, holidays or other atypical situations.

> (1) The plan shall include all posts and functions, a calculated shift relief factor, adequate numbers of male and female jail staff on-duty and available to perform sensitive functions and procedures as necessary by inmate gender, and total number of employees required to fill identified posts and functions.

---

[29] http://codes.ohio.gov/oac/5120:1-8 retrieved December 21, 2018

Confidential Draft

(2) The plan shall reflect that the jail has staff for administration and supervision; inmate programs; inmate supervision, custody and back up; support services including medical, food service, maintenance and clerical; staff training; and other jail-related functions such as escort and transportation of inmates.

(3) The staffing plan shall be reviewed once a year by the jail administrator and revised as needed.

The AIG notes that there is continuing ambiguity between staffing data provided by the Sheriff's Department, the Personnel Review Commission and County I.T. systems. The differences in data need to be corrected in order to monitor, manage and improve CCCC operations. Moreover, there is a disconnect between the PRC and the CCCC regarding appropriate hiring procedures.



### 1. CCCC Staffing Levels Are Below Authorization

The end of 2018 marked the highest number of correction officers employed with CCCC in three years, 583. 81 of those officers were stationed at the satellite facilities; 61 stationed at the Bedford Heights site and 20 stationed at the Euclid site. Of the 583 COs employed by CCCC, only 502 CO's were assigned to cover the downtown facility representing the lowest number of COs staffing the main location in the last three years. According to the US Marshals report, CCCC is authorized to have 673 Corrections Officers

Confidential Draft

for Safety and Security. Corrections Officers were not hired in quantities sufficient to fill the growing demand of operating 3 separate facilities.

### 2. In Three Years, CCCC's Turnover of COs Increased 118%

Since 2015, the number of correction officers separating from the position due to retirement, or resignation has increased 118%.[31] In 2018, a total of 72 correction officers left their employment with CCCC.[32]



# of CCCC CO Separations by Year

| Year | Separations |
| --- | --- |
| 2018 | 72 |
| 2017 | 57 |
| 2016 | 42 |
| 2015 | 33 |

According to the Society for Human Resource Management (SHRM), on average, "it costs a company 6 to 9 months of an employee's salary to replace him or her. For an employee making $60,000 per year, that comes out to $30,000 - $45,000 in recruiting and training costs."[33]

The actual costs of turnover may be even higher for the County in light of the difficulty in replacing COs. Between 2017 and 2018, 2,609 people applied for a CO position with CCCC.[34] Of those, 21% met the eligibility requirements. Due to the challenging hiring process and low wages, CCCC was unable to fill all the CO vacancies.[35] There was no comprehensive staffing plan prior to the release of the U.S. Marshals report.

---

[31] Data provided by Human Resources Manager, Hadiya Butler on January 14, 2019
[32] Id.
[33] https://www.enrich.org/blog/The-true-cost-of-employee-turnover-financial-wellness-enrich
[34] Rebecca Kopcienski, Director of Personnel Review Commission data received Jan. 14, 2019
[35] Id.

29

Confidential Draft

### 3. High Level of Call-Offs Negatively Impacts Understaffing and Increases in Red- zoning

#### a. During an Average Week, 40% of COs Call Off From Work

The CCCC has 81 housing pods and each one is usually assigned an officer. Due to the staffing shortages, each shift normally operates with a deficit of 22-32 officers even when all scheduled CO's report for their assigned shift.[36] On average, 40% of correction officer positions are vacant during a given week.[37] As one example, on October 13, 2018, approximately 51 Corrections Officers called off from work. Indeed, the records reviewed by the AIG show that CCCC employees have excessively high call-offs rates which often result in mandatory overtime and staffing for the COs that reported for work.[38] According to information provided



by the Ohio Patrolman's Benevolent Association ("OPBA")[39], the high level of call-offs is caused by COs' dislike of mandatory hold-overs and the belief that management unfairly denies their grievances and complaints.[40] Some CCCC employees expressed that these staffing issues have resulted in co-workers calling off sick or even quitting their jobs with the County. As of January 14, 2019, 119 Correction Officer positions were vacant.[41] The

---

[36] Associate Warden Damara Shemo during Jail tour Jan. 10, 2019
[37] Data provided by Patrick Smock Cuyahoga County Department of Human Resources via email dated October 17, 2017 to Ken Mills.
[38] Brian Klak OPBA Union Director
[39] The OPBA provides union representation to the Correction Officers.
[40] Brian Klak OPBA Union Director
[41] Rebecca Kopcienski, Director of Personnel Review Commission data received Jan. 14, 2019

30

Confidential Draft

high number of unfilled positions coupled with excessive call of rates make adequately staffing CCCC a continuous struggle.

### b. Red-Zoning, Limited Relief Workers and Mandatory Overtime are Results Of Not Being Fully Staffed.

During Red-Zoning, a single CO can be responsible for overseeing up to 4 housing pods at a time. These pods can consist of as many as 24 cells with 2 inmates in each cell. The officer to inmate ratio during a Red-Zone can be as high as 1 CO to 196 inmates.

 Due to the overcapacity of the detainee population, one-man cells are often used to confine two adults: one inmate sleeps on the bed and the other inmate sleeps on the floor.[42] Because of the limited space in the single cells, the inmate sleeping on the floor will have either their head or feet underneath the toilet bowl while sleeping.[43] Implementing Red-zone during staffing shortages results in inmates at the downtown location being confined in their cells for up-to 20 hours daily.[44] Extended inmate confinement can increase tensions between inmates and increase the likelihood of more aggressive behaviors, psychological breakdowns and even physical illness.[45]

### c. CCCC's Revised Overtime Policy Negatively Affected Absenteeism and Increased Red-zoning.

According to OPBA representatives[46], prior to the Mills administration at CCCC, overtime was offered on a volunteer basis and Red-zoning was rarely used. CCCC used an "Off-Day Volunteer List" to call in COs who might want to volunteer for overtime hours. Recently however, jail management changed the process for staffing the jail when call offs

---

AIG Direct Observation during visits to CCCC Jail 2 Oct. 30-Nov. 1, 2018

[44] Id.

Inmate grievance letter sent to County Executive on Sept. 2, 2018 and

[45] **https://www.psychologytoday.com/us/blog/modern-minds/201806/what-really-happens-inside-prisone-isolation-cells**

Interview with Brian Klak Union Director January 7, 2019

Confidential Draft

were high. According to an email sent to all corporals, the "Off day volunteer list was removed" to reduce overtime.[47] In one incident, OPBA union representative Brian Klak questioned Warden Ivey about the use of red zoning and overtime availability.

> Brian Klak stated:
>
> "Today I spoke to Sergeant Leahy with Officer. Brown-Wiggins about overtime availability. Sergeant Leahy advised us that, under your order overtime with only be given out for critical areas and housing units do not constitute being a critical area. Therefore, he must turn Officers away if housing units are red zoned / double podded and opt to leave those areas as such."



| | 2015 | 2016 | 2017 | Change '15-'17 |
|---|---|---|---|---|
| C.O. OT Hours[50] | 94,470.18 | 82,582.35 | 70,622.91 | -25.2% |

From 2015 to 2017, the County reduced overtime hours by 25.2% even though it had a continuing shortage of correction officers. In the face of understaffing and high call-offs, the County continued to Red-Zone parts of the CCCC in lieu of fully staffing or paying the

[a] CO Overtime hours as listed in 2017 Sheriff's Department Annual Report

Confidential Draft

cost of overtime. Although this policy was arguably financially efficient in the very short run, it likely contributed to staff turnover, low morale, increased absenteeism and more frequent red-zoning.

### d. Complaints Regarding Persistent Red-zoning Were Routinely Denied Based Upon Information Provided By CCCC Or Because They.

In grievance forms reviewed by AIG Staff[51], inmates complained of periods when their pod, or housing unit was subjected to "Red zoning" for 12 straight days. Some of the grievance forms alleged that detainees were confined to their cells from 10 a.m. to 7 p.m. for nearly two consecutive weeks. Inmates claimed that they feared for their lives as well as the lives of the officers because extensive periods of red-zoning increased stress and the risk of disruptions.[52] The complaints of the inmates were echoed by CCCC staff members. In an email, one senior staff member quoted Juan Mendez, a United Nations official: "The psychiatric and medical literature is very clear. Deprivation of meaningful social contact does create pain and suffering."

Most of the Red-zoning related grievances filed with either Human Resources or the State Bureau of Adult Detention, ultimately resulted in the grievance listed as unfounded or dismissed as invalid.[53] One inmate listed four different complaints regarding the use of "Red-Zoning."

---

[51] Copies of Inmate grievance forms obtained by AIG on Oct. 31, 2018
[52] Inmate Request Form dated August 28, 2018.
[53] List of Correction Officer Grievances provided by OPBA Union Director Brian Klak on Jan. 10, 2019
Letter from the Department of Rehabilitation and Correction Dated April 2, 2018 Re: Jail Complaint –COM 2017-Cuyahoga County Correction Center-00407

33

Confidential Draft

## F. Access to Medical Care

### 1. Alleged Delays and Denial in the Delivery of Care.

Ohio Minimum Standards Section 5120:1-8-09 (A)(2) requires CCCC to have a designated health authority and that authority "arranges all levels of health care, mental health care and dental care and assures quality, accessible and timely services for inmates."







According to the employee, while delivering medicine, a nurse noticed that an inmate, who had been seen by medical staff the day before, looked worse. The inmate told the nurse his symptoms had worsened, and the nurse went to the doctor and requested another appointment for the inmate. The doctor allegedly told the nurse that the inmate was seen yesterday and did not need to be seen again. Even after the nurse advised the doctor that the inmate's physical condition had worsened, and he needed immediate attention, the doctor still refused to see or evaluate the inmate. The

Confidential Draft

nurse explained that the inmate was not seen until the she advised the medical director of the issue. After the inmate was evaluated by medical staff, the inmate was taken to the hospital where the inmate was admitted until their condition improved several days later.

Other issues alleged



Inmates interviewed claimed that the Inmate Request forms they complete regarding medical concerns often go unanswered or take weeks to receive a response.[57] Other times, it is alleged that the medical request can be denied because the inmate used an incorrect form. [58]

---

[57] Former inmate -Monte Roberts' account described during Community Hearing on County Jail December 6, 2018; A second inmate explained that he was delayed access to medical care for a health problem he had prior to coming to CCCC. During his stay in CCCC, he claimed that he was forced to sleep on a mat on the floor which caused his medical issue to "flare up". The inmate submitted a request to be evaluated by the medical department, but he claimed his request went unanswered. The inmate went on to state that he was not seen by a nurse until the problem became so severe his mobility was impaired. The inmate also claimed that prior to seeing the nurse, a correction officer tried to force him to walk, however, he was unable to walk because the pain had become unbearable. Once he was finally seen by a nurse, he stated that the medical staff did not believe his issue was as severe as described. Upon visual inspection, the medical unit immediately rushed the inmate to the hospital where he was admitted for a few days.

58 Letter to County Executive dated September 2, 2018 and letter to County Sheriff dated October 8, 2018. One inmate stated he completed a request form on September 9, 2018 to see medical regarding an acid reflux type issue. He was told in response to his inmate request form to buy pills from commissary. On September 11, 2018 the inmate claimed that he completed another Inmate Request form requesting to see the doctor again because the pills on commissary did not work for his issue. A medical staff member responded to his Request form on September 13, 2018, "This is not a grievance form. Please put on the correct form." even though the option on the form that read "Grievance-Medical" had been checked. According to the inmate grievance dated September 19, 2018, the inmate still had not been seen by medical. On the Inmate Request Form dated for the same day, the inmate wrote "You people are refusing me medical care." The response from staff regarding the issue was "Place your grievance on the proper form", although the form the inmate used contained an option for "Grievance-Medical", which the inmate selected. The inmate eventually wrote letters to the County Executive and the County Sheriff and neither responded.

Confidential Draft

## 2. Reduced Security for Medical Staff Limits the Care Provided to Detainees.



Confidential Draft

### G. Concerns Regarding Retaliation

### 1. Employee Retaliation Concerns

There is significant and widespread belief among correction officers that jail management retaliates against employees who report malfeasance, misconduct or mistakes.[59] Every correction officer who agreed to speak with AIG Investigators would only speak if they could remain anonymous. According to one anonymous correction officer, if a person speaks out against management will label that individual a "disgruntled employee and face retaliation or disrespect." The Employee Handbook for Cuyahoga County, approved March 2018, Section 3.06 strictly prohibits the use of retaliation toward any employees.[60]

One of the most vocal correction officers, and a union leader, has been a voice on behalf of his co-workers to express concerns regarding the jail. In a Facebook video post, the corrections officer expressed his belief that officers are retaliated against when they speak out against the jail.[61] In one example of retaliation, he referenced a Corporal who video-recorded an inmate using a spoon to "break out" of his cell. The Corporal was demoted to Corrections Officer for not reporting the incident immediately or for not generating a log book entry that the locks were faulty. [62]



---

59

[59] Cite

[60] cite

[61] Cite

[62] Email from State Inspector Joel Commins to Director Mills on Jan. 25, 2017

[62] AIG Investigation file number 17-0002-I received on February 27, 2017

This correction officer alleged to the AIG that CCCC management posted a letter from the State inspector with the CO's home address on it into the jail for the inmates to see, instead of redacting that confidential information and thereby putting his family's safety at risk. The CO alleged that this was in retaliation for the CO's filing of several complaints and grievances regarding the jail conditions.

The correction officer believes he has been subjected to retaliation, discrimination and harassment based on his race and position he holds in the Union. The corrections officer was placed under investigation and removed from the specialty unit assignment during a pending investigation regarding a "potential breach of policy." The correction officer claimed that other officers who experienced similar situations maintained their current positions while pending discipline. The grievance filed with Human Resources regarding this claim was denied.[66]

In October of 2018, the correction officer emailed Human Resources regarding another report of retaliation and harassment.[67] The correction officer was forced to work beyond his scheduled time. When he informed the sergeant in command that he was sick, the sergeant allegedly approached him in an aggressive manner and told him he had to stay, or he would be considered to have refused the post. The correction officer claimed the sergeant allowed correction officers with less seniority to go home but required him to stay despite his illness. He believed his health and safety was at risk because in the past a correction officer who complained about not feeling well was forced to work due to the staff shortage and died shortly after his shift was over.[68]

These anecdotal responses from CO's are indicative of the concern by Jail staff that if they report problems or wrong-doing, they will be subject to retaliation.

---

[66] Grievance filed by Frank Hocker on February 23, 2018
[67] C/S 35 form filed by Frank Hocker on October 24, 2018
[68] Id.

### 2. Inmates Fear Retaliation for Reporting Complaints

Ohio Administrative Code Section 5120:1-8-16 states "Retaliation by staff for inmate grievances is prohibited."[69] However, inmates consistently reported instances in which they are subjected to retaliation because they voice their concerns regarding the environment of the jail. For example, during one interview with an inmate, the inmate expressed concerns for speaking with investigators out of the fear of retaliation by the guards.[70] The inmate shared information with the investigators, but at the end of the interview, the inmate noticed that an SRT escort had returned to the area. The inmate began talking loudly saying "I'm not telling y'all nothing. I thought y'all could help me with my case. Y'all can't help me. I'm not telling you nothing."[71]

This behavior seemed completely contrary to the inmate's behavior just a few moments prior to the SRT escort returning to the interview room. However, the investigator realized the inmate was trying to create the illusion that he did not say anything that the SRT escort might use to retaliate against him.

Every inmate who spoke with the investigators stated they feared for their safety because the staff would likely retaliate against them for speaking out.[72] Inmates described incidents in which staff members would escort the inmate to an area that was not visible to the camera, then the staff member would "beat up" the inmate.[73] Inmates described another alleged incident in which the inmate was placed in hand cuffs and put on an elevator[74] because the inmate had attempted to throw a bodily fluid at another inmate, but instead hit a CO. According to the inmate, once the doors of the elevator closed, the staff member punched the inmate and caused the inmate to hit their head on the rails of the elevator.[75] Rather than take the inmate to the medical unit, the inmate was placed in Administrative Segregation, where the inmate remained for 14 days while the injuries

---

[69] Ohio Revised Code Chapter 5120:1-8-16 (B) Full Service Jails- Retaliation by staff for inmate grievances is prohibited.
[70] Inmate interviews conducted Oct. 31, 2018 during USMS Facility Review
[71] Id.
[72] Id.
[73] Id.
[74] Id.
[75] Id.

Confidential Draft

sustained healed.[76] The inmate was allegedly denied access to a shower during this period as well. [77]

Inmates described a separate incident in which an inmate was observed by other inmates in the pod to be experiencing a seizure.[78] Several inmates alerted the correction officer in the pod and SRT was summoned. The SRT members allegedly threw the inmate having seizure-like symptoms down to the ground before removing the inmate from the pod and taking him to the medical unit.[79]

## H. Jail Oversight

### 1. Quarterly Grand Jury Inspections

Ohio Revised Code Section 2939.21, entitled "Quarterly visits to the county jail" states as follows:

> Once every three months, the grand jurors shall visit the county jail, examine its condition, and inquire into the discipline and treatment of the prisoners, their habits, diet, and accommodations. They shall report on these matters to the court of common pleas in writing. The clerk of court of common pleas shall forward a copy of the report to the department of rehabilitation and correction.

The grand jurors, after reviewing the county jail, report their findings in writing to the Court of Common Pleas. The clerk then sends the reports to ODRC. Typically, the grand jurors are escorted through the jail facility in what jurors refer to as a "tour" rather than an "inspection".

These "tours" are unlikely to provide adequate oversight. One review of best practices in the United States for jail inspections noted that grand juries comprised of average citizens cannot reasonably be expected to have the expertise or training to provide effective oversight:

---

[76] Id.
[77] Id.
[78] Inmate interviews conducted Oct. 30, 2018 during USMS Facility Review
[79] Id.

40

Confidential Draft

Finally, five states rely on grand juries to conduct inspections. Although grand juries constitute an independent oversight body, grand jurors generally do not have sufficient training or expertise in conducting inspections nor are they able to provide technical support to help jails make the necessary repairs or improvements. Independent oversight without sufficient training and expertise is not a satisfactory approach to external oversight of jails.[80]

It is unreasonable to expect a grand jury to be able to analyze and evaluate the CCCC at a level of an expert or at a level sufficient to guarantee that the CCCC is run effectively. Despite the best efforts of the Courts and the grand juries, the current system of quarterly walk-through tours by the grand jury is fundamentally flawed because, among things:

1. Systemic flaws (including health care procedures, intake processes, staff training and leadership, etc) will not be evident from a visual inspection of the physical plant;

2. Without context or standards for comparison, average citizens on a grand jury will not have the ability to determine whether the normally-harsh conditions of jail incarceration are beyond appropriate limits;

3. Typically, a time-comparison is not possible to allow the grand jury to determine if jail conditions have improved or worsened over recent years.

4. The time required to inspect the entire CCCC with two separate downtown jail buildings, satellite jails, nearly 2,000 detainees and one-thousand employees, is substantial.

A grand jury inspection cannot substitute for independent inspections by the U.S. Marshal Service, ODRC, an outside accrediting body or other independent experts. However, the AIG believes that grand jury jail inspections can be improved by:

1. Developing a brief educational training session explaining to grand jurors the issues to look for and questions to ask;

---

[80] Worsley and Memmer, https://www.uhd.edu/academics/public-service/jcil/Documents/6.%20Article.pdf

41

Confidential Draft

2. Providing a check list with objective standards and subjective issues which grand jurors can use to inform their inspection;

3. Providing copies of recent jail inspection reports to grand jurors;

4. Creating opportunities for grand jurors to speak with staff in a confidential setting;

5. Attempting to assure that grand jurors review the entire jail system over the course of a 12-month period or as otherwise required by law;

6. Grand jurors should not announce in advance the timing or locations of their inspections;

There is no single solution. However, these are recommendations that are likely to improve the process as well as the results.

## 2. CCCC's Efforts to Influence or Evade Effective State Oversight

### a. When Provided Advance Notice of Jail Inspections, CCCC Altered Its Standard Conduct.





### b. Relationships with State Inspectors May Have Impaired The Independence of State Investigations

The prior Regional Jail Director worked to improve his relations with the State Inspector by, among other things, inviting the State Inspector to be an honored guest.

---

- Interview with CO1 on October 23, 2018
- Direct observation during AIG visit to CCCC on October 16, 2018
- Interview with CO2 on December 3, 2018
- Id.
- Cite

Confidential Draft

Dever writes:



Mills responds:



On certain occasions, the State Inspectors evaluated complaints against CCCC based substantially on information provided by CCCC. For example, in a complaint filed with the Bureau of Adult Detention, one correction officer claimed that insufficient staffing at the jail is causing Red-Zoning and Double Podding. Double Podding is a situation where one correction officer is assigned to supervise 2 housing pods which could consist of 96 inmates.[9] The state inspector reviewed the complaint by the CO and provided a written response dated August 16, 2017. The inspector determined "Double Podding/Red Zoning does not occur for extended periods of time and Jail Administration ensures that Double

---

[1] Cite
[2] Cite
[3] Cite

44

Confidential Draft



Confidential Draft



Confidential Draft



47

Confidential Draft



The state inspector pulled ten medical records (5 male and 5 female) to determine if the inmates received their 14-day health assessments within the standard time frame. The inspector found one male medical file that lacked the 14-day health assessment. He wrote in his notes that the file was acceptable, but he mentioned to the Jail administrators that they should complete the health assessment immediately. ▮

### I. Health and Safety Issues

### 1. Grievances Regarding Health and Safety Issues

---

▮

109 Facility description obtained from https://sheriff.cuyahogacounty.us/en-US/corrections.aspx last accessed 12/18/18

▮

Confidential Draft

The US Marshal report identified specific areas where the CCCC is operating at an unsatisfactory level. Many of these areas had a previous grievance filed by staff and/or inmates that went ignored by management. Grievances reporting unsafe work environments, over-work and lack of respect from management were often denied or listed as unfounded.[111] In 2018, 68% of all grievances filed by the Correction Officers Union were denied and only 19% were resolved.[112]

Health and safety grievances represented half of all the claims presented to the Union on behalf of the correction officers.



Category of Grievances filed by Correction Officers during 2018

In 2018, 90% of the health and safety grievances were denied by the grievance review board ▮

Confidential Draft

## 2. COs Alleged That Bolted Stations Are A Workplace Hazard





50

Confidential Draft



3. CCCC Improperly Used Food As Punishment

Confidential Draft

ORC 5120:1-8-12(D) prohibits the use of food as punishment. However, CCCC's use of food as punishment was confirmed by one correction officer during an interview with the AIG and his Union Representative.[114] The Union Representative originally stated that the US Marshals report was inaccurate when reporting that CCCC used food as punishment. The correction officer interjected and stated that CCCC did use food as punishment and the US Marshal report was correct in its findings that CCCC management encouraged this practice for inmates who did not comply.[115] According to the officer, inmates were served "sweat meat"[116] bologna sandwiches, rotten carrots, and spoiled milk.[117] The correction officer suggested that food was purposely ordered at or past expiration date so the food could be purchased at a lower rate.[118]



### 4. The Cost Per Meal Declined 19% - From $0.83 to $0.64 Per Meal.

In 2017, the County's cost per meal served to detainees was $0.64. Since 2014, the cost spent per meal at CCCC declined 19%.[119]

|  | 2014 | 2016 | 2016 | 2017 |
|---|---|---|---|---|
| Cost per meal | $ 0.83 | $ 0.77 | $ 0.67 | $ 0.64 |

---

[114] ORC 5120:1 8 12(D) (Important) Jail disciplinary measures shall not include corporal punishment, discipline administered by inmates and withholding food.
[115] Interview with Brian Klak Union Director January 7, 2019
[116] Term used by former inmates to describe the bologna meat provided in the sandwiches.
[117] Grievance filed by Frank Hocker on September 11, 2017 regarding visibly rotten carrots given to inmates in segregation units. Expiration on carrots was 9-2-17, photo was attached to the grievance and shown above.
[118] Interview with Brian Klak Union Director January 7, 2019
[119] Cuyahoga County Sheriff's Department Annual reports 2015-2017
**https://sheriff.cuyahogacounty.us/en-US/Communications.aspx**

Confidential Draft

For context, in 2015, the State of Ohio spent $1.58 per meal per prisoner or twice the cost to Cuyahoga County.[120] It is unclear whether such meals can provide minimally adequate nutrition.

Studies have argued that inadequate food can lead to substantially higher security and health care costs:

> The fact is, serving decent food is cheaper than serving unhealthy and unappetizing food in the long run. Considering the additional costs associated with poor food quality, the cost-cutting measures correctional agencies have taken around food services are fiscally short-sighted. For one thing, deteriorating food quality causes frequent security problems: when incarcerated people see that they are getting worse — or less — food than before, they protest in various ways — from dumping bad potatoes on the floor to strikes. Additional guards may be required to manage food service, not to mention the risks associated with large-scale protests like the coordinated prison strikes in the fall of 2016.
>
> Food costs are also dwarfed by healthcare costs in prisons, so improving the nutritional quality of prison food would be a cost-effective way to improve inmate health. In our recent analysis of criminal justice costs, we found that correctional agencies spend almost six times more on health care than on food.[121]

Thus, the County should review its food policy.

### 5. Inmates Were Limited to One Roll Per Week of Toilet Paper

---

[120] https://www.daytondailynews.com/news/state--regional-govt--politics/state-looks-private-vendor-feedinmates/Ar53ZoDWHEkiFwuxwdfe5K/
[121] https://www.prisonpolicy.org/blog/2017/03/03/prison-food/

Confidential Draft



It was alleged that inmates were denied access to toilet paper at the discretion of the correction officer. When AIG asked a correction officer about these allegations, the correction officer explained that the inmates like to line the toilet seat with toilet paper, and that correction officer believes that is a waste.[122] The correction officer believes the inmates should instead use the cleaning products to clean the toilet seat prior to use. AIG asked the correction officer where the cleaning products were located and whether the inmates had access to the products. The correction officer said the products are in a locked closet down the hall.[123]

### 6. Mold and Sanitation

During a visit of CCCC, AIG Investigators noticed mold in the shower of one of the male pods. When the investigators inquired about the visible mold around the shower wall with bugs flying around, the correction officer said he was aware of the shower condition. The Warden turned to the CO assigned to the pod and said "Why is the shower not clean?" The CO stated that he was a relief officer who had just arrived in the pod and that it wasn't his area. ████████████████████████████████████████████ ██████████████████████████████████████████████████ This scenario showed a break down in the management process with regards to cleanliness of the jail The CO's are responsible for performing certain tasks, however, their supervisors bear responsibility to ensure the tasks are completed appropriately. In this case, corporals were not insuring the correction officers were managing the daily cleaning, the sergeants were not checking the corporals, and the associate wardens were not checking either. A simple daily walk through of the jail areas by senior staff or their designee would have helped to ensure that necessary maintenance            .

---

[122] Interview with CO1 on October 30, 2018 during U.S. Marshals Facility Review at the Bedford Annex Site
[123] Id.

54

Confidential Draft

was being completed in all parts of the jail. The mold displayed in the shower did not just wipe away while an inmate attempted to clean it.



## J. Discrimination Issues In CCCC

### 1. Reports of Religious Discrimination.

Muslim inmates spoke of challenges they face with performing religious daily prayer practices. One inmate spoke of an experience while trying to pray when a correction officer told him "Fuck your religion. I'm **an** atheist. If you all are going to pray, I'm gonna start locking y'all down."[124] Another inmate described an instance where a different correction officer assaulted an inmate while he was praying.[125]

### 2. Female COs

Female staff members are not allowed to bring their personal feminine hygiene products to their section. [125] According to a senior staff member, a female correction officer was



55

Confidential Draft



### 3. Female Inmates





Confidential Draft

One detainee described an incident she experienced during a "shake down" when staff conduct contraband searches.[137] The inmate stated that the female SRT staff member "molested" her during the process.[138] She explained she was terrified and felt violated through the whole process.[139]

 Furthermore, several inmates claimed that there is inadequate communication with inmates regarding medical issues. For example, one female inmate had given birth to a baby within six weeks of her time in CCCC.[140] She completed an Inmate Request form to be seen by medical for her post-partum six-week exam.[141] No response ever came from her form, however when



Several of the female inmates reported to AIG investigators that staff regularly refer to them as "Bitches" and "Hoes" as well as other derogatory names.[143]





Confidential Draft



### K. Access to the Courts

Inmates have a constitutional right to have access to the courts.[147] This right requires prison authorities to assist in the preparing and filing of meaningful legal papers by providing adequate law libraries or adequate assistance from persons trained in the law. [148] The Federal Performance Based Standards G.2. provides inmates with the right to have access to a law library and legal materials.[149] In 2018, only 17 of the CCCC's average 2300 inmates were on the list for the single Law Library computer.[150]



Less than 1 % of inmates are provided access to the courts via the use of a law library. According to inmates interviewed, the ██████████████████████ ████████████████████████████████ Half of the detainees on the list had Law library privileges that were a result of a Court Order, a Civil case or they were a federal detainee.[151] The law library itself has been replaced with a single computer terminal. When the single computer is out of order for



technical or mechanical reasons, the inmates are effectively denied access. According to inmates, the "Law Library" was unavailable for at least four weeks of 2018 because the computer allegedly needed an update.[152]

## V. Conclusions

County leadership failed to adequately supervise, manage and operate the CCCC. Despite years of overcrowding, the CCCC increased the average daily inmate population while reducing staff. At the same time, CO turnover increased 118% and weekly call-offs averaged approximately 40%. This led to increased double-, triple or even quadruple podding. The County's ability to identify and correct problems was worsened by a culture of contempt towards COs, fear of retaliation by whistleblowers, and a system that fails to address complaints in an effective manner. Oversight was inadequate at nearly every level – from the line managers, to the County, to the State. As set forth in the recommendations above, the County should increase the quantity and quality of staff by, among other things, hiring professional leaders with experience in jail management, filling staff to authorized levels and working to change the culture that has damaged morale, affected call-offs, and discouraged staff from correcting problems within the CCCC. The County should work with the Courts, the State, the Federal Government and independent accrediting entities to reform its system of oversight and accountability.

---

[152] Cite

Exhibits

Exhibit A: Comparison of Ohio State Minimum Standards for Jails and the Federal Performance Based Detention Standards

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| 01(A)(10) | The jail shall develop, implement, maintain, and update as necessary a set of generally applicable inmate rules. The rules shall be accessible to all inmates and shall provide information regarding confinement including sleeping hours, meals, mail, work assignments, telephone access, visitation, correspondence, medical care, hygiene, laundry, recreation, programs, rules of conduct, disciplinary procedures and | Important | Compliant | Not Reviewed | Unsatisfactory | Inmate handbook N/A in Spanish. |

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | grievance procedures. A staff member or translator shall assist the inmate in understanding the inmate rules if there is a literacy or language problem. The jail shall maintain signed acknowledgements from each inmate acknowledging that the rules were received by and/or explained to them. | | | | | |
| +03(A)(3) | A secure booking and release area. | Essential | Compliant | Compliant | Unsatisfactory | Numerous Sally Port doors left opened while transporting inmates. |
| 03(B)(10)(b) | Use of force shall be limited to the amount of force necessary to control a given situation and shall include a continuum of escalating force levels. In no event is | Essential | Compliant | Compliant | Unsatisfactory | SRT members verbally abusing and demonstrating aggressive behavior towards inmates; review of multiple UOF and SRT body-cam video contain aggressive conduct and behavior as well |

| 512011-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | physical force used as punishment. | | | | | as abusive, explicit language used by SRT members direct at inmates. |
| 03(B)(16) | Keys, tools and culinary equipment are inventoried and use is controlled. | Essential | Compliant | Compliant | Unsatisfactory | Facility keys are not controlled, as keys in numerous areas were observed lying about or hanging on unsecured hooks and nails near entryways accessible to anyone. |
| 03(B)(17)(a) | Toxic, corrosive and flammable substances and tools shall be: Stored in a secure area and used by inmates only under direct supervision and used only in accordance with manufacturer's instruction. The substances are only accessible to authorized persons. | Important | Not Reviewed | Compliant | Unsatisfactory | Inappropriate storage use and accountability of flammable, toxic, and caustic materials in accordance with OSHA regulations in the following areas; in the Food Service department, Maintenance department, sanitation chemicals storage area, housing pods and roving barber's carts. Several unlabeled bottles with chemicals inside, were |

62

| §120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | | | | | | found throughout the facility. Also, there is no written documentation of safety training for detainees handling chemicals. |
| 03(B)(5) | The maintenance by staff of a log to record routine information, emergency situations and unusual incidents. | Essential | Compliant | Compliant | Unsatisfactory | Log books do not reflect reason old books were confiscated and replaced. |
| 04(B) | Seating shall be provided in holding areas, holding cells, housing cells, dormitories, dayrooms and eating areas for each inmate. | Important | Compliant | Compliant | Unsatisfactory | Several inmates in one holding cell standing or seating on the floor because there are no benches or other suitable seating for up to eleven inmates per cell who remain in these conditions for approximately 8 to 10 hours. Some inmates |

| 512011-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | | | | | | with no area to place food items other than on the floor. |
| 04(G) | Shower facilities at a minimum of one operable shower for every twelve occupants. Water temperatures shall be controlled thermostatically in a range from one hundred five to one hundred twenty degrees Fahrenheit. | Important | Compliant | Compliant | Unsatisfactory | Two showers located in the male booking area are dirty and unserviceable. |
| 04(H) | One operable wash basin with hot and cold potable water for every twelve occupants. | Important | Compliant | Compliant | Unsatisfactory | Observation revealed toilets/washbasins were unserviceable due to the water being turned off by staff. |

| §12011-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| 04(K) | Unadjudicated juvenile inmates shall be separated by sight and sound from adult inmates. | Essential | Compliant | Compliant | Unsatisfactory | Two juveniles were found to be housed in the adult RHU for rule violations; the juveniles were not separated by sight and sound from adult inmates as required by facility policy. |
| 05(B) | All areas of a full-service jail shall be safe and sanitary, including the food service and laundry areas. Staff and inmates shall have specific housekeeping responsibilities, which shall include, but are not limited to daily cleaning of toilets, urinals, sinks, drinking facilities and showers in areas occupied by inmates and disposal of garbage. | Essential | Compliant | Compliant | Unsatisfactory | Multiple housing pods contained no cleaning chemicals for detainees/inmates to clean their cells. Detainees'/inmates' clothing storage areas are cluttered and unsanitary. In several pods, detainees/inmates are using cardboard boxes as trash receptacles and/or property storage containers. In 10C housing pod showers, there are flying bugs on the ceiling and walls. |

| 51201.1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| 05(C) | Monthly sanitation, vermin and safety inspections of all areas shall be done by a designated trained staff person. | Essential | Compliant | Compliant | Unsatisfactory | Mice/Vermin present in kitchen. |
| 05(K) | Shaving equipment and supplies shall be made available daily. Issuance and retrieval of shaving equipment and supplies shall be documented. | Important | Compliant | Not Reviewed | Unsatisfactory | Detainees/inmates in both the RHU and No Contact Housing are not afforded the opportunity to shave and there is no policy or procedures to document when an inmate is deprived of any authorized item or activity. |
| 05(M) | The jail shall have a written fire safety plan approved by local fire officials, and that is reviewed annually and updated as needed. The plan shall include fire prevention, training and drills, fire response and post-fire documentation and review. A | Essential | Compliant | Compliant | Unsatisfactory | Fire Response/Evacuation plan not approved by an independent outside contractor |

66

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | current copy of the plan shall be maintained at the local fire department. | | | | | |
| 05(O) | Fire drills shall be conducted every three months on each shift. | Essential | Compliant | Compliant | Unsatisfactory | Fire drills are not conducted every three months on each shift as required by the facility's Fire Safety Plan. Drills are not being documented and evaluated. |
| 05(P) | Jail furnishings shall meet fire safety performance standards. | Essential | Compliant | Compliant | Unsatisfactory | No fire rating documentation for detainees' mattresses, shower curtains and trash receptacles in the housing pods to ensure they are fire-resistant, non-toxic, and non-hazardous. |
| 05(Q) | Jail exits shall be clear and evacuation routes shall be posted or clearly marked throughout the jail. | Essential | Compliant | Compliant | Unsatisfactory | Fire evacuation plan diagrams are not posted in ample locations for staff, detainees/inmates, and visitors to find the information they need in the event of an |

68

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | | | | | | emergency. Two exit signs are damaged and unserviceable. |
| 09(A)(1) | Provide written policies and procedures specifically designed for the jail for all aspects of this standard that shall be reviewed on an annual basis. | Essential | Compliant | Compliant | Unsatisfactory | Policies and procedures are not updated and there is no documentation of an annual review. |
| 09(AA) | Inmate death. In all inmate deaths, the health authority determines the appropriateness of clinical care; ascertains whether corrective action in the system's policies, procedures, or practices is warranted; and, identifies trends that require further study. | Important | Compliant | Compliant | Unsatisfactory | Debriefing reports or mortality reviews are not conducted. Required documentation, minutes of debriefing, medical summary, timeline of incarceration, notifications, autopsy reports were not available in the medical department; despite CCCC policy which requires aforementioned |

69

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | | | | | | documentation be maintained in the medical department. Additionally, no information regarding the 6 inmates' death was available or maintained in the Warden's office either. |
| 09(C) | Receiving screen. Health trained personnel, in accordance with protocols established by the health authority, shall perform a written medical, dental and mental health receiving screening on each inmate upon arrival at the jail and prior to being placed in general population. | Essential | Compliant | Compliant | Unsatisfactory | Inmates admitted and held for the City of Cleveland on the 3rd floor, are not afforded the process of screening by medical. |

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| 09(D) | Health appraisal. Within fourteen days, a licensed nurse, physician, physician's assistant, EMT or paramedic shall complete a health appraisal to determine the medical and mental health condition for each inmate in custody. Such appraisal shall at least include the following: | Essential | Compliant | Compliant | Unsatisfactory | Comprehensive medical and mental health appraisals are not conducted within 14 calendar days of detainee's/inmate's arrival. |
| 09(G) | Credentials. All health and mental health care personnel who provide services to inmates are appropriately credentialed according to the licensure, certification, and registration requirements of Ohio. Verification of current credentials | Essential | Compliant | Compliant | Unsatisfactory | No job descriptions for the Pharmacy staff, Physical Therapist or the Mental Health Nurse Practitioner. Files made available for review reveal: 1 medical staff had expired CPR certifications; four have expired licenses; one Licensed Practical Nurse has no license on file; one Medical |

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | is on file at the facility. Health care staff work in accordance with profession-specific job descriptions approved by the health authority. | | | | | Technical Assistant did not have a diploma; two EduCare nurses had partial CPR certifications; and one Licensed Practical Nurse and one Nurse Practitioner have board actions on their verification but no documentation of the disposition. |
| 09(Q) | Pregnant inmates shall receive appropriate and timely pre-natal care, delivery and postpartum care, as determined by the health authority. | Essential | Compliant | Compliant | Unsatisfactory | Two pregnant female inmates were sleeping on the floor. |
| 09(S) | Continuous quality improvement program. The health authority shall develop a continuous quality improvement (CPI) system of monitoring and | Important | Compliant | Not Reviewed | Unsatisfactory | The quality management program or Continuous Quality Improvement (CQI) Program, has not had a meeting in the past year. |

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
|  | reviewing, at least annually |  |  |  |  |  |
| 09(T) | Emergency response plan | Important | Compliant | Not Reviewed | Unsatisfactory | Man-down drills are not conducted annually on each shift. Documentation presented contained only clinical tabletop exercises with no response action or evaluation. |
| 09(V) | Special nutritional and medical diets. Inmate diets are modified when ordered by the appropriate licensed individual to meet specific requirements related to clinical conditions. | Essential | Compliant | Compliant | Unsatisfactory | Food service is not providing medical diets. Diet orders required but not being provided include the type of diet prescribed, duration of the diet and any special instructions. |

| §120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| 10 (E) | The jail shall make provisions for modified diets by physician's order or to accommodate the mandatory dietary requirements of a recognized religion practiced by the inmate. | Essential | Compliant | Compliant | Unsatisfactory | Food service is not providing medical diets. Diet orders required but not being provided include the type of diet prescribed, duration of the diet and any special instructions. No religious diet menu available for those whose dietary requirements cannot be met via the common fare menu. |
| 10(C) | Menu cycles and contents shall be evaluated and approved annually by a licensed nutritionist or registered dietitian or registered dietitian nutritionist. | Essential | Compliant | Compliant | Unsatisfactory | A complete menu analysis of regular and religious diets is not conducted annually or certified to be nutritionally adequate by a registered dietitian. |
| 10(F) | All persons involved in the preparation of food shall receive a pre-assignment medical examination and | Essential | Compliant | Compliant | Unsatisfactory | No procedures or documentation in place indicating detainees receive a pre-assignment medical examination |

73

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | annual re-examinations. | | | | | to work in food service. |
| 10(G)(2) | The food services manager or designee is responsible for a healthy and sanitary kitchen environment and shall immediately address any health or cleanliness issues with kitchen staff or inmate workers. | Essential | Compliant | Compliant | Unsatisfactory | All sheet pans are heavily encrusted with grease deposits and soil accumulation. Equipment and walls throughout the department have accumulated dirt and food debris. |
| 11(A) | Exercise and/or equipment for inmates shall be provided and the jail shall ensure that inmates are offered at least five hours per week. | Important | Not Reviewed | Compliant | Unsatisfactory | Leisure activities and outside physical activity programs are not consistently provided as stated in the CCCC's policy due primarily to the implementation of the previously described "Red Zone" system. |
| 11(E) | Inmates shall be permitted to practice a recognized religion subject to limitations | Important | Not Reviewed | Compliant | Unsatisfactory | Facility does not have an Imam for Muslim detainees/inmates. |

| §1201:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | necessary to maintain security and order. | | | | | |
| 12(F) | Pre-disciplinary hearing requirements shall include, at minimum a written incident report, an inmate's opportunity to waive in writing the disciplinary hearing, an investigation that commences within twenty-four hours of the incident to determine whether sufficient evidence exists to support the charge, and written notification to the inmate of the nature and date of the violation within twenty-four hours of the alleged violation(s) or discovery of the alleged violation(s). | Important | Not Reviewed | Compliant | Unsatisfactory | The Warden, upon review of the disciplinary packet, imposes up to 30 days in disciplinary isolation without a disciplinary hearing; violating detainees/inmates 5th and 14th Amendment Rights under the United States Constitution as they relate to Due-Process. |

76

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| 12(H) | Disciplinary hearing requirements shall include an impartial hearing officer appointed by the jail administrator or designee, the inmate's opportunity to be heard, present evidence and question witnesses subject to limitations imposed by the hearing officer, the hearing officer shall state the reasons for any limitations in writing, a written statement by the hearing officer of the facts relied upon and reasons for the imposition of any penalties shall be provided to the inmate and a copy placed in the inmate's file, and selection by the jail administrator or | Important | Not Reviewed | Compliant | Unsatisfactory | |

77

| 5120:1-8- | State   Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018   FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | designee of a staff person to assist an inmate when the inmate is unable to effectively communicate. | | | | | |
| 15(A) | Each jail shall have written policies and procedures that govern the administrative segregation of inmates from the general population. | Important | Compliant | Not Reviewed | Unsatisfactory | No updated policy/procedure to reflect US Dept. of Justice restrictive housing reqs. No procedure for operating/managing the RHUs. |
| 15(F) | Inmates in administrative segregation shall receive all privileges and rights unless the inmate poses a threat to the security of the jail or the | Important | Compliant | Not Reviewed | Unsatisfactory | Inmates are not provided with cleaning solution or equipment to clean their cells the same as inmates in general population. |

| 5120:1-8- | State Minimum Standard | Standard Type | 2016 State Inspection | 2017 State Inspection | 2018 USMS Report | 2018 FPBDS Review Findings |
|---|---|---|---|---|---|---|
| | health and welfare of him/herself or others. Any suspension or modification of privileges and/or rights shall be documented. | | | | | |
| 16(A) | Inmate rules shall include a grievance procedure that is available to inmates and includes at least one level of appeal. | Important | Compliant | Not Reviewed | Unsatisfactory | Facility policy addressing the grievance process totally contradicts information provided in the detainee/inmate handbook. Detainees/inmates are not allowed to retain a copy of the form. They must submit both copies to ensure a response is received. |

78

Exhibit B: U.S. Marshal Service Facility Review for Cuyahoga County
Correctional Facility October 30-November 1, 2018

Exhibit C: Minimum Standards for Jails



**CUYAHOGA COUNTY
AGENCY OF INSPECTOR GENERAL**

## CONFIDENTIAL LAW ENFORCEMENT REFERRAL MEMORANDUM

TO:      Matthew Meyer, Special Assistant Attorney General
             Ohio Attorney General's Office
             615 West Superior, 11th Floor
             Cleveland, OH 44113

FROM:   Mark Griffin, Inspector General
             Cuyahoga County Agency of Inspector General
             2079 East Ninth Street, 6th Floor Suite 201
             Cleveland OH 44115

DATE:   April 25, 2019

RE:      Information Relevant to Ongoing Criminal Investigations

---

## PURPOSE

Pursuant to Section §§ 204.01(B)(3)(d) and 407.01 of the Cuyahoga County ("County") Code if an investigation reveals reasonable grounds to believe a violation of any state, federal, or local law, rule, regulation, or policy has taken place, the Agency of Inspector General ("AIG") shall notify and refer the matter to the appropriate civil, criminal, or administrative agencies in charge with enforcement of said violation. This memorandum and material is intended to fulfill this obligation.

## INFORMATION

This memorandum is accompanied by a portable storage device and other documents that may be relevant to ongoing criminal investigation(s) being conducted by the Ohio Attorney General's Office.

**EXHIBIT
3**